## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LIBERTY PROPERTY LIMITED PARTNERSHIP,

                 Plaintiff,

       v.

STRUCTURE TONE, LLC,

                 Defendant.

:
:  CIVIL ACTION NO. _____
:
:
:
:
:
:
:
:
:
:

## <u>COMPLAINT – CIVIL ACTION</u>

As and for its complaint against Structure Tone, LLC, Plaintiff Liberty Property Limited Partnership, by and through its undersigned counsel, hereby alleges as follows:

### Parties

1.     Plaintiff Liberty Property Limited Partnership ("Liberty") is a Pennsylvania limited partnership with its principal place of business in Wayne, Pennsylvania.

2.     Upon information and belief, Defendant Structure Tone, LLC ("STO") is incorporated under the laws of the state of New York, with its principal office located in New York. STO is in the business of construction management and general contracting. Upon information and belief, STO is the parent corporation of LF Driscoll Company, LLC ("Driscoll").

### Jurisdiction and Venue

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

4.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c), because the defendant resides in this District and because a substantial part of the events or omissions giving

1

rise to the plaintiff's claims occurred in this District.

## FACTUAL BACKGROUND

### A.  The Construction Agreement and the Required Insurance Policy

5.      In or about 2014, Liberty was hired as developer for the development of the Comcast Technology Center, a sixty-story trophy-class office tower and five-star luxury Four Seasons hotel (the "Project").

6.      On June 30, 2014, Liberty and Driscoll executed a modified AIA A111 Base Building/Hotel Construction Agreement for the Project (the "Agreement"), whereby Driscoll was hired as the construction manager for the project.  A copy of the Agreement, without exhibits, is attached hereto as Exhibit 1.

7.      Section 10.9 of the Agreement includes a requirement that Driscoll procure a CapAssure Policy complying with the terms and conditions of the "Comcast Project Specific Insurance Manual dated May 2, 2014" attached as Exhibit J to the Agreement.  The CapAssure Manual (Exhibit J) is attached hereto as Exhibit 2.

8.      The Manual included a Specimen of the Policy.

9.      The Cap Assure Policy is a form of policy issued by XL Insurance Company, that, inter alia, provides coverage to owners/developer, such as Liberty, from the risk of default by builders, such as Driscoll.

10.      Exhibit J to the Agreement was prepared for Driscoll by Willis of Texas ("Willis") as producer/broker.  It provided for a $35,000,000 per project limit, $50,000,000 policy aggregate, and included a detailed Specimen Policy (the "Specimen Policy") issued by Indian Harbor Insurance Company ("Indian Harbor"), which is a division of XL Specialty Insurance Company ("XL").

11.     The Specimen Policy includes Endorsement Form KAX 401 0412, the "For Cause Endorsement."

12.     The "For Cause Endorsement" was intended to provide coverage to Liberty, as Loss Payee, in the event of the default and termination of Driscoll arising out of Driscoll's material breach of the Agreement.

13.     Section 1.3 of the Agreement provided that the Agreement could not be modified other than by a writing signed by both parties to the Agreement.

**B.  The Actual Policy as Issued, and Driscoll's Material Breach of the Agreement**

14.     On or about February 1, 2018, Driscoll provided to Liberty, for the first time, a copy of CapAssure Policy # CCR7420 (the "Policy") that had been issued to Driscoll and produced by Willis for Indian Harbor.  This was the first time that Liberty had ever received a copy of the Policy.  A copy of the Policy, as issued, is attached hereto as Exhibit 3.

15.     The Policy as issued differs from the Specimen Policy in several material respects, including the fact that it does not contain the "For Cause Endorsement," modifying the Part A (Contractor Default) coverage that was included in the Specimen Policy.

16.     Absent the For Cause Endorsement, the Part A coverage in the Policy is limited to losses resulting from Driscoll's default and termination arising out of Driscoll's insolvency.  Unlike the terms of the Specimen Policy, the Policy as issued does not contain the For Cause Endorsement, and thus, on its face, does not include coverage for losses resulting from Driscoll's material breach of the Agreement.

17.     In addition, the Policy as issued contains policy limits that differ from the policy limits in the Specimen Policy, insofar as the Policy's limits are staggered by time period, and at no single time satisfy the contractually-mandated $35,000,000 project limit.

18.     Driscoll's failure to obtain coverage in the form of the Specimen Policy, including the For Cause Endorsement, constitutes a material breach of the Agreement.

## C.   STO's Intentional Interference with the Contractual Relationship Between Liberty and Driscoll

19.     Upon receipt of the Policy as issued, Liberty conducted an investigation to determine why the Policy as issued does not contain the For Cause Endorsement, as required by the Agreement.

20.     Liberty's investigation revealed that STO, a corporate affiliate of Driscoll, had intentionally interfered with the contractual relationship between Liberty and Driscoll, and had caused Driscoll to materially breach the Agreement by failing to obtain coverage in the form of the Specimen Policy, including but not limited to the For Cause Endorsement.

21.     Documents reviewed by Liberty demonstrate that William Noonan ("Noonan"), who, upon information and belief, at the time was STO's Vice President of Risk Management, was the driving force in the negotiation and procurement of the Policy, and in causing Driscoll to materially breach the Agreement by failing to obtain coverage in the form of the Specimen Policy, including, but not limited to, the For Cause Endorsement.

22.     By way of example only:

a.     Willis prepared a "L.F. Driscoll Company, LLC Comcast Project Specific Default Insurance Proposal" (the "Proposal"), dated April 13, 2014 and updated June 16, 2014. The Proposal reflects that it was presented to "Bill Noonan." Page 1 of the Proposal refers to an April 23, 2014 telephone conference between, among others, Noonan and Luke Nolan of Willis. A notation on the same page dated June 16, 2014 states: "We will request coverage effective June 1, 2014 per Bill Noonan. They wish to bind ConstructAssure and CapAssure for the Project Specific Placement on Comcast." Page 5 of the Proposal refers to

4

a February 12, 2014 call with "Bill" in which Noonan requested clarification and/or responses regarding various items. The Proposal makes clear that "For Cause" default coverage was part of the request and the proposal.

      b.     Willis issued a policy binder dated June 30, 2014 (the "June Binder") that included For Cause coverage. The June Binder had an expiration of July 15, 2014, and a policy does not appear to have been issued at that time. The June Binder included Contractor Default Insurance that included a For Cause endorsement, had a $35 million limit, and quoted a premium of $991,666.

      c.     On or about July 9, 2014, Bonnie Milavec of Liberty sent an email to Noonan posing a number of specific questions about the June Binder, including questions seeking clarification about the operation of the For Cause endorsement.

      d.     Noonan responded the following day, without suggesting in any way that the For Cause Endorsement would be excluded from the Policy.

      e.     On or about August 27, 2014, Noonan directed Willis/XL to price "full limits of $35M for a duration of 40 months." The next day, Martha Gaines of XL sent Noonan a premium quote for the requested coverage with a premium of over $1.1 million. However, this option required *Structure Tone* – not Driscoll – to provide security/guaranty in the amount of $31.5 million (90% of project limit) for the full 40 month term.

      f.     Upon information and belief, Noonan and Structure Tone were unwilling to tie up that much cash for 40 months, as required by XL in order for Driscoll to carry out its contractual obligation to provide the Policy in accordance with the Specimen Policy. Therefore, seeking to find an option that was less costly *for Structure Tone,* just four minutes later, Noonan responded to XL by requesting lower staggered limits of $15 million

(12 months)/$25 million (24 months)/$15 million (final 4 months).  Willis/XL responded that the premium for that program would be only $700,000.

     g.     At no time did Liberty request lower limits than the $35 million, or a lower premium.

     h.     On or about September 8, 2014, Noonan instructed Michael Delaney of Driscoll to tell Liberty that XL offered $35 million, but that STO pushed back and got XL to offer the staggered limits.

     i.     On September 10, 2014, Delaney wrote to Noonan:  "Chris blessed 15/25/15.  Need something to forward onto Bonnie with some detail."   Upon information and belief, the "Bonnie" referred to is Bonnie Milavec, an attorney in Liberty Property Trust's legal department who was coordinating the insurance matters, including CapAssure, for the Project.

     j.     Delaney's statement was not true.   Warth did not "bless" or agree with Delany on any form of staggered limits, because Warth was aware that he had no authority to modify the Agreement in any way, including by agreeing to any modifications in the CapAssure Policy.

     k.     Neither Driscoll nor Structure Tone ever presented Bonnie Milavec with further information about staggered limits.

     l.     In October 2014, Noonan started to press Willis to sign deductible agreements and move ahead with the policy.  XL asked "which option" STO wanted to bind.  By email dated October 2, 2014, Noonan responded by reaffirming its prior direction to go with 15/25/15 million in coverage (12 months/24 months/4 months), and directing Willis to proceed with binding the coverage.

m.    Upon information and belief, Noonan was aware at this time that staggered option that he was directing Willis to bind did not contain the For Cause Endorsement.

n.    At no time had Liberty agreed to modify Driscoll's contractual obligation to provide the CapAssure Policy described in Exhibit "J" including $35 million in coverage and a For Cause Endorsement.

o.    Email correspondence dated July 16, 2015 between Luke Nolan and Debbie English of Willis discussed changes to the June 27, 2014 "Request to Bind Coverage," with typed notations on it indicated "Items Revised After Coverage Was Bound Per Bill Noonan."

23.    The foregoing documents and correspondence make clear that Noonan and STO were the driving force behind the negotiation and procurement of the Policy, and that the revisions to reduce coverage were intended to benefit STO, rather than Driscoll.

24.    As detailed above, the For Cause Endorsement, as contained in the Specimen Policy in the Agreement, was not included in the Policy as issued.

25.    In summary, the documents described above demonstrate that (a) Willis/XL initially prepared a binder for Contractor Default Insurance that included a For Cause endorsement; (b) Bill Noonan of STO was the driving force behind the negotiation of and procurement of the Policy; (c) when Noonan asked Willis/XL to price "full limits of $35M for a duration of 40 months," XL priced that option with a requirement that STO provide security/guaranty in the amount of $31.5 million (90% of project limit) for the entire planned 40 month duration of the Project; (d) Noonan immediately responded by requesting lower staggered limits of 15 million (12 months)/25 mil (24 months)/15m (final 4 months) because it would reduce or eliminate the amount of security that Structure Tone would need to provide; and (e) the Policy ultimately procured by STO from

7

XL/Willis did not contain the For Cause Endorsement.

26.     Moreover, no later than October 2, 2014, STO had already directed Willis to bind a CapAssure Policy without the For Cause Endorsement and with lower coverage limits than required by the Agreement.

27.     Yet, on October 7, 2014, Bill Noonan of STO sent an email to Liberty's insurance adviser, AON, intending that it be shared with Liberty, including responses from Willis that represented that the For Cause Endorsement would be part of the Policy.   The email exchange not only makes clear that Liberty expected the For Cause Endorsement to be part of the policy, but contains representations by Willis and STO that the For Cause Endorsement would in fact be included in the Policy.

28.     STO's representation to AON and Liberty that the Policy included the For Cause Endorsement was knowingly and materially false, and STO intended this false representation to induce Liberty not to further inquire about the terms of the Policy as issued. STO knew that if Liberty was aware that the Policy was being issued without the For Cause Endorsement, Liberty would have objected, and STO would have been forced to provide collateral in the amount of 90% of the total amount of For Cause coverage.

29.     Upon information and belief, STO directed XL/Willis to issue the Policy without the For Cause Endorsement, in order to reduce or eliminate the amount and duration of Structure Tone's collateral obligations.

30.     Moreover, STO/Driscoll never informed Liberty that the For Cause endorsement had been removed, and did not provide Liberty with a copy of the Policy as issued until on or about February 1, 2018.

31.     On or about February 28, 2018, Liberty asked Driscoll to explain why the Policy as

issued did not conform to the requirements set forth in the Agreement.

32.     Six weeks later, after multiple requests from Liberty, Driscoll purported to respond to Liberty.  However, Driscoll's purported response did not evidence any agreement by Liberty to relieve Driscoll of its contractual obligations under the Agreement.

33.     Liberty has never agreed to modify the requirements of Section 10.9 of the Agreement.

34.     On information and belief, when XL priced coverage with the For Cause Endorsement which would have required STO to provide a $31.5 million security/guaranty, STO (without Liberty's knowledge or consent) directed XL to prepare a policy that did not include the For Cause Endorsement in order to reduce or eliminate the collateral obligation being imposed on STO itself, irrespective of Driscoll's contractual obligation to provide coverage identical to the Specimen Policy.

35.     On information and belief, STO caused the For Cause Endorsement to be removed so that STO would not have to incur the costs and exposure of providing security/guaranty in the amount of $31.5 million (90% of project limit) for 40 months, as XL had proposed on August 28, 2014.

36.     On information and belief, STO did so strictly to protect its own corporate assets, and not to protect the assets of its affiliate, Driscoll.

37.     STO's intentional interference in the contractual relationship between Liberty and Driscoll caused Driscoll to materially breach the Agreement by failing to obtain coverage in the form of the Specimen Policy, including but not limited to the For Cause Endorsement.

38.     STO had no valid privilege or justification for its intentional interference in the contractual relationship between Liberty and Driscoll.

39.    STO's conduct was willful, wanton, malicious, and/or reckless.

40.    Liberty has suffered and continues to suffer legal damage as a result of STO's intentional interference in the contractual relationship between Liberty and Driscoll, in that Driscoll materially breached the Agreement by failing to obtain coverage in the form of the Specimen Policy, including but not limited to the For Cause Endorsement.  STO's conduct harmed important contractual rights that Liberty bargained for and that were integral parts of the Agreement.

### D.  Liberty Is Forced to Pay in Excess of the Guaranteed Maximum Price

41.    Liberty's total payments (including unreleased retainage) for the Base Project reached the Guaranteed Maximum Price ("GMP") in or around November 2018.   Despite its contractual obligation to bear all construction costs in excess of the GMP, Driscoll flatly refused to do so; rather, Driscoll threatened that if Liberty did not pay Driscoll's subcontractors, construction would stop entirely.

42.    Driscoll's intransigence  presented a Hobson's Choice to Liberty:  either refuse to pay the subcontractors and see construction stop, which would put Liberty in breach of its obligations to the Owners under the Development Agreement, or come out of pocket beyond its budgeted costs for the Project, in order to keep the Project moving and avoid breaching the Development Agreement.  Liberty had no realistic choice but to continue paying the subcontractors in order to complete the Project, subject to a reservation of its rights to recover the excess funds from Driscoll.   Although Liberty considered replacing Driscoll as the Construction Manager, it determined that the resulting delay in construction and extra costs – and Liberty's financial exposrue arising out of breaching its obligations to the Owners – would be greater than the delay and cost of keeping Driscoll in place.

43.    Liberty's options would not have been so limited, however, if it had received the

benefit of what it bargained for in the Agreement:  a $35 million CapAssure Policy with a For Cause Endorsement protecting itself against Driscoll's material default.   Had that policy been in place, Liberty would have been able to terminate Driscoll for breaching the Agreement, and thereafter claim against the Cap Assure Policy for up to $35 million in costs in excess of the GMP needed to finish the Project.

44.     Moreover, it is likely that if the proper coverage had been in place, Driscoll (and Structure Tone) would have been deterred from the course of action that they took, i.e., refusing to pay the for any costs of construction above the GMP.  Given that Structure Tone's collateral would have been at risk if the Cap Assure carrier paid Liberty under the Policy, Driscoll and Structure Tone would have been highly motivated to reduce the overall costs of construction by remaining involved, rather than expose themselves to the additional costs and delay that would inevitably result from Liberty bringing on a replacement construction manager.

45.     Accordingly, had the proper coverage been in place, it is likely that Liberty would have avoided the additional costs and expenses that it incurred as a result of Driscoll's default, including, but not limited to, the $53,050,112 in construction costs that Liberty paid in excess of the GMP.

46.     Absent the proper coverage, however, Liberty had no rational choice other than to keep paying the subcontractors in excess of the GMP and to incur all of the additional costs that it incurred as a result of Driscoll's default.

## COUNT ONE
## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

47.     Paragraphs 1 through 46 above are incorporated herein by reference.

48.     The Agreement was the written manifestation of an existing contractual and economic relationship between Liberty and Driscoll.

11

49.     STO took purposeful action, specifically intended to harm the contractual and economic relationship between Liberty and Driscoll.

50.     STO had no valid privilege or justification for such actions.

51.     Liberty has suffered and continues to suffer legal damage in an amount in excess of $53 million as a result of STO's wrongful conduct.

52.     STO's conduct was willful, wanton, malicious, and/or reckless, thus warranting the imposition of punitive damages.

WHEREFORE, Plaintiff Liberty Property Limited Partnership asks that a judgment be entered in its favor and against defendant Structure Tone, LLC, in an amount not less than $53,050,112, plus punitive damages, interest, costs, and such other relief as the Court deems just.


## COUNT TWO
## FRAUD

53.     Paragraphs 1 through 52 above are incorporated herein by reference.

54.     STO's representations to AON and Liberty concerning the For Cause Endorsement were materially false.

55.     STO intended that Liberty rely upon its false statements.

56.     Liberty reasonably relied upon STO's false statements to refrain from further inquiry into whether terms and conditions of the Policy as procured by STO and Willis on behalf of Driscoll complied with the requirements of the Agreement.

57.     Liberty has suffered injury and damage as a result of its reliance on STO's materially false statements.

58.     Liberty has suffered and continues to suffer legal damage in an amount in excess of $53 million as a result of STO's wrongful conduct.

12

59.     STO's conduct was willful, wanton, malicious, and/or reckless, thus warranting the imposition of punitive damages.

WHEREFORE, Plaintiff Liberty Property Limited Partnership asks that a judgment be entered in its favor and against defendant Structure Tone, LLC, in an amount not less than $53,050,112, plus punitive damages, interest, costs, and such other relief as the Court deems just.

Dated:  February 4, 2020

CHARLSON BRABER MCCABE & DENMARK

Noah H. Charlson, Esquire (ID No. 89210)
Judy Moon, Esquire (No. 318858)
8 Penn Center
1628 JFK Boulevard, Suite 1803
Philadelphia, PA  19103
215-447-7400
Email:  noah@charlsonlaw.com

Attorneys for Plaintiff,
Liberty Property Limited Partnership

Of Counsel:

Christopher Thatch, Esquire
Kevin O'Brien, Esquire
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001-2113

# EXHIBIT 1

# Standard Form of Agreement Between Developer and Contractor where the basis of payment is the Cost of the Work Plus a Fee with a Guaranteed Maximum Price

## (AIA Document A111 – 1987 Ed. - AS REVISED BY DEVELOPER AND CONTRACTOR)

**AGREEMENT**
made as of the 30th day of June in the year 2014

| | |
|---|---|
| **BETWEEN** the Developer:<br>*(Name and address)* | Liberty Property Limited Partnership<br>Eight Penn Center<br>1628 John F. Kennedy Boulevard<br>Suite 1100<br>Philadelphia, PA 19103 |
| and the Contractor:<br>*(Name and address)* | L. F. Driscoll Company, LLC<br>9 Presidential Boulevard<br>Bala Cynwyd, PA 19004 |
| The Project is:<br>*(Name and address)* | **Comcast Innovation and Technology Center – Base Building Core & Shell and Hotel Construction:** The construction of a trophy-class mixed-use skyscraper consisting of an approximately 59-story vertically integrated office and hotel building containing: approximately 1,284,000 rentable square feet of office space; a 265,000 square foot, 222-room, 5-star luxury hotel with spa, restaurant(s), banquet and meeting space; approximately 3000 square feet of retail space; indoor and outdoor public space with an area of approximately 20,000 square feet at various levels of the building; an underground pedestrian concourse connecting from the east curb-line of the Land to the existing Comcast Center concourse; and an underground parking area with approximately 70 accessory parking spaces. |
| the Architect is:<br>*(Name and address)* | Kendall/Heaton Associates, Inc.<br>3050 Post Oak Boulevard, Suite 1000<br>Houston, TX 77056 |

The Developer and Contractor agree as set forth below.

## ARTICLE 1
## THE CONTRACT DOCUMENTS

**1.1**    The Contract Documents in descending order of precedence consist of:

**1.1.1**    written Modifications to this Agreement (as defined in Paragraph 1.1.1 of the General Conditions) that expressly modify **Exhibit "D-2"**;

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**1.1.2**   <u>Exhibit "D-2"</u> which clarifies the scope and extent of the Contractors obligations under the Contract, the Development Agreement, and the Work Letter, and which take precedence over general provisions of the Agreement, the Conditions of the Contract, the Development Agreement and the Work Letter);

**1.1.3**   written Modifications to Article 14 of the Agreement;

**1.1.4**   Article 14 of the Agreement;

**1.1.5**   written Modifications to this Agreement (other than those described in Paragraph 1.1.1 and 1.1.3 above) and the Exhibits attached to this Agreement; and

**1.1.6**   this Agreement and the Exhibits attached to this Agreement;

**1.1.7**   the Conditions of the Contract (General, Supplementary and other Conditions);

**1.1.8**   the Plans, Drawings and Other Documents listed in <u>Exhibit "D-1"</u> (including without limitation Design Development Progress Set No. 4 dated May 15, 2014 and the other listed documents and drawings) attached hereto, including but not limited to any addenda thereto that are listed in <u>Exhibit "D-1"</u>;

**1.1.9**   the other documents listed in the Exhibits, and any other documents listed and described as such in this Agreement;

all of which form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein.

**1.2**   The Contract represents the entire and integrated agreement between the parties hereto and supersedes all prior negotiations, representations or agreements, either written or oral, including without limitation, the Letter Agreement and Notice to Proceed with the Initial Work executed by the parties as of June 11, 2014 (the "Letter Agreement"). The parties acknowledge and agree that all work and services performed by the Contractor pursuant to the Letter Agreement are deemed to have been provided pursuant to the terms and conditions of this Contract, and that all amounts paid or payable by the Developer pursuant to the Letter Agreement are deemed to have been paid or to be payable pursuant to the terms and conditions of this Contract.

**1.3**   The Contract cannot be amended or otherwise modified, except by a writing signed by both parties. An enumeration of the Contract Documents, other than Modifications, appears in Article 16.

**1.4**   If anything in the other Contract Documents is inconsistent with this Agreement, the order of precedence of the Contract Documents listed above shall govern. Capitalized terms that are not defined in this Agreement have the meanings given to them in the General Conditions.

**1.5**   In the event of conflict or variance between two or more requirements in any of the Contract Documents of equivalent precedence, the requirement that is more stringent upon the Contractor and more beneficial to the Developer shall govern in all instances; provided, however, that the Scope of Work Narrative attached as <u>Exhibit "D-2"</u> takes precedence over any other provision of the Contract Documents other than written Modifications of this Agreement that expressly modify <u>Exhibit "D-2."</u>

## ARTICLE 2

## THE WORK OF THIS CONTRACT

**2.1**   The Contractor shall execute the entire Work described in the Contract Documents, except as specifically indicated in the Contract Documents to be the responsibility of others.

**2.2**   The parties acknowledge and agree that they have entered into a separate agreement, dated even herewith, for the Public Areas Work (the "Public Areas Contract") and that they intend to enter into a separate TI Contract for the TI Work as more fully set forth in Paragraph 4.9.1 hereof. This Agreement, the Public Areas Contract, and the TI Contract and any other contract between the parties relating to the Related Projects, when executed, are collectively referred to as the "Construction Agreements."

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**2.2.1** <u>**Cross-Default:**</u> Default by Contractor or Developer under any one Construction Agreement related to the Project shall constitute a default under all other construction agreements for the Project.

## ARTICLE 3: RELATIONSHIP OF THE PARTIES

**3.1** The Contractor accepts the relationship of trust and confidence established by this Agreement and covenants with the Developer to cooperate with the Architect and utilize the Contractor's skill and judgment in furthering the interests of the Developer; to furnish efficient business administration and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with the Developer's interests. The Developer agrees to furnish, in a timely manner, information required by the Contract Documents to be given to the Contractor and to make payments to the Contractor in accordance with requirements of the Contract Documents.

## ARTICLE 4A: DATE OF COMMENCEMENT, MILESTONE DATES AND COMPLETION

**4.1** The parties acknowledge that the Work commenced pursuant to the Letter Agreement on or about June 20, 2014.

**4.2.1** The entire Work of the Contractor as described in the Contract Documents, including without limitation the preconstruction services for, and construction of, the high-rise 59-story Class A office building including a 222-room full service luxury hotel, underground parking for 70 vehicles and all other work required by the Contract Documents, is sometimes hereinafter referred to as the "Work" or the "Project". Other work related to the Project, including (i) the tenant improvements for the office tower portion of the Project (the "TI Work"), (ii) the installation of the hotel furniture, fixtures and equipment and operating supplies and equipment (the "Hotel FF&E and OS&E Work"), (iii) the installation of office furniture, fixtures and equipment (FF&E), technology, audiovisual and security systems (the "Post-TI Work") and (iv) the development of the retail space and related facilities and stipulated project elements financed through public funding including without limitation, the streetscape surrounding the project, Winter Garden, Concourse and pedestrian tunnel under 18th Street connecting to the existing Comcast Center Concourse, (the "Public Areas Work"), are governed by separate agreements between Developer and Contractor, between Developer and Four Seasons Hotels and Resorts, and between Comcast Corporation and its contractors, as applicable, and are not included within the Work of the Project. (The TI Work, the Hotel FF&E/OS&E Work, the Post-TI Work and the Public Areas Work are collectively referred to herein as the "Related Projects"). Notwithstanding the foregoing, the Contractor will be required to coordinate the Work of the Project with the Related Projects, including providing access through the Project for installation of the Related Projects.

**4.2.2** The Contractor shall achieve Substantial Completion of the entire Work under this Agreement not later than the Outside Delivery Dates and the Hotel LD Date (each, a "Milestone Date") set forth in <u>**Exhibit "E-1"**</u> attached hereto, subject to adjustments of this Contract Time as provided in the Contract Documents.

**4.2.3** The dates set forth in <u>**Exhibit "E-1"**</u> attached hereto are required completion Milestone Dates that are critical to the Project, and time is of the essence as to each of these Milestone Dates. The current schedules for the construction of the Work, (as it may be modified in accordance with the Contract Documents, the "Construction Schedule") are attached hereto as <u>**Exhibit "B-1," "B-2," and "B-3"**</u>. The General Conditions of the Contract govern updates and modifications to the Construction Schedule.

## ARTICLE 4B
## DEVELOPMENT AGREEMENT and WORK LETTER

**4.3.1** Contractor acknowledges that the Fee Owners of the Project are Liberty Property 18th & Arch, LP ("Office Owner") and Liberty Property 18th & Arch Hotel, LLC ("Hotel Owner") (Office Owner and Hotel Owner are collectively referred to herein as "Fee Owners") and that Developer has entered into a Development Agreement dated June 30, 2014 with the Fee Owners (the "<u>Development Agreement</u>"), pursuant to which Developer will develop the Project on Fee Owners' behalf. A copy of the Development Agreement is attached hereto as <u>**Exhibit "N"**</u>.

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**4.3.2**    Contractor acknowledges and agrees that the Development Agreement contains provisions that affect the design and construction of the Project, and that it further incorporates a Work Letter that imposes certain obligations upon Developer relating to the design and construction of the Project. A copy of the Work Letter is attached here as a part of **Exhibit "N"**.

**4.3.3**    Contractor agrees that, to the extent the Development Agreement or the Work Letter affect the construction of the Work of the Project, Contractor will comply with the terms and conditions of the Development Agreement and the Work Letter incorporated therein.

**4.3.4**    Contractor agrees that it shall perform the obligations required of General Contractor under the Development Agreement and the Landlord's Contractor under the Work Letter so as to satisfy those obligations of the Developer to Fee Owners in the Development Agreement and the obligations of the Landlord to the Tenant under the Work Letter. Contractor further agrees that (i) it is obligated to Developer in the same manner, and under the same terms and conditions, as Developer is obligated to Fee Owners under the Development Agreement and (ii) it is obligated to Developer (Landlord in the Work Letter) in the same manner, and under the same terms and conditions, as Landlord is obligated to Tenant under the Work Letter as those obligations affect construction of the Project, subject to the **Exhibit "D-2"**, Scope of Work Narrative.

**4.3.5**    Contractor acknowledges that the Development Agreement and the Work Letter are highly confidential documents. Contractor agrees that it shall maintain the confidentiality of the Development Agreement and the Work Letter, except as provided herein. Contractor agrees that it shall only use the information in the Development Agreement or the Work Letter for the purpose of performing its services on this Project, and not for any other purpose. Contractor shall be permitted to disclose information in the Development Agreement and the Work Letter to its employees and Subcontractors, provided that (1) such employees execute a confidentiality agreement prior to receipt of such information; and (2) that all Subcontracts include a confidentiality provision; both; the confidentiality agreement and subcontract confidentiality provision in form and substance mutually satisfactory to Contractor and Developer.

## ARTICLE 4C: DELAYS, EXTENSIONS AND LIABILITY FOR DELAYS

**4.4**    If Contractor is delayed at any time in the progress of the Work by a Permitted Delay (hereinafter defined), then, subject to the requirements of Paragraph 4.3 of the General Conditions, the Milestone Dates shall be extended by Change Order for a period of time equal to the period of such delay; provided, that such extensions shall be net of delays caused solely by the Contractor, any Subcontractor or Sub-subcontractor, any supplier of any tier, any of their respective employees or agents, or anyone else for whom any of them may be responsible (each, a "Responsible Party").

**4.4.1**    The term "Permitted Delay" means a delay in the Work caused by the Developer, the Fee Owners, the Architect, any Tenant, including but not limited to Comcast, or by a separate contractor employed by Developer, the Fee Owners, or any Tenant on this Project or one of the Related Projects, or by Force Majeure as defined in Subparagraph 4.4.2 below; provided, that the Contractor could not reasonably have avoided such delay through the exercise of due diligence and has used all reasonable means to minimize the consequences thereof, and further provided that the Contractor demonstrates that the delay directly affects an item shown as a "critical activity" of the then-current Construction Schedule (i.e., it is a delay to the critical path of a Milestone Date). It is understood that "float" (i.e., the total period of time an activity can be delayed without having an adverse impact on the time it will take the Contractor to achieve a Milestone Date) in the Construction Schedule is not for the exclusive use or benefit of either party, but is a jointly owned expiring Project resource, available to both parties, acting in good faith, as needed. In lieu of a time extension provided for in this Paragraph 4.4, the Developer may elect to require the Contractor to accelerate the Work pursuant to Paragraph 4.7 hereof. Notwithstanding anything to the contrary contained in the Contract Documents, no remedy or cost shall be available to the Contractor for any delay, including but not limited to claims for disruption, obstruction or lost productivity, other than as is expressly permitted by this Paragraph 4.4; Paragraph 4.6; or Paragraph 4.7 hereof.

**4.4.2**    The term "Force Majeure Delay" shall mean any actual delay due to Force Majeure, and any delay or default by the party to this Agreement which is not alleging the Force Majeure Delay in performing any of its obligations under this Agreement due to Force Majeure. "**Force Majeure**" means: acts of God; strikes, lockouts or other labor or industrial disturbances or disputes (whether lawful or not) to the extent not caused by Contractor or its subcontractors; action or inaction by a governmental authority to the extent not caused by Contractor or its subcontractors; war, civil disturbance, acts of terrorism or civil riots; floods; embargo; natural disasters; fire; inability to secure customary supplies, materials or labor through ordinary sources, without reasonably-available and commercially acceptable substitute; orders of any court or public authority having jurisdiction, to the extent not caused by Contractor; adverse weather conditions (including high wind) which cause, in the aggregate, more than fifty (50) days of delay; unavoidable

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

1800 Arch Street – A111 – Driscoll Base Building FINAL – 6.26.14

Electronic Format A111 - 1987
AIA Licensed - Page #4

casualties, and; any other causes not reasonably within the control of Contractor and which by the exercise of due diligence Contractor could not have, wholly or in part, prevented or overcome.  Any prevention, delay or stoppage due to Force Majeure shall excuse the performance of Contractor for a period of time equal to the Force Majeure Delay.  Contractor shall notify Developer with reasonable promptness and shall make reasonable efforts to mitigate the delay so caused.

**4.5**     Contractor will not be entitled to a time extensions, nor will delay or acceleration costs incurred by the Contractor be allowable as increases to the Guaranteed Maximum Price, to the extent such delays were caused by a Responsible Party, whether on this Project or on one of the Related Projects.  To the extent that any period of Permitted Delay is concurrent with a delay caused by a Responsible Party (hereafter "Concurrent Delay"), the Milestone Dates shall be extended by Change Order for the period of Concurrent Delay, but Contractor shall not be entitled to an increase in the Guaranteed Maximum Price as a result of such Concurrent Delay.  Contractor shall be entitled to charge the additional costs, if any, resulting from such Concurrent Delay, to the Contractor's Reserve Fund.

**4.6**     To the extent a Permitted Delay is caused by the acts or neglect of the Developer, the Fee Owners, the Architect, any Tenant, or a separate contractor of the Developer, Fee Owners, or any Tenant it shall be deemed a "Developer-Caused Delay", for purposes of this Paragraph 4.6, and if the Contractor has timely notified the Developer of the Developer-Caused Delay as required under Paragraph 4.3 of the General Conditions, the Contractor shall be entitled to a time extension to the extent provided above and to compensation for documented additional direct costs (to the extent otherwise reimbursable as part of the Cost of the Work pursuant to Article 7 of this Agreement) incurred by the Contractor and its Subcontractors as a result of the delay.  The recovery of Compensable Direct Costs as set forth in this Paragraph 4.6 (as defined in Subparagraph 4.6.1) shall be the sole monetary relief payable to Contractor as a result of any Developer-Caused Delay, and shall in no event include compensation for indirect economic impact claims, including without limitation, home office overhead or *Eichleay* claims.

**4.6.1**     "Compensable Direct Costs" as used in Paragraph 4.6 and Paragraph 4.7 shall include only the following components: (a) the actual additional cost to the Contractor of materials, if any, including sales tax and delivery, directly attributable to the delay; (b) the actual additional cost to the Contractor of labor (including normal fringe benefits) and supervision directly attributable to the delay; (c) the actual additional cost to the Contractor of construction equipment; (d) the actual additional General Conditions costs incurred by Contractor, to the extent attributable to the delay; (e) the actual additional cost to the Contractor of (i) work performed by Subcontractors or (ii) materials furnished or supplied for the work through suppliers or materialmen, which are solely attributable to the delay; including in either case, markups in accordance with Paragraph 6.4 hereof, provided, however, that any Subcontractor costs included within item (e) of this subparagraph shall be considered a Compensable Direct Cost only if it would meet the criteria of items (a) through (d) of this subparagraph if incurred by Contractor.

**4.7**     If at any time the Developer shall desire the Work to be performed with greater speed than is called for under the Contract, or in the event of a Permitted Delay, if the Developer elects to accelerate the Work in lieu of an extension of time as set forth in Paragraph 4.4 hereof, the Contractor shall, when reasonably possible and without affecting or abridging the rights of the Developer set forth in any Article hereof, upon receipt of a written order from the Developer, institute actions as reasonably determined jointly by the Developer and the Contractor (including furnishing such additional labor and/or working overtime and/or expediting deliveries of materials, machinery or equipment) sufficient to speed up and complete the Work in accordance with the then-current Construction Schedule (including but not limited to the Milestone Dates), to the extent reasonably possible, or more quickly.  The Contractor shall be entitled to compensation only for the documented Compensable Direct Costs (as defined in Subparagraph 4.6.1, and to the extent otherwise reimbursable as part of the Cost of the Work pursuant to Article 7 of this Agreement) incurred by the Contractor and its Subcontractors and Sub-subcontractors and suppliers as a result of the acceleration.  The recovery of Compensable Direct Costs as set forth in this Paragraph 4.7 (and as defined in Subparagraph 4.6.1) shall be the sole monetary relief payable to Contractor  as a result of any Developer-Caused Delay, and shall in no event include compensation for indirect economic impact claims, including without limitation, home office overhead or *Eichleay* claims.

**4.8**     To the extent that there is a delay in the progress of the Work that is not a Permitted Delay, the Developer shall have the right to cause the Contractor to institute measures to "recover" the delay (including but not limited to furnishing such additional labor and/or working overtime and expediting deliveries of materials, machinery or equipment) sufficient to speed up and complete the Work in accordance with the then-current Construction Schedule (including but not limited to Milestone Dates).  Such action shall be taken without any increase in the Guaranteed Maximum Price, but subject to the Contractor's rights with respect to use of the Contractor's Reserve Fund (hereinafter defined).

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**4.9**     **Damages for Late Completion**

**4.9.1**     Contractor and Developer acknowledge that they intend to enter into a separate construction contract for the TI Work (hereinafter the "TI Contract"), as set forth in Paragraph E.3 of the Work Letter, which shall include cross-default provisions with this Agreement and the other Construction Agreements for construction of the Related Projects.  Upon execution of the TI Contract by Contractor and Developer, then Developer's delay damages for late completion of the TI Work shall thereafter be determined as set forth in the TI Contract.  The parties acknowledge and agree that, in the event that they do not enter into the TI Contract, they will negotiate mutually acceptable amendments and modifications to the terms and conditions of this Agreement to address the performance of the TI Work by a separate TI Contractor, including without limitation (i) to establish a schedule of turnover dates and turnover procedures for each Phase of the TI Work; and (ii) to establish procedures for the coordination of the TI Work with the Shell & Core Work, including without limitation, responsibility for preparation and updating of the Construction Schedule, and providing TI Contractor access to Contractor's hoists, and this Agreement modified in writing accordingly, provided, however, that nothing in this Paragraph 4.9.1 is intended to, nor shall it be construed to, limit Contractor's liability to Developer for delay damages for the Base Building Work or Hotel Work as set forth in sub-paragraphs 4.9.2 and 4.9.3 below.

**4.9.2**     In the event the Contractor fails to Substantially Complete the Hotel Work on or before the Outside Delivery Date (Hotel), or if the Contractor causes the Hotel Opening Date to be delayed beyond the Hotel LD Date, as set forth in **Exhibit "E-1"** attached hereto, or such later dates to which either of these Milestone Dates may have been extended by Change Order, Developer's damages for late completion of the Hotel Work shall not exceed Developer's liability to Hotel Owner pursuant to the Development Agreement and Work Letter, which are comprised of:

.1     a Per Diem liquidated damage payment of $7,500 per calendar day (up to a maximum of 365 of such Per Diem) for each day that the Contractor causes the Hotel Opening Date to be delayed beyond the Hotel LD Date as provided in Paragraph 1.7.b.(vii) of the Work Letter; plus

.2     the Hotel Operator's actual damages for lost hotel revenue (estimated to be $27,697 per day) and the Hotel Operator's actual expenses for fees, salaries, Staff, Administration, Sales and Marketing Expense, (estimated to be $28,581) as provided in Section 3.1(e) of the Development Agreement;

provided, however, that Contractor shall be liable for liquidated and actual damages only to the extent such damages are paid by the Developer to, or assessed against the Developer by, the Tenant or the Hotel Owner as a result of the Hotel Delay caused by the Contractor.

**4.9.3**     If this Agreement is terminated by Developer, for any reason, prior to the execution of the TI Contract, then Contractor shall remain liable for delays, if any, to the critical path of the Construction Schedule for which Contractor is contractually responsible, as of the effective date of the termination ("Base Building Delay").

**4.9.3.1**     Following termination, Contractor shall be afforded reasonable access to each CPM schedule for the TI Work and each update of such schedules, prepared by or on behalf of Developer and/or the TI Contractor.

**4.9.3.2**     If, at the conclusion of the TI Work, there is delay in the completion of the TI Work ("TI Delay"), and Developer contends that any part of such TI Delay was caused by Contractor's Base Building Delay, Developer shall bear the burden of proving, through CPM schedule analysis, that Contractor is responsible for such TI Delay.

**4.9.3.3**     In the event that Contractor is responsible for any part of a TI Delay, Developer's delay damages for each Phase and Part shall be determined in accordance with the schedule of actual and liquidated damages set forth in **Exhibit "E-2"**.

**4.9.3.3.1**     With respect to actual damages as provided in Sections A(1) and A(3) of **Exhibit "E-2"**, Contractor shall be liable for actual damages, if and to the extent such damages are paid by the Developer to the Fee Owners or Tenant as a result of the delay.

**4.9.3.3.2**     Liquidated damages for late completion of Phase 6 (Inventory Space) shall be determined as provided in Section B(2) of **Exhibit "E-2"**.

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**4.9.3.3.3**  With respect to liquidated damages as provided in Sections A(2) and B(1) of **Exhibit "E-2"** the actual total damages sustained by Developer because of such delay to its use of the Project and the extended time for construction of the Project will be substantial but will be difficult to ascertain and calculate with precision, and it is agreed that the reasonably foreseeable value of the loss of use and extended time for construction of the Project by Developer (including without limitation lost rent and other costs and losses) would be at least the sums listed as liquidated damages in **Exhibit "E-2"**, and therefore the Contractor shall pay such sums to the Developer, as liquidated damages and not as a penalty, for each calendar day beyond the required Milestone Date that such Milestone Date has not been achieved; provided, that Contractor's liability to Developer for liquidated damages shall not exceed Developer's liability to the Tenant or Fee Owners for such damages.

**4.9.3.4** Liquidated damages and actual damages as provided in this Paragraph 4.9 and **Exhibit "E-2"** shall be the Developer's exclusive damage remedy for Contractor's failure to achieve any Milestone Date.

**4.10**  As more fully set forth in the Construction Schedule, the Core & Shell Work (under this Agreement) and the TI Work and Post TI Work (under the separate Construction Agreements between the Contractor and the Developer for the Related Projects) is being performed in eleven (11) Parts, with each Part comprising 2 or 3 floors of the office space leased by the Tenant. All punchlist Work shall be completed no later than the date that the Tenant takes occupancy of each Part of the Project; except to the extent that any such punchlist work is unavoidably delayed as a result of material availability, in which case, Developer and Contractor shall agree on a reasonable time for the completion of such work. The punchlists shall be developed, the punchlist work performed, and the punchlist work inspected to verify satisfactory completion, on the following schedule:

**4.10.1**  Thirty (30) days prior to the Milestone Date for Substantial Completion of the TI Work (which is also the start date for Post TI Work) in each Part of the Project, the Contractor shall prepare and submit to the Developer and the Architect a comprehensive list of items to be completed and corrected, and the Contractor shall proceed promptly co complete and correct the items on the list. Upon receipt of the Contractor's list, the Developer and the Architect shall review the Contractor's list, and make an inspection of the Work to verify the Contractor's list and to identify and add any additional items to the list, as provided in Paragraph 9.8.2 of the General Conditions. This list, after the inspection by the Architect and the Developer is referred to as the "Punchlist."

**4.10.2**  On the Milestone Date for Substantial Completion of the TI Work (the start date for Post TI Work) for each Part of the Project, representatives of the Contractor, the Developer and the Architect shall inspect the Work and review the Punchlist noting completed and corrected items and adding any new items that may have arisen since the Punchlist was originally prepared.

**4.10.3**  Ten (10) days prior to the scheduled Post TI Completion Date for each Part of the Project, representatives of the Contractor, the Developer and the Architect shall again re-inspect the Work and review the Punchlist noting completed and corrected items.

**4.10.4**  During the last ten (10) days of the Post TI Work for each Part of the Project, and prior to Tenant's occupancy of each Part, the Contractor shall complete all remaining Punchlist items, except, to the extent that any such punchlist work is unavoidably delayed as a result of material availability, in which case, Developer and Contractor shall agree on a reasonable time for the completion of such work.

**4.11**  Contractor shall cause each subcontract with its Subcontractors to include language substantially identical to that contained within Paragraphs 4.4 through 4.8 above.

## ARTICLE 5: CONTRACT SUM AND GUARANTEED MAXIMUM PRICE

## 5.1  CONTRACT SUM

**5.1.1**  The Developer shall pay the Contractor, in current funds for the Contractor's proper performance of the Work of this Contract, the Contract Sum consisting of (a) the Cost of the Work as defined in Article 7 of this Agreement, plus (b) the Contractor's Fee (as defined in Subparagraph 5.1.2 of this Agreement); PROVIDED, that the Contract Sum is subject to the Guaranteed Maximum Price and the Savings set forth in Subparagraph 5.3.1 of this Agreement.

**5.1.2**  The Contractor's Fee for the Project (inclusive of overhead and profit) shall be two and one-quarter percent (2.25%) of the actual Cost of the Work as defined in Article 7.

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**5.2**     **GUARANTEED MAXIMUM PRICE**

**5.2.1**     The Contract Sum is guaranteed by the Contractor not to exceed the Guaranteed Maximum Price of SIX HUNDRED FIFTEEN MILLION, FIVE HUNDRED EIGHTY-ONE THOUSAND, THREE HUNDRED FIFTY FIVE DOLLARS ($615,581,355), as set forth in the Guaranteed Maximum Price Breakdown attached as **Exhibit "A"**, subject to additions and deductions by Change Order as provided in the Contract Documents. Costs which would cause the Guaranteed Maximum Price to be exceeded shall be paid by the Contractor without reimbursement by the Developer. The Guaranteed Maximum Price consists of (a) the estimated Cost of the Work, plus (b) the Contractor's Reserve Fund, plus (c) the Contractor's Fee on the sum of estimated Cost of the Work and the Contractor's Reserve Fund. Notwithstanding the foregoing, Contractor's Fee shall only be payable on the actual Cost of the Work in accordance with Paragraph 7.1.

**5.2.2**     **Development and Completion of Design Documents**

**5.2.2.1** The Guaranteed Maximum Price set forth in Paragraph 5.2.1 above is based upon the Plans, Drawings and Other Documents listed in **Exhibit "D-1"**, and the Scope of Work Narrative in **Exhibit "D-2"**, attached hereto, subject to paragraphs 5.2.3 through 5.2.7 below. Developer and Contractor acknowledge and agree that the Plans, Drawings and Other Documents listed on **Exhibit "D-1"** for the Work are not complete, and that Architect is continuing to develop the Design Documents for the Work to complete them in accordance with the terms and conditions of the Development Agreement, and the following schedule:

| Design Deliverable | Milestone Date |
|---|---|
| Publish Design Development Progress Set No. 5 | (Actual) June 16, 2014 |
| Publish Construction Documents Progress Set No. 1 | July 15, 2014 |
| Publish Construction Documents Progress Set No. 2 | August 15, 2014 |
| Issue Bid Package No. 6 Construction Documents | September 2, 2014 |
| Compile and Issue Structural Construction Documents Amendment | October 31, 2014 |
| Issue Bid Package No. 7 Construction Documents | October 31, 2014 |
| Compile and Issue Architectural/MEP Construction Documents Amendment | December 15, 2014 |

**5.2.2.2** The Contractor shall regularly consult with the Architect and the Developer and shall monitor the development of the Plans, Drawings and other documents by the Architect and shall monitor the costs of materials, building systems, equipment, and labor, and shall develop detailed cost data from which an iterative cost model ("Statement of Construction Cost") can be prepared in form and substance satisfactory to the Developer. The Contractor shall also inform the Developer and the Architect of any component the cost of which would reasonably be expected to have a material impact on the Guaranteed Maximum Price. The Contractor shall update the Statement of Construction Cost on a regular basis throughout each phase of the design, in accordance with Paragraph 5.2.2.3 hereof, including, without limitation, within thirty (30) days after the Architect's completion of Design Development Progress Set No. 5, and Construction Documents Progress Set No. 2.

**5.2.2.3** Each Statement of Construction Cost prepared by the Contractor shall be in a CSI trade format, or other suitable format as agreed upon by the Developer, the Architect and the Contractor, to allow comparison with Bids and shall be comprised of the Contractor's estimate of the Construction Cost plus an allowance for Contractor's Reserve Fund, and Contractor's Fee.

**5.2.2.4** In addition to and notwithstanding Section 3.2.1 of the General Conditions, Contractor acknowledges and agrees, and represents and warrants to Developer that, subject to the Scope of Work Narrative in **Exhibit "D-2"** hereto, and subject to the provisions of Subparagraphs 5.2.2.1 through 5.2.2.3 above, that it has carefully studied and compared all of the existing Contract Documents, and that (a) the Plans, Drawings and Other Documents listed on **Exhibit "D-1"** and in conjunction with the Scope of Work Narrative in **Exhibit "D-2"** are sufficiently complete for Contractor to propose and agree to the Guaranteed Maximum Price for the Work set forth in paragraph 5.2.1 above, (b) Contractor has made reasonable and sufficient provision in the Guaranteed Maximum Price for further development of the Plans, Drawings and Other Documents by the Architect that is consistent with them and with the Scope of Work Narrative and reasonably inferable therefrom, including without limitation all items that Contractor knew or reasonably should have known would be necessary for the proper and complete construction of the Work whether or not specifically shown, listed or described in the Plans, Drawings and Other Documents listed on **Exhibit "D-1"**, and (c) it has reported to its Developer and the Architect any errors, inconsistencies or omissions that it has discovered in the Contract Documents prior to its execution of this Agreement. Contractor acknowledges and agrees that, subject to the Scope of Work Narrative in **Exhibit "D-2"** hereto, it shall not be entitled to an increase in the Guaranteed Maximum Price, or additional compensation or additional time, whether by change order, claim or otherwise, as a result of such further development of the Plans, Drawings and Other Documents by the

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Architect, irrespective of whether or not such items constitute errors, inconsistencies or omissions in the Contract Documents, to the extent that Contractor knew or reasonably should have known that such items would be necessary for the proper and complete construction of the Project, provided that such further development is consistent with the Plans, Drawings and Other Documents listed on **Exhibit "D-1"** and the Scope Narrative attached as **Exhibit "D-2"** and reasonably inferable therefrom; and further provided that such further development does not include such things as changes in scope, systems, kinds and quality of materials, finishes or equipment, all of which, if required, shall be incorporated by change order.

**5.2.2.5  Notice of Scope Change Contention**
**5.2.2.5.1**        If, upon Contractor's receipt of the further developed Plans, Drawings and Other Documents or changes to the Scope of Work Narrative, the Contractor contends that information or requirements therein represent a Scope Change, Contractor shall so notify Developer and Architect in writing within ten (10) days (or such longer time as may be agreed by the parties on a case by case basis) after receipt by Contractor of any such Plans, Drawings or Other Documents or changes in the Scope of Work Narrative. Failure to so notify Developer within ten (10) days (or such longer time as may be agreed by the parties on a case by case basis) shall waive Contractor's right to make a claim for additional cost or additional time arising out of such further developments to the Plans, Drawings or Other Documents.

**5.2.2.5.2**        Notwithstanding the foregoing, after submitting the Notice required by Section 5.2.2.5.1 above, prior to submitting any dispute concerning an alleged scope change as a Claim pursuant to Section 4.3 of the General Conditions, Contractor shall request, and Developer and Architect shall participate in, a GMP Reconciliation Meeting (as described in Section 5.2.2.6 below) in an attempt to resolve the dispute.

**5.2.2.6  GMP Reconciliation Meeting**
**5.2.2.6.1**        Developer acknowledges and agrees that pursuant to the terms and conditions of the separate Architect's Agreement with Developer, the Architect is obligated to design the Base Building to a Fixed Limit of Construction Cost that is equal to the Guaranteed Maximum Price set forth in Paragraph 5.2.1 above.  If any Statement of Construction Cost based on further developed Plans, Drawings, and Other Documents or based on changes in the Scope of Work Narrative exceeds the then-current Guaranteed Maximum Price, the Contractor, Developer, and Architect shall meet and confer in good faith in an effort to reconcile the design of the Project and the Statement of Construction Cost, and bring the Statement of Construction Cost within the then-current Guaranteed Maximum Price (hereafter "GMP Reconciliation Meeting").

**5.2.2.6.2**        If, following the GMP Reconciliation Meeting, the Statement of Construction Cost still exceeds the then-current Guaranteed Maximum Price, Contractor shall proceed with the Project, as directed in writing by the Developer.  If Contractor still contends that any further developed Plans, Drawings and Other Documents, or changes in the Scope of Work Narrative constitute a Scope Change, Contractor may provide notice as set forth in Paragraph 5.2.2.5 and make a Claim as set forth in Section 4.3 of the General Conditions and Article 14 hereof.

**5.2.3    Contractor's Reserve Fund.**
**5.2.3.1** The Guaranteed Maximum Price includes a reserve contingency fund (the "Contractor's Reserve Fund") in the amount of NINETEEN MILLION, SEVEN HUNDRED NINETY-SIX THOUSAND, FIVE HUNDRED NINETY-FIVE DOLLARS ($19,796,595), which has been set up for unknown and unforeseeable risks which are not included directly or by inference in the Schedule of Values, and the costs of which are not, directly or by inference, precluded by any provisions of the Agreement.  The Contractor's Reserve Fund may only be used to pay for items included within the Cost of the Work, as set forth in Articles 7 and 8 of this Agreement.  The Contractor shall notify the Developer in writing of any distribution of the Contractor's Reserve Fund or buyout savings.  This Contractor's Reserve Fund may be used for items such as unanticipated local market conditions, labor and material conditions, bidder and Subcontractor defaults, Contractor's estimating errors, and interfacing omissions between and from the various work categories.  As the Contractor buys out the Project, buyout savings shall be accounted for and deposited in the Contractor's Reserve Fund.  Expenditures from the Contractor's Reserve Fund shall be considered a Cost of the Work subject to Contractor's Fee as provided in Paragraph 5.1.2.

**5.2.3.2** The Contractor shall provide a monthly report detailing the expenditures from the Contractor's Reserve Fund and the amount remaining in the Contractor's Reserve Fund.  Such report shall include, without limitation, an explanation of the contingency cost item, the reason such cost was incurred, the payee of such cost, and all supporting documentation therefor.

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**5.2.3.3** In addition to Contractor's obligations under Subparagraph **5.2.3.2**, Contractor shall obtain prior written consent from Developer before incurring any Contractor's Reserve Fund expense greater than one hundred thousand dollars ($100,000), such consent not to be unreasonably withheld, qualified or delayed.

**5.2.4**   The Guaranteed Maximum Price is based upon and includes the following Alternates, if any, which are described in the Contract Documents and are hereby accepted by the Developer:

> None, except to the extent that any Alternates are set forth on **Exhibit "G"** to this Agreement

**5.2.5**   The amounts agreed to for unit prices, if any, are as follows:

> None, except to the extent that any unit prices are set forth on **Exhibit "H"** to this Agreement. Unit prices shall include all materials, equipment, labor, delivery, installation costs, overhead and profit and any other costs or expenses in connection with or incidental to the performance of that portion of the Work to which such unit prices apply.

**5.2.6**   Allowances included in the Guaranteed Maximum Price, if any, are as follows:

> None, except to the extent that any allowances are set forth on **Exhibit "I"** to this Agreement.

**5.2.7**   The Assumptions, Exclusions and Clarifications, if any, upon which the Guaranteed Maximum Price is based are as follows:

> None, except to the extent set forth on **Exhibit "D-2"** to this Agreement.

## 5.3   SAVINGS

**5.3.1**   Savings are defined as the difference between (a) the Cost of the Work plus the Contractor's Fee, and (b) the Guaranteed Maximum Price, if the Cost of the Work plus the Contractor's Fee is less than the Guaranteed Maximum Price. After first deducting, for the benefit of Developer, the full amount of any unused allowance items, Developer shall then pay Contractor, from the Savings, a sum equal thirty percent (30%) of the Savings; provided, however, Contractors' total share of Savings shall not exceed the sum of $3,000,000. Any further Savings shall be solely for the benefit of Developer, and shall not be shared with Contractor. The payment of Contractor's share of the Savings, if any, shall be made at the time of Final Payment. Contractor and Developer agree that any Savings remaining in the Public Areas Contract shall be included within the Savings in this Section 5.3.1, and governed by the provisions hereof.

## 5.4   PRE-CONSTRUCTION SERVICES

**5.4.1**   Pre-construction services are services that Contractor provided to Developer during the planning stages of this Project, prior to the effective date of this Agreement and prior to the commencement of any of the Work on the Project site. Preconstruction services are included within the Guaranteed Maximum Price.

**5.4.2**   During the Pre-Construction Phase of the Project, Contractor shall, at a minimum, perform the services described below and such other services as may be requested by Developer, which services are not intended to limit the services set forth in this Agreement:

> **5.4.2.1**   Consult with Developer (including various groups, as designated by Developer), Architect, and other members of the Project Team to ascertain Developer's needs and goals and the requirements of the Work.

> **5.4.2.2**   Attend weekly meetings of the Project Team.

> **5.4.2.3**   Thoroughly review, in consultation with the Developer and the Architect, all the progress drawings, including the Design Development Documents and the Construction Documents ("Design Documents"), and all revisions and additions thereto, for the purpose of preparing and submitting to Developer Statements of Construction Cost as described in Paragraph 5.2.2 above. The Statements of Construction Cost shall be in such form and shall contain such detail as Developer may require and shall be revised monthly or more frequently if Developer so requires.

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**5.4.2.4** If any Statement of Construction Cost exceeds the Guaranteed Maximum Price, participate in a GMP Reconciliation Meeting with Developer and Architect as described in Paragraph 5.2.2.6 above.

**5.4.2.5** Provide assistance to and cooperate with Developer, Architect and Developer's code consultant in obtaining all necessary approvals of Governmental Authorities having jurisdiction over the Project.

**5.4.2.6** Review the Design Documents on an ongoing basis during their development by Architect to advise Developer regarding: (1) proposed Site use, logistics and improvements; (2) selection and availability of materials, building systems and equipment; (3) methods of Project delivery; (4) Long Lead-Time items; (5) potential areas of Trade conflict; (6) value engineering recommendations; (7) possible economies; (8) constructability; and (9) completeness of the Design Documents.

**5.4.2.7** Review all Design Documents and Construction Documents, and use best efforts to identify any failure of said Documents to comply with Applicable Laws, including, but not limited to, applicable building codes. Contractor shall advise Developer and Architect of any failure of the Design Documents or Construction Documents to comply with Applicable Laws that Contractor identifies. Contractor shall not, however, by virtue of this review, become liable for Architect's failure to design the Project in accordance with all Applicable Laws.

**5.4.2.8** Advise Developer regarding the costing and procurement of Pre-Purchased Items, and Bid Packages when early procurement is in Developer's best interests including, but not limited to, the purchase of Long Lead-Time Items and pertinent portions of the Construction Documents. If Developer procures any Pre-Purchased Item itself, Developer shall have the right to assign the Purchase Order for that Pre-Purchased Item to Contractor or a Trade Contractor; provided that the Contractor's obligations with respect to any such assigned Purchase Order shall not be greater than the obligations imposed on the supplier under the assigned Purchase Order.

**5.4.2.9** Participate in value engineering reviews with Developer and Architect. The Contractor and Developer acknowledge and agree that the Contractor does not assume design responsibility for value engineering suggestions, and that any value engineering suggestion accepted by the Developer and the Architect shall be expressly incorporated into the Architect's Design Documents and become part of the Architect's design for which the Architect remains liable pursuant to the terms of the Architect's Agreement with Developer.

**5.4.2.10** Review the Design Documents on an ongoing basis as they are being prepared for the purpose of making recommendations to Developer and Architect regarding:

    **.1**       Availability of labor, materials, equipment and supplies.

    **.2**       Elimination of possible conflicts and/or overlapping jurisdictions among the various trades or overlapping responsibilities among Trade Contractors.

    **.3**       Conflicts and omissions and/or variations from customary construction practices and methods which may cause difficulties or delays in the performance of the Work.

    **.4**       Discrepancies and deficiencies in the Design Documents, or between the Design Documents and existing conditions at the Project Site.

    **.5**       Conduct of construction operations utilizing good construction practices.

    **.6**       Costs of labor, materials, equipment and supplies to be used in the Work.

    **.7**       Costs on comparable projects.

    **.8**       Unit prices and alternates.

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format A111 - 1987
AIA Licensed - Page #11

.9          Required Temporary Systems and Project support facilities.

.10         Construction detailing.

.11         Achievement of construction economies through alternative methods, materials, or concepts, consistent with Developer's requirements and sound construction practice.

.12         Temporary and Final Certificate of Occupancy process.

**5.4.2.11**        Comply with the Economic Opportunity Plan annexed hereto as **Exhibit "Q"**, as set forth more fully in Paragraph 14.5.10.

**5.4.2.12**        Provide: (1) a code compliance analysis of the Site; and (2) a confirmation of Building infrastructure, Site analysis and related probe work, provided, however, that Contractor assumes no design responsibility for any of the items described in this subparagraph.

**5.4.2.13**        Advise and make recommendations to Developer and Architect regarding the best order and sequence for the development of the Construction Documents, including the appropriate Bid Packages.

**5.4.2.14**        Maintain written records of all communications with, and recommendations made to, Architect, and Architect's responses thereto.  Contractor shall make such records available for inspection by Developer at all times, and promptly furnish Developer, upon request, with copies of all correspondence and notes relating to communications between Contractor and Architect relative to the Work and the Project.

**5.4.2.15**        Advise and consult with Developer and Architect with regard to division of the Construction Documents into appropriate Bid Packages.

**5.4.2.16**        Manage the construction in Philadelphia, PA of a full-size curtain wall mockup, hotel guestroom mockup and other mockups as may be necessary for Project approvals.

**5.4.2.17**        Develop and refine the preliminary site logistics plan in cooperation with adjoining buildings and Governmental Authorities requirements.

**5.4.2.18**        Prepare (and update regularly) a Project Procedures Manual which addresses Contractor's policies, together with the policies of Developer and Architect on the following issues:

.1          Prior to taking possession of the site for preparations to commence construction, develop a plan for approval by the Developer with advice from the Design Team to document existing conditions on adjacent public and private property around the Site that may be affected by the project construction.

.2          Coordination with Interiors Contractor's operations.

.3          Document control, including filing systems.

.4          Submittals, including Submittal Schedules, number of copies required and control logs.

.5          Clarifications, fully setting forth the process for requests for information.

.6          Change Order control, including related time extensions.

.7          Schedules, including CPM Requirements and occupancy schedules.

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**.8**     Cost Control procedures, including cost reports.

**.9**     Quality Control procedures, including management, inspection and testing.

**.10**    Safety Procedures.

**.11**    Photography, video and site monitoring requirements.

**.12**    Coordination procedures, including Coordination Drawings and coordination meetings.

**.13**    Subcontractor and supplier Procurement Schedule including Contractor's methodology for vetting potential subcontractors/suppliers and the list of proposed bidders with the results of the vetting process for each. This information will be kept confidential within the Developer's office

**.14**    Contractor's proposed project team with resumes and specific assignments for the entire duration of the Project including no fewer than six (6) references for each candidate relating to at least two (2) projects successfully completed over the previous five (5) years in the same or similar roles for which they are being proposed on the Project. Each proposed team member, Contractor shall include at least one reference each from the previous projects' Owner or Developer, applicable Design Team member (Architect, Engineer or other Consultant) and at least one Subcontractor who they managed on each of the previous two (2) projects.

**.15**    Monthly progress reports.

**.16**    Application for Payment process.

**.17**    Meetings including pre-construction, progress and others.

**.18**    Trade Contractor/Supplier/Vendor dispute resolution procedures.

**.19**    Closeout procedures, including procedures for Substantial and Final Completion inspections, preparation of Punchlists, and the preparation of As Built Drawings.

The Project Procedures Manual shall be subject to Developer's approval prior to implementation.

**5.4.2.19**    Contractor shall confirm that materials, equipment and labor are currently available to accomplish the Work. Contractor shall continually thereafter undertake materials and labor surveys, including analyses of the following with respect to materials and equipment: all materials and equipment required for the Work; a forecast of the availability thereof; and any factors or potential occurrences identified by Contractor which might affect the future availability of such materials and equipment. With respect to labor, Contractor shall prepare an analysis of costs, types and quality of labor required for the Work; a forecast of labor availability as and when needed; and a schedule of the dates of all union contracts coming up for renewal during the anticipated period of the Work.

**5.4.2.20**    Contractor shall perform other services similar in type to those described above including, but not limited to: preparation of such other schedules, reports, budgets and other technical data as may be reasonably requested by Developer; and attendance at such meetings during the Pre-Construction Phase as Developer may reasonably request in order to assist in the preparation of the Construction Documents, cost estimates, updated Project Schedules and any other documents and instruments relative to the Project, to the end that Final Completion of the Work may be achieved within the budgetary and time objectives set forth in this Agreement.

**5.4.2.21**    Contractor acknowledges that portions of the Pre-Construction and Construction Phases may be on-going at the same time and that certain services performed by Contractor may overlap.

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**5.4.2.22**    As part of Pre-Construction Phase Services (and at no additional charge to Developer), Contractor shall coordinate and cooperate with parties working on the Tenant Interiors Project including, but not limited to, the Interiors Architect, Interiors Contractor, and Interiors Trade Contractors. Contractor shall also provide advice and proposed pricing to the Developer and Tenant for Core and Shell revisions proposed by the Tenant ("Tenant Change Request" or "TCR") and as approved by both parties, and endeavor to include the approved TCR(s) in the Project scope of work with minimal disruption and schedule delay.

**5.4.2.23**    Contractor shall provide information as required for a tax cost segregation study.

**5.4.2.24**    Throughout the Pre-Construction Phase, Contractor shall post on the Project Website or Project Portal (or cause Trade Contractors to post), as appropriate, documentation generated or received by Contractor in the performance of Contractor's services.

## ARTICLE 6
## CHANGES IN THE WORK

**6.1**    Adjustments to the Guaranteed Maximum Price on account of changes in the Work may be determined by any of the methods listed in Subparagraph 7.3.3 of the General Conditions.

**6.2**    In calculating adjustments to subcontracts (except those awarded with the Developer's prior written consent on the basis of cost plus a fee), the terms "cost" and "fee" as used in Subparagraph 7.3.3.3 of the General Conditions and the terms "costs" and "a reasonable allowance for overhead and profit" as used in Subparagraph 7.3.6 of the General Conditions shall have the meanings assigned to them in the General Conditions and shall not be modified by Articles 5, 7 and 8 of this Agreement.

**6.3**    In calculating adjustments to this Contract, the terms "cost" and "costs" as used in the above-referenced provisions of the General Conditions shall mean the Cost of the Work as defined in Article 7 of this Agreement and the terms "fee" and "a reasonable allowance for overhead and profit" shall mean the Contractor's Fee as defined in Paragraph 5.1.2 of this Agreement, subject to Paragraphs 5.1.1 and 5.2.1 of this Agreement.

**6.4**    Notwithstanding anything to the contrary in this Article 6 or in any other provision of this Agreement or the other Contract Documents, and unless otherwise agreed in writing by Developer in its sole discretion, any adjustments to the Guaranteed Maximum Price on account of changes in the Work shall not include mark-ups for Subcontractors and Sub-subcontractors except as follows: (a) the maximum mark-up on the direct costs reimbursable under Subparagraph 7.3.6 of the General Conditions by the entity who actually performs the Work (whether a Subcontractor or a Sub-subcontractor) shall be ten percent (10%) for overhead and  profit combined; and (b) the maximum mark-up on the direct Cost of the Work charged to the Developer, when combining the mark-ups of the entity that performed the Work and any higher-tier subcontractors for whom the Work was performed, shall in no event exceed twenty-five percent (25%) for overhead and profit combined, exclusive of Contractor's mark-up, which mark-up is limited to Contractor's Fee of two and a quarter percent (2.25%) as set forth in section 5.1.2 above.

**6.4.1**    Work performed by Contractor's own forces shall be a Cost of the Work at the hourly rates agreed upon as established in **Exhibit "K"** subject to Contractor's Fee.

**6.4.2**    Any Change resulting in a decrease in the Cost of the Work shall include a corresponding decrease in Contractor's Fee.

**6.5**    If the Developer and Contractor are unable to agree as to whether or not a change has occurred that would entitle the Contractor to an adjustment to the Guaranteed Maximum Price and/or to the Milestone Dates (hereinafter "Disputed Work"), then the Contractor shall proceed expeditiously to perform the Disputed Work upon receipt of a written directive from Developer to do so. The Contractor shall then maintain a separate record of all of its actual costs incurred to perform the Disputed Work on a daily basis, and the Contractor may submit a claim under Paragraphs 4.3 and 4.4 of the General Conditions.

**6.6**    If the Developer and the Contractor agree that a change has occurred, but are unable to agree as to the adjustment to the Guaranteed Maximum Price or the Milestone Dates resulting from the change (hereinafter "Changed Work"), then the Contractor shall

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format A111 - 1987
AIA Licensed - Page #14

1800 Arch Street – A111 – Driscoll Base Building FINAL – 6.26.14

proceed expeditiously to perform the Changed Work upon receipt of a written directive from Developer to do so. The Contractor shall then maintain a separate record of all of its actual costs incurred to perform the Changed Work on a daily basis, and the Contractor may submit a claim under Paragraphs 4.3 and 4.4 of the General Conditions.

**6.7**     In order to avoid delays to the Project, Contractor shall continue to perform all of the Work, including without limitation all Disputed Work and all Changed Work, and shall not delay, slow down or refuse to perform any of the Work, pending the resolution of any or all claims and disputes; subject, however, to a reservation of rights by Contractor and Developer against each other with regard to all such claims and disputes, provided that timely written notice thereof was provided by each party to the other in each instance in accordance with the Contract Documents.

**ARTICLE 7**
**COSTS TO BE REIMBURSED**

**7.1**     The term Cost of the Work shall mean the actual costs necessarily incurred by the Contractor for each cost item in the proper performance of the Work. Such costs shall be at rates not higher than the actual costs incurred by Contractor for each cost item; provided further, however, that the actual cost shall not be higher than the standard paid at the place of the Project except with the prior written consent of the Developer. The Cost of the Work shall include only the items set forth in this Article 7. If the Guaranteed Maximum Price includes fees that the Developer has paid or is required to pay directly, such fees shall be deducted from the Guaranteed Maximum Price pursuant to a deductive Change Order.

### 7.1.1   LABOR COSTS

**7.1.1.1** Wages of construction workers directly employed by the Contractor to perform the construction of the Work at the site or, with the Developer's prior written agreement, at off-site workshops.

**7.1.1.2** As to supervisory and administrative personnel, the individuals in the positions listed on the attached **Exhibit "K"**, while employed in the performance of the Work, shall be considered reimbursable, whether stationed in the field or in the main office, but only at the agreed-upon rates included in said Exhibit and only to the extent of their time applicable to this Project and for no more than eight (8) hours per day and a maximum of forty (40) hours per week, except as otherwise agreed in writing by Developer.

**7.1.1.3** Costs paid or incurred by the Contractor for taxes, non-OCIP insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided such costs are based on wages and salaries included in the Cost of the Work under Clauses 7.1.1.1 through 7.1.1.2.

**7.1.1.4** Notwithstanding any other provision of this Agreement, reimbursable labor costs shall not include any bonuses, profit sharing, incentive compensation or any tuition reimbursement, or any discretionary payments paid by Contractor to any of its employees, except as included in the agreed-upon rates set forth in **Exhibit "K"**.

**7.1.1.5** All reimbursable labor costs shall be actual costs, such as the actual wages or salaries paid by Contractor, and not other labor rates that Contractor may use for its own purposes, except as included in the agreed-upon rates set forth in **Exhibit "K"**.

### 7.1.2   SUBCONTRACT COSTS

Costs incurred by the Contractor for the work of Subcontractors in accordance with the requirements of the subcontracts entered into in accordance with the Contract Documents, subject to Paragraphs 6.2 through 6.4 above. Notwithstanding any other provision of this Agreement, reimbursable subcontract costs shall not include any bonuses, profit sharing, incentive compensation or any discretionary payments paid by Contractor to any of its Subcontractors or suppliers, except with Developer's prior written approval.

### 7.1.3   COSTS OF MATERIALS AND EQUIPMENT INCORPORATED IN THE COMPLETED CONSTRUCTION

**7.1.3.1** Costs, including transportation and storage of materials and equipment incorporated or to be incorporated in the completed construction; provided, that such materials and equipment are obtained pursuant to purchase orders entered into in accordance with the terms of the Contract Documents.

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**7.1.3.2** Costs of materials described in the preceding Paragraph 7.1.3.1 of this Agreement in excess of those actually installed but required to provide reasonable allowance for waste and for spoilage; provided, that such materials are obtained pursuant to purchase orders entered into in accordance with the Contract Documents. Unused excess materials, if any, shall be handed over to the Developer at the completion of the Work or, at the Developer's option, shall be sold by the Contractor; amounts realized, if any, from such sales shall be credited to the Developer as a deduction from the Cost of the Work.

## 7.1.4   COSTS OF OTHER MATERIALS AND EQUIPMENT, TEMPORARY FACILITIES AND RELATED ITEMS

**7.1.4.1** Costs of transportation, storage, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment, and hand tools not customarily owned by the construction workers, which are provided by the Contractor at the site and fully consumed in the performance of the Work; and cost less salvage value on such items if not fully consumed, whether sold to others or retained by the Contractor. Cost for items not fully consumed by the Contractor shall mean fair market value.

**7.1.4.2** Rental charges for temporary facilities, machinery, equipment, and hand tools not customarily owned by the construction workers, which are provided by the Contractor at the site, whether rented from the Contractor or others, and costs of transportation, installation, minor repairs and replacements, dismantling and removal thereof. The total rental cost of any Contractor-owned item may not exceed the purchase price of any comparable item; and the rental rate may not exceed the standard rental rate from unaffiliated third parties for comparable items and for comparable durations. Rates and quantities of equipment rented shall be subject to the Developer's prior written approval.

**7.1.4.3** Costs of removal, and proper and legal disposal, of debris from the site.

**7.1.4.4** Costs of local and long distance telephone, cellular and fax transmissions, postage and parcel delivery charges, express delivery and messenger services, field radios, charges and service, telephone and local area network services and equipment, computers, software, computer accessories , reproduction charges, including reasonable charges for use of in-house equipment and outsourced reproduction services, coffee and water services, cleaning services and equipment, food services when associated with team meetings held at site offices, archival services and equipment, stationary and supplies for office equipment, printers and plotters, maintenance and services agreements, personal safety equipment, staff parking for staff working at the site, and reasonable petty cash expenses of the site office or adjacent offsite offices. If any of the items described in this subparagraph 7.1.4.4 were purchased exclusively for the Project, such items shall become the property of the Developer upon Final Completion.

**7.1.4.5** That portion of the reasonable travel and subsistence expenses of the Contractor's personnel incurred while traveling in discharge of duties connected with the Work (but not daily commuting expenses or relocation expenses), subject to advance written approval by Developer.

## 7.1.5   MISCELLANEOUS COSTS

**7.1.5.1** Premiums for that portion of non-OCIP insurance and bonds required by the Contract Documents that can be directly attributed to this Contract.

**7.1.5.1** Deductibles and self-insurance for that portion of non-OCIP insurance and bonds required by the Contract Documents that can be directly attributed to this Contract as agreed to in writing in advance by Developer.

**7.1.5.2** Sales, use or similar taxes, or the Philadelphia Business Privilege Tax (if any), imposed by a governmental authority which are related to the Work and for which the Contractor is liable; provided, that Philadelphia Business Privilege Tax shall not be reimbursable to the extent imposed because of the Contractor's failure to comply with its obligations under the Contract Documentation.

**7.1.5.3** Fees and assessments for the building permit and for other permits, licenses (not including business licenses) and inspections for which the Contractor is required by the Contract Documents to pay. If the Guaranteed Maximum Price includes fees that the Developer has paid or is required to pay directly, then such fees shall be deducted from the Guaranteed Maximum Price pursuant to a deductive Change Order.

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**7.1.5.4** Fees of testing laboratories for tests required by the Contract Documents, except those directly related to defective or nonconforming Work for which reimbursement is excluded by Subparagraph 13.5.3 of the General Conditions and Subparagraph 8.1.6 of the Agreement or other provisions of the Contract Documents and which do not fall within the scope of Subparagraph 7.2.2 of this Agreement.

**7.1.5.5** Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents; the cost of defending suits or claims for infringement of patent rights arising from such requirement by the Contract Documents; payments made in accordance with legal judgments against the Contractor resulting from such suits or claims and payments of settlements made with the Developer's consent; provided, however, that such costs of legal defenses, judgments and settlements shall not be included in the calculation of the Contractor's Fee or the Guaranteed Maximum Price and provided that such royalties, fees and costs are not excluded by the last sentence of Subparagraph 3.17.1 of the General Conditions or other provisions of the Contract Documents.

**7.1.5.6** Deposits lost for causes other than the Contractor's fault or negligence or that of any other Responsible Party.

**7.1.5.7** Legal fees, including mediation and arbitration costs, and including consultants' fees incurred by Contractor in defense of claims by subcontractors and suppliers of any tier; provided that Developer consents to such fees in writing, such consent not to be unreasonably withheld.

## 7.1.6   OTHER COSTS

**7.1.6.1** Other costs incurred in the performance of the Work if and to the extent approved in advance in writing by the Developer.

**7.2    EMERGENCIES: REPAIRS TO DAMAGED, DEFECTIVE OR NONCONFORMING WORK.**   Subject to Paragraph 8.1.6 below, the Cost of the Work shall also include costs described in Paragraph 7.1 which are incurred by the Contractor:

**7.2.1**    In taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property, as provided in Paragraph 10.3 of the General Conditions.

**7.2.2**    In repairing or correcting Work damaged or improperly executed by construction workers in the employ of the Contractor, provided such damage or improper execution did not result from the fault or negligence of the Contractor, or the Contractor's foremen, engineers or superintendents, or other supervisory, administrative or  managerial personnel of the Contractor.

**7.2.3**    In repairing damaged Work other than that described in Subparagraph 7.2.2, provided such damage did not result from the fault or negligence of the Contractor or the Contractor's personnel, and only to the extent that the cost of such repairs is not recoverable by the Contractor from others and the Contractor is not compensated therefore by insurance or otherwise.

**7.2.4**    In correcting defective or nonconforming Work performed by or supplied by a Subcontractor or material supplier and not corrected by them, provided such defective or nonconforming Work did not result from the fault or neglect of the Contractor or the Contractor's personnel adequately to supervise and direct the Work of the Subcontractor or material supplier, and only to the extent that the cost of correcting the defective or nonconforming Work is not recoverable by the Contractor from the Subcontractor or material supplier.

## 7.3    LIMIT ON GENERAL CONDITIONS COSTS IN CHANGE ORDERS

**7.3.1**    Notwithstanding anything to the contrary in Article 6 or 7 above, or in any other provision of this Agreement or the other Contract Documents, the costs included in Change Orders for general conditions costs, including without limitation the cost items listed on **Exhibit "M"** shall be determined as follows: (a) for the first $5 million of Change Orders, in the aggregate, there shall be no cost included or markup added for general conditions expenses unless the Change Order involves an extension of time; (b) after the first $5 million of Change Orders, in the aggregate which do not involve an extension of time, or in the event of any extension of time, or in the event that additional general conditions expenses arise from the cumulative effect of multiple changes, the Contractor shall provide a breakdown of the additional general conditions expenses, with the Change Order request.   Contractor shall be entitled to additional general conditions expenses for Change Orders described in clause (b) above if the Contractor demonstrates that the additional services included in the breakdown submitted with the Change Order request could not reasonably have been performed by the existing field staff of the Contractor as listed on **Exhibit "M"**.

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

## 7.4    RELATED PARTY TRANSACTIONS

**7.4.1**    For purposes of this Section 7.4, a "related party" shall mean (a) a parent, subsidiary, affiliate or other entity having common ownership or management with the Contractor, or (b) any entity in which any stockholder in, or management employee of, the Contractor owns any interest in excess of 10% in the aggregate, or (c) any person or entity which has the right to control the business affairs of the Contractor. The term "related party" includes any member of the family of any person identified above.

**7.4.2**    Before any transaction with a related party which will include reimbursable costs is agreed to by the Contractor, and before any such costs are incurred, the Contractor shall first notify the Developer in writing of (a) the specific nature of the contemplated transaction, including the identity of the related party, the mark-up being charged by the related party to the Contractor, and the anticipated reimbursable costs to be incurred by the transaction with the related party, and (b) the results of all competitive bids received by the Contractor for the same Work, equipment, goods or services pursuant to Article 10A of this Agreement. If the Developer, after such notification, authorizes the proposed transaction in writing, then the costs incurred shall be included as reimbursable costs, subject to the other terms and conditions of these Contract Documents. The Contractor shall then procure the Work, equipment, goods or services from the related party as a Subcontractor subject to the terms of Article 10A of this Agreement.

## ARTICLE 8
## COSTS NOT TO BE REIMBURSED

**8.1**    The Cost of the Work shall not include:

**8.1.1**    Salaries and other compensation of the Contractor's personnel stationed at the Contractor's principal office or offices other than the site office, except as specifically provided in Clauses 7.1.1.2 and 7.1.1.3.

**8.1.2**    Expenses of the Contractor's principal office and offices other than the site office.

**8.1.3**    Overhead and general expenses, except as may be expressly included in Article 7.

**8.1.4**    The Contractor's capital expenses, including interest on the Contractor's capital employed for the Work.

**8.1.5**    Rental costs of machinery and equipment, except as specifically provided in Clause 7.1.4.2.

**8.1.6**    Except as provided in Subparagraphs 7.2.2 through 7.2.4 of this Agreement, costs due to the fault or negligence of the Contractor, Subcontractors, anyone directly or indirectly employed by any of them, or for whose acts any of them may be liable, including but not limited to costs for the correction of damaged, defective or nonconforming Work, disposal and replacement of materials and equipment incorrectly ordered or supplied, and making good damage to property not forming part of the Work.

**8.1.7**    Any cost not specifically and expressly described in Article 7.

**8.1.8**    Costs which would cause the Guaranteed Maximum Price to be exceeded.

**8.1.9**    Legal, mediation or arbitration costs (including but not limited to attorneys' fees and consultants' fees) relating to claims or other disputes that are not consented to by Developer pursuant to Paragraph 7.1.5.7; provided that legal fees relating to normal project administration may be included in the Cost of the Work.

**8.1.10**    Notwithstanding any other provision of this Agreement, Contractor shall not be entitled to be reimbursed for costs incurred to correct defective or non-conforming work within the one year time period set forth in Subparagraph 12.2.2 of the General Conditions or within such longer period provided by any applicable special warranty in the Contract Documents.

**8.1.11**    Any deductibles or self-insured retentions arising under any insurance required to be provided by Contractor pursuant to the Contract Documents, except as agreed to in writing in advance by Developer.

---

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**8.1.12**  Any uninsured losses that result from a failure of the Contractor to maintain insurance required by the Contract Documents or denial of coverage under such insurance or the failure of the insurer to otherwise pay claims under such insurance.

**8.1.13**  Costs or premiums for insurance provided by the Owner under the Owner Controlled Insurance Program (OCIP).

## ARTICLE 9
## DISCOUNTS, REBATES AND REFUNDS

**9.1**     Cash discounts obtained on payments made by the Contractor shall accrue to the Developer if (1) before making the payment, the Contractor included them in an Application for Payment and received payment therefor from the Developer, or (2) the Developer has deposited funds with the Contractor with which to make payments; otherwise, cash discounts shall accrue to the Contractor. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Developer, and the Contractor shall make provisions so that they can be obtained.

**9.2**     Amounts which accrue to the Developer in accordance with the provisions of Paragraph 9.1 shall be credited to the Developer as a deduction from the Cost of the Work.

## ARTICLE 10A
## SUBCONTRACTS AND OTHER AGREEMENTS

**10.1**     Those portions of the Work that the Contractor does not perform with the Contractor's own personnel shall be performed under subcontracts or by other appropriate written agreements with the Contractor.  The Contractor shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated especially for the Work and shall deliver such bids to the Developer. The Developer will then determine, with the advice of the Contractor, which bids will be accepted by Contractor. The Developer may designate specific persons or entities from whom the Contractor shall obtain bids; however, the Developer may not prohibit the Contractor from obtaining bids from others. The Contractor shall not contract with anyone to whom the Contractor or the Developer has reasonable objection.

**10.1.1**  Contractor shall advise Developer in writing if any of the Work will be performed by Contractor's own forces. Such self-performed work shall be subject to Paragraph 6.4.1.

**10.2**     If a specific bidder among those whose bids are delivered by the Contractor to the Architect and the Developer (1) is recommended to the Developer by the Contractor, (2) is qualified to perform that portion of the Work, and (3) has submitted a bid that conforms to the requirements of the Contract documents without reservations or exceptions, but the Developer requires that another bid be accepted by Contractor, then Contractor may require that a Change Order be issued to adjust the Guaranteed Maximum Price by the difference between the bid of the person or entity recommended to the Developer by the Contractor and the amount of the subcontract or other agreement actually signed with the person or entity designated by the Developer.

**10.3**     Developer approves the Subcontractors listed on **Exhibit "L"** hereto for the trades under which they are so listed.

**10.4**     Subcontracts or other agreements shall conform to the payment provisions of Paragraphs 12.7 and 12.8.

**10.5**  Subcontracts shall not be awarded on the basis of cost plus a fee, without the advance written approval of the Developer at its sole discretion.

**10.6**     Contractor shall not award any subcontract without the prior written approval of Developer.

**10.7**     At least twenty-four (24) hours prior to executing any subcontract, Contractor shall complete the Notice of Award attached as **Exhibit "X"** and transmit copies thereof to AON Risk Services by email to **acs.construction@aon.com** or fax to **800-363-6695**.

**10.8**     Contractor shall not permit any subcontractor, of any tier, onto the Project site until such Subcontractor has been approved to work on the Project by the OCIP Administrator.   Completed enrollment information can be obtained via the AonWrap website.

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format A111 - 1987
1800 Arch Street – A111 – Driscoll Base Building FINAL – 6.26.14                                                                         AIA Licensed - Page #19

## ARTICLE 10B: CONTRACTOR AND SUBCONTRACTOR DEFAULT INSURANCE AND BONDS

**10.9**     Contractor shall provide CapAssure™ Contractor and Subcontractor Default Insurance for the duration of the Project, pursuant to the limits, terms and conditions set forth in the Comcast Project Specific Insurance Manual dated May 12, 2014, attached hereto as **Exhibit "J"**.

## ARTICLE 11: ACCOUNTING AND PROJECT RECORDS

**11.1**     The Contractor shall keep full and detailed records and accounts related to the Cost of the Work and exercise such controls as may be necessary for proper financial management under this Contract and to substantiate all costs incurred, and the accounting and control systems shall be satisfactory to the Developer.  The Contractor shall also keep full and detailed project records.  Subject to Subparagraphs 11.2 and 11.3 below, the Developer and the Developer's auditors, Fee Owners and Comcast Corporation and its designees shall be afforded access to, and shall be entitled to audit and copy, whether in hard copy or electronic format, all of the Contractor's records, books, correspondence, instructions, drawings, receipts, subcontracts, subcontractor proposals, purchase orders, vouchers, memoranda, complete documentation supporting accounting entries, contractor and subcontractor meeting minutes, change order logs, daily and weekly reports, schedules and updates, job cost reports, subcontractor records and costs, supplier records and costs, costs incurred at the site, costs for project personnel whether charged to reimbursable cost or as not reimbursable, and other data relating to this Contract (together the "Contractor's Records"); and the Contractor shall preserve the Contractor's Records for a period of three years after final payment, or for such longer period as may be required by law.  Developer, Fee Owners and Comcast Corporation and its designees may audit and copy Contractor's Records both before final payment and again for a period of time of at least three years after final payment.  If any audit shows a discrepancy of more than 2%, the Contractor, in addition to its other obligations under this Agreement, shall promptly reimburse the Developer for the cost of the audit.

**11.2**     All audits shall be performed during normal business hours, with reasonable advance notice to Contractor, and shall be conducted in such a manner as not to unreasonably disrupt Contractor's business operations.

**11.3**     Developer shall be entitled to conduct audits on a quarterly basis, and shall conduct its final audit within 60 days after the Contractor submits the final Application for Payment and the Contractor's final accounting of the Cost of the Work, pursuant to Section 13.2 of the Agreement.

## ARTICLE 12: PROGRESS PAYMENTS

**12.1**     Based upon Applications for Payment submitted to the Architect and the Developer by the Contractor and Certificates for Payment issued by the Architect and approved by the Developer, in its reasonable discretion, the Developer shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

**12.2**     The period covered by each Application for Payment shall be one calendar month ending on the last day of the month.

**12.2.1**     On or before the 25th day of each calendar month during the performance of the Work, or as otherwise mutually agreed by Developer and Contractor, the Developer, the Architect, and the Contractor shall meet to discuss the Contractor's draft Application for Payment for that month and the accompanying documentation ("Monthly Payment Meeting").  On the basis of the Monthly Payment Meeting, the Contractor shall, on or before the 1st day of the following month, submit to the Architect, with a copy to the Developer, the Application in form and substance as agreed at the Monthly Payment Meeting for all Work performed through the end of the prior month.

**12.3**     Provided an Application for Payment is received by the Architect and the Developer not later than the first (1st) day of a month, the Developer shall make any payment due to the Contractor not later than the thirtieth day of the same month.  If an Application for Payment is received by the Architect and/or the Developer after the application date fixed above, any payment due shall be made by the Developer not later than thirty (30) days after the Architect and the Developer receive the Application for Payment.

**12.4**     With each Application for Payment the Contractor shall submit payrolls, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Developer or Architect to demonstrate that cash disbursements

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

1800 Arch Street – A111 – Driscoll Base Building FINAL – 6.26.14

Electronic Format A111 - 1987
AIA Licensed - Page #20

already made by the Contractor on account of the Cost of the Work equal or exceed (1) progress payments already received by the Contractor; less (2) that portion of those payments attributable to the Contractor's Fee; plus (3) payrolls for the period covered by the present Application for Payment; plus (4) retainage provided in Subparagraphs 12.5.3 and 12.5.4 applicable to prior progress payments.

**12.5.1** Each Application for Payment shall be based upon the most recent Schedule of Values submitted by the Contractor and approved by the Developer and the Architect in accordance with the Contract Documents. The Schedule of Values shall allocate the entire Guaranteed Maximum Price among the various portions of the Work, except that the Contractor's Fee shall be shown as a single separate item. The Schedule of Values shall be prepared in such form and supported by such data to substantiate its accuracy as the Architect and the Developer may require. This schedule, unless objected to by the Architect or the Developer, shall be used as a basis for reviewing the Contractor's Applications for Payment.

**12.5.2** Applications for Payment shall show the percentage completion of each portion of the Work as of the end of the period covered by the Application for Payment. The percentage completion shall be the lesser of (1) the percentage of that portion of the Work which has actually been completed or (2) the percentage obtained by dividing (a) the expense which has actually been incurred by the Contractor on account of that portion of the Work for which the Contractor has made or intends to make actual payment prior to the next Application for Payment by (b) the share of the Guaranteed Maximum Price allocated to that portion of the Work in the Schedule of Values.

**12.5.3** Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

**12.5.3.1** Take that portion of the Guaranteed Maximum Price properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Guaranteed Maximum Price allocated to that portion of the Work in the Schedule of Values, less retainage of ten percent (10%) on all items except Contractor's general conditions costs as set forth in the List of General Conditions Cost Items attached as **Exhibit "M"**. Pending final determination of cost to the Developer of changes in the Work, amounts not in dispute may be included as provided in Subparagraph 7.3.7 of the General Conditions, even though the Guaranteed Maximum Price has not yet been adjusted by Change Order.

**12.5.3.2** Add that portion of the Guaranteed Maximum Price properly allocable to materials and equipment delivered and suitably stored at the site (provided, that the Contractor does not unreasonably overload the site) for subsequent incorporation in the Work or, if approved in writing in advance by the Developer, suitably stored off the site at a location agreed upon in writing, less retainage of ten percent (10%). In all instances, whether or not Developer agrees to make payment therefor, materials and equipment stored off-site must be stored at an off-site location acceptable to Developer (including without limitation a bonded warehouse if so required by Developer); the material and equipment must be segregated from other material and equipment stored for others at the same off-site location; the material and equipment must be tagged or otherwise marked to identify it for this Project and for Developer; Contractor must supply insurance certificates covering the full replacement value of such materials and equipment, and naming Developer as an additional insured; and Developer may, in its sole discretion, inspect the materials and equipment stored at such off-site locations.

**12.5.3.3** Add the Contractor's Fee, less retainage of ten percent (10%). The Contractor's Fee shall be computed upon the Cost of the Work described in the two preceding Clauses at the rate stated in Paragraph 5.1 or, if the Contractor's Fee is stated as a fixed sum in that Paragraph, shall be an amount which bears the same ratio to that fixed-sum Fee as the Cost of the Work in the two preceding Clauses bears to a reasonable estimate of the probable Cost of the Work upon its completion. Retainage withheld on the Contractor's Fee shall be subject to reduction when the work is 50% complete in accordance with Paragraph 12.5.4 hereof.

**12.5.3.4** Subtract retainage of ten percent (10%) from that portion of the Work, if any, the Contractor self-performs.

**12.5.3.5** Subtract the aggregate of previous payments made by the Developer.

**12.5.3.6** Subtract the shortfall, if any, indicated by the Contractor in the documentation required by Paragraph 12.4 to substantiate prior Applications for Payment, or resulting from errors subsequently discovered by the Developer's accountants or auditors in such documentation.

**12.5.3.7** Subtract amounts, if any, for which the Architect or the Developer has withheld or nullified a Certificate for Payment as provided in Paragraph 9.5 of the General Conditions.

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**12.5.4** Additional retainage, if any, shall be as follows:

All progress payments are subject to retainage of ten percent (10%), except that retainage shall not be withheld on general conditions costs. Upon written request from Contractor, when all of the Work for the Project reaches 50% completion, the retainage for the remaining Work may be reduced from ten percent (10%) to zero percent (0%) by Developer in its sole discretion and without any obligation to do so, and with any such reduction request not to be unreasonably refused; and any such reduction in the retainage shall then be effectuated by Developer continuing to hold the full ten percent (10%) retainage that it has already withheld on the Work performed up to that point, and with Developer then not withholding any additional retainage on the Work remaining to be performed; provided further, however, that Developer may elect at any time thereafter, in its sole discretion, to reinstate the retainage back to ten percent (10%) if Developer deems it appropriate to do so. If Contractor requests such a retainage reduction from ten percent (10%) to zero percent (0%) on the remaining Work, then Contractor shall provide Developer, simultaneously with its request, with an estimate of the Savings on the Project and with a revised Schedule of Values to reflect all buy-outs by the Contractor and all other adjustments to its actual costs. In addition, when the entire Work of any particular Subcontractor reaches 50% completion, and upon written request from Contractor, the retainage applicable to the remaining Work of that particular Subcontractor may be reduced from ten percent (10%) to zero percent (0%) by Developer in its sole discretion and without any obligation to do so, on the same basis and subject to the same terms and conditions, as set forth in this paragraph for Contractor.

**12.5.5** Upon Substantial Completion of all of the Work, the Developer shall pay Contractor a sum sufficient to increase the total payments to Contractor to ninety-eight percent (98%) of the Contract Sum (subject to the Guaranteed Maximum Price), less amounts, if any, for incomplete Work and unsettled claims, and less two hundred percent (200%) of the value of any punchlist items, which punchlist may include reasonable amounts attributed by Developer for deliverables due upon final completion (e.g., as-built drawings).

**12.6   Intentionally Omitted.**

**12.7**   Except with the Developer's prior approval, payments to Subcontractors included in the Contractor's Applications for Payment shall not exceed an amount for each Subcontractor calculated as follows:

**12.7.1** Take that portion of the Subcontract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Subcontractor's Work by the share of the total Subcontract Sum allocated to that portion in the Subcontractor's schedule of values, less retainage of ten percent (10%). Pending final determination of amounts to be paid to the Subcontractor for changes in the Work, amounts not in dispute may be included as provided in Subparagraph 7.3.7 of the General Conditions even though the Subcontract Sum has not yet been adjusted by Change Order.

**12.7.2** Add that portion of the Subcontract Sum properly allocable to materials and equipment delivered and suitably stored at the site (provided the site is not unreasonably overloaded) for subsequent incorporation in the Work or, if approved in advance by the Developer, suitably stored off the site at a location agreed upon in writing, less retainage of ten percent (10 %). In all instances, whether or not Developer approves payment therefor, materials and equipment stored off-site shall be subject to the requirements of Subparagraph 12.5.3.2 above.

**12.7.3** Subtract the aggregate of previous payments made by the Contractor to the Subcontractor.

**12.7.4** Subtract amounts, if any, for which the Architect or the Developer has withheld or nullified a Certificate for Payment for reasons which are the fault of the Subcontractor or any of its Sub-subcontractors.

**12.7.5.1** Add, upon Substantial Completion of the entire Work of Contractor, a sum sufficient to increase the total payments to the Subcontractor to ninety-eight percent (98 %) of the Subcontract Sum, less amounts, if any, for incomplete Work and unsettled claims and less two hundred percent (200%) of the value of any punchlist items; and, if final completion of the entire Work is thereafter materially delayed through no fault of the Subcontractor, add any additional amounts payable on account of Work of the Subcontractor in accordance with Subparagraph 9.10.3 of the General Conditions. In addition, upon Substantial Completion of the entire Work of any particular Subcontractor, and upon written request from Contractor, the Developer, in its sole discretion and without any obligation to do so, may authorize payment to that particular Subcontractor of a sum sufficient to increase the total payments to that Subcontractor in the same manner, and subject to the same terms and conditions, as set forth in this paragraph for Contractor.

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**12.7.5.2**     The Subcontract Sum is the total amount stipulated in the subcontract to be paid by the Contractor to the Subcontractor for the Subcontractor's performance of the subcontract.

**12.8**     Except with the Developer's prior approval, the Contractor shall not make advance payments to suppliers for materials or equipment which has not been delivered and stored at the site.

**12.9**     In taking action on the Contractor's Applications for Payment, the Architect shall be entitled to rely on the accuracy and completeness of the information furnished by the Contractor and shall not be deemed to represent that the Architect has made a detailed examination, audit or arithmetic verification of the documentation submitted in accordance with Paragraph 12.4 or other supporting data; that the Architect has made exhaustive or continuous on-site inspections or that the Architect has made examinations to ascertain how or for what purposes the Contractor has used amounts previously paid on account of the Contract.  Such examinations, audits and verifications, if required by the Developer, will be performed by the Developer's auditors acting in the sole interest of the Developer.

## ARTICLE 13: FINAL PAYMENT

**13.1**     Final payment shall be made by the Developer to the Contractor when (1) the Contract has been fully performed by the Contractor except for the Contractor's responsibility to correct defective or nonconforming Work, as provided in Subparagraph 12.2.2 of the General Conditions, and to satisfy other requirements, if any, which necessarily survive final payment; (2) a final Application for Payment and a final accounting for the Cost of the Work have been submitted by the Contractor and reviewed by the Developer's auditors; and (3) a final Certificate for Payment has then been issued by the Architect and approved by Developer; such final payment shall be made by the Developer to Contractor not more than the later of (a) 30 days after the issuance of the Architect's final Certificate for Payment or (b) 30 days after Developer's auditors have completed the audit of Contractor's books and records, subject to any adjustments required by the audit. Developer's auditors shall perform the audit of Contractor's books and records within ninety (90) days after the Contractor has properly submitted both its final Application for Payment and its final accounting for the Cost of the Work.

**13.2**     The amount of the final payment shall be calculated as follows:

**13.2.1**   Take the sum of the Cost of the Work substantiated by the Contractor's final accounting and the Contractor's Fee; but not more than the Guaranteed Maximum Price, if any.

**13.2.2**   Subtract amounts, if any, for which the Architect withholds, in whole or in part, a final Certificate for Payment as provided in Subparagraph 9.5.1 of the General Conditions or other provisions of the Contract Documents or that the Developer withholds in accordance with Subparagraph 9.5.1 of the General Conditions or other provisions of the Contract Documents.

**13.2.3**   Subtract the aggregate of previous payments made by the Developer.

**13.2.4**   If the aggregate of previous payments made by the Developer exceeds the amount due the Contractor, the Contractor shall reimburse the difference to the Developer within ten (10) days after demand therefor.

**13.3**     The Developer's auditors will review and report in writing on the Contractor's final accounting within sixty (60) days after delivery of the final accounting to the Developer and Architect by the Contractor and proper submission of the final Application for Payment.  Based upon such Cost of the Work as the Developer's auditors report to be substantiated by the Contractor's final accounting, and subject to such other audits as are deemed appropriate by Developer, and provided the other conditions of Paragraph 13.1 of this Agreement have been met, the Architect will, within seven (7) days after receipt of the written report of the Developer's auditors, either issue to the Developer a final Certificate for Payment (subject to Developer's approval) with a copy to the Contractor, or notify the Contractor and Developer in writing of the Architect's reasons for withholding a certificate as provided in Subparagraph 9.5.1 of the General Conditions.  The time periods stated in this Paragraph 13.3 supersede those stated in Subparagraph 9.4.1 of the General Conditions.

---

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**13.4**    If the Developer's auditors report the Cost of the Work as substantiated by the Contractor's final accounting to be less than claimed by the Contractor, the Contractor shall be entitled to make a claim of the disputed amount. Such claim shall be made by the Contractor within 30 days after the Contractor's receipt of a copy of the Architect's final Certificate for Payment, and failure to make a claim within this 30-day period shall result in the substantiated amount reported by the Developer's auditors becoming binding on the Contractor, subject to additional offsets the Developer may have against the Contractor. Pending a final resolution of a timely claim, the Developer shall pay the Contractor the amount certified by Developer's auditors, provided that it does not exceed the amount stated in the Architect's final Certificate for Payment, and subject to any offsets of Developer against Contractor.

## ARTICLE 14: MISCELLANEOUS PROVISIONS

**14.1    CROSS REFERENCES.**        Where reference is made in this Agreement to a provision of the General Conditions or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

**14.2    INTEREST.**    Payments due and unpaid under the Contract shall bear interest beginning on the 31st day after the date payment is due at the rate stated below:    **110 basis points above the 3-month LIBOR rate as published in the Wall Street Journal in its Money Rates Section on the date payment is due.**

**14.3    RESOLUTION OF CLAIMS AND DISPUTES.**

**14.3.1**    If a dispute, claim, or other matter in controversy arises out of or relates to this Agreement, or to the Project, and if it cannot be resolved through negotiation, then Contractor and Developer agree to proceed with formal non-binding mediation pursuant to Subparagraph 14.3.2 below, and to attempt in good faith to settle the dispute, claim, or other matter in controversy through formal mediation, before resorting and as a condition precedent to litigation. Subject to Paragraphs 6.5 through 6.7 of this Agreement and Paragraph 4.3 of the General Conditions, any disputes during construction as to "Disputed Work" or "Changed Work", as defined in Paragraphs 6.5 through 6.7 of this Agreement, may be referred to mediation as set forth in Subparagraph 14.3.2 below.

**14.3.2**    Mediation shall be conducted by a mediator selected by agreement of the Developer and Contractor, with the cost and fees of the mediator to be equally shared by the Developer and Contractor. The mediator shall be selected by agreement of Developer and Contractor within thirty (30) days of a demand for mediation by either party. If the Developer and Contractor are unable to select a mediator by agreement within the thirty (30) day period set forth above, then the Developer and Contractor, or either of them, shall apply to the American Arbitration Association ("AAA") for a list of qualified mediators with experience in construction disputes, and the Developer and Contractor shall select the mediator from the AAA list through the AAA. If the Developer and Contractor cannot select a mediator from the AAA list within thirty (30) days, then the AAA shall select the mediator and the Developer and Contractor hereby agree to proceed with the mediator. Information disclosed to the mediator by the Developer and the Contractor, or by witnesses, in the course of the mediation shall be confidential, and shall not be divulged by the mediator. The Developer and Contractor shall maintain the confidentiality of the mediation and shall not rely upon, or attempt to introduce as evidence in any judicial or other proceeding, any admissions made by the other in the course of the mediation proceedings, any proposals made or views expressed by the mediator, any proposals made or views expressed by any party to the mediation, or the fact that any party to the mediation had or had not expressed a willingness to accept a proposal for settlement made by the mediator.

**14.3.3**    WITH RESPECT TO EACH OTHER, CONTRACTOR AND DEVELOPER HEREBY EACH WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY WITH REGARD TO ANY AND ALL DISPUTES, CLAIMS OR OTHER MATTERS IN CONTROVERSY THAT ARISE OUT OF OR RELATE TO THIS AGREEMENT, OR THAT ARISE OUT OF OR RELATE IN ANY MANNER TO THE PROJECT, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE; AND CONTRACTOR AND DEVELOPER ACKNOWLEDGE AND AGREE THAT THIS WAIVER OF THE RIGHT TO TRIAL BY JURY SHALL BE ENFORCEABLE BY EACH AGAINST THE OTHER IN ALL FORUMS AND JURISDICTIONS.

**14.3.4**    Developer and Contractor hereby agree that any litigation commenced by either of them against the other with regard to any and all disputes, claims or other matters in controversy that arise out of or relate to this Agreement, or that otherwise arise out of or relate in any manner to the Project, whether sounding in contract, tort, or otherwise, shall be filed in and only in the state or federal court where the Project is located, which is Philadelphia County, Pennsylvania, and not in any other forum or jurisdiction. This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania without reference to choice of law principles.

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format A111 - 1987
AIA Licensed - Page #24

**14.3.5**  Notwithstanding anything to the contrary in sections 14.3.1 through 14.3.4 above, Contractor agrees to all of the terms and conditions of the Dispute Resolution provision in the Development Agreement and the Work Letter (Article XI of the Development Agreement, and Section J of the Work Letter, both attached as part of **Exhibit "N"** hereto) with regard to all disputes between Developer and Fee Owners or Comcast Corporation ("Comcast"), to the extent that such disputes also involve Contractor and as to which Developer demands participation by Contractor in the dispute resolution proceeding with Fee Owners or Comcast.  Developer shall consult with Contractor with respect to the appointment of the Independent Neutral by Comcast and Developer under the Comcast Work Letter, provided, however, that as between Developer and Contractor, Developer shall have sole discretion with respect to the selection of the Independent Neutral.  Contractor agrees to participate in any mediation or arbitration proceedings under the Comcast Work Letter to the extent that such disputes involve the Contractor, as Developer may demand.  To the extent that any dispute between the Developer and the Fee Owners or Comcast involve the Contractor, Contractor agrees that it shall participate, as Developer may demand, in any dispute resolution proceeding between Developer and Fee Owners or Developer and Comcast under the Development Agreement or the Comcast Work Letter; and Contractor agrees to be bound by the decisions of the Independent Neutral under the Dispute Resolution provision of the Comcast Work Letter to the same extent as Developer is bound by such decisions.  If, as a result of the determination of the Independent Neutral, Contractor is liable for any costs incurred by Contractor that were a subject of the dispute and which are otherwise reimbursable as Cost of the Work, such costs shall be paid from the Contractor's Reserve Fund if available, if not otherwise made the subject of any approved Change Order as between Developer and Contractor.

**14.3.6**  During mediation or litigation proceedings, the Developer and Contractor shall comply with Subparagraph 4.3.4 of the General Conditions, subject to Developer's rights and Contractor's obligations under Paragraphs 6.5 through 6.7 of this Agreement. In order to avoid delays to the Project, Contractor shall continue to perform all of the Work, and shall not delay, slow down or refuse to perform any of the Work, and Developer shall continue to make all undisputed payments to Contractor, pending the resolution of any or all claims and disputes; subject, however, to a reservation of rights by Contractor and Developer against each other with regard to all such claims and disputes provided that timely written notice thereof was provided by each party to the other in each instance in accordance with the Contract Documents.

## 14.4    WAIVER OF LIENS, RELEASES AND AFFIDAVITS

**14.4.1**  In addition to any other  requirements set forth in this Agreement, Contractor shall execute and deliver to Developer a written Affidavit, Release, and Waiver of Liens simultaneously with each request for payment, in the form attached hereto as **Exhibit "C-1"**.  Contractor shall also require all of its Subcontractors and suppliers to provide an Affidavit, Release, and Waiver Of Liens, in the form attached hereto as **Exhibit "C-2"**, simultaneously with each request for payment by said Subcontractors and suppliers to Contractor, and shall cause all of its Subcontractors to require their Sub-subcontractors to provide an Affidavit, Release and Waiver of Liens, in the form attached hereto as **Exhibit "C-3"**, simultaneously with each request for payment by said Sub-subcontractors and sub-suppliers to Subcontractor.  With each payment request, Contractor shall provide Developer with proof of paid construction costs (except for the first payment request), a certified list of all of its Subcontractors and suppliers, proof of payment to its Subcontractors and suppliers (except for the first payment request), and executed Affidavits in the form attached hereto as **Exhibit "C-2"** and **Exhibit "C-3"** by all Subcontractors and suppliers and Sub-subcontractors and suppliers, respectively, for disbursements previously made by Developer to Contractor for work, services, materials or equipment provided by said Subcontractors and suppliers and Sub-subcontractors and sub-suppliers.  Should Contractor fail or be unable to provide such an Affidavit from a Subcontractor or supplier, or Sub-subcontractor then Developer may withhold payment from Contractor in such amounts as Developer may determine are necessary to protect Developer against claims or liens by such Subcontractor or supplier or Sub-subcontractor, subject to Contractor's right to provide Developer with a bond (from a surety company, and in form and substance, acceptable to Developer) to cover such claims or liens.

**14.4.2**  The Contractor shall execute, and deliver to Developer, the Final Payment Affidavit, Release, and Waiver of Liens attached hereto as **Exhibit "C-4"** at the time of, and as a condition to, final payment.  The Contractor shall also require all of its Subcontractors and suppliers to provide a Final Payment Affidavit, Release, and Waiver of Liens, in the form attached hereto as **Exhibit "C-5"**, at the time of, and as a condition to, final payment, and shall cause all of its Subcontractors to require their Sub-subcontractors to provide an Affidavit, Release and Waiver of Liens, in the form attached hereto as **Exhibit "C-6"**, at the time of, and as a condition to, final payment to said Sub-subcontractors.  Should Contractor fail or be unable to provide such an Affidavit from a Subcontractor, Sub-subcontractor or supplier, then Developer may withhold payment from Contractor in such amounts as Developer may determine are necessary to protect Developer against claims or liens by such Subcontractor, Sub-subcontractor or supplier, subject to Contractor's right to provide Developer with a bond (from a surety company, and in form and substance, acceptable to Developer) to cover such claims or liens.

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**14.4.3      Indemnification and Discharge of Liens:**  Provided that (a) Developer has made all undisputed payments to the Contractor in accordance with the provisions and limitations of this Agreement, and (b) provided that the Developer has made all undisputed payments to Subcontractors and suppliers in accordance with Section 14.6 of this Agreement, the Contractor hereby agrees to indemnify, defend and hold harmless Developer, Fee Owners and Tenant, and their respective partners and affiliates, successors and assigns, from and against any and all damages, costs, judgments, liabilities, demands, suits and expenses (including reasonable attorney's fees) directly or indirectly relating to any cause of action, claim or lien filed by any person or entity with respect to any work performed in the construction of the Project.  Upon the request of Developer, the Contractor will undertake to defend such causes of actions, claims or liens at its sole cost and expense, and will cause such liens to be  satisfied, removed, or discharged at its own expense by bond, payment or otherwise within ten (10) days from the date of Contractor's receipt of notice as to the filing thereof, and upon its failure to do so, the Developer shall have the right, in addition to all other rights and remedies provided under the Contract Documents or by law, to cause such liens or claims to be satisfied, removed, or discharged by whatever means the Developer chooses, at the entire cost and expense of the Contractor, such cost and expense to include reasonable attorneys' fees and disbursements, which the Developer may sustain or incur in connection therewith.

## 14.5    FURTHER PROVISIONS.

**14.5.1**  The Contract Documents shall not be construed to create a contractual relationship of any kind between any persons or entities other than Developer and Contractor; provided, however, it is understood and agreed that Fee Owners and Comcast Corporation and their direct and indirect subsidiaries, including but not limited to 18A LLC, a Delaware limited partnership ("18A"), are intended third-party beneficiaries of this Agreement between Developer and Contractor; and further provided, however, it is understood and agreed that Developer is an intended third-party beneficiary of all subcontracts, all purchase orders, and all other agreements between Contractor and third parties relating to the Project, including without limitation Contractor's agreements with any Subcontractors.  Contractor shall incorporate the obligations of this Agreement into its respective subcontracts, purchase orders and other agreements with third parties.

**14.5.2  Excavation and Earth-Moving.**  Contractor shall be responsible for all excavation and earth-moving operations as provided in this Paragraph 14.5.2 and on **Exhibit "D-2"**.  Contractor shall also confirm all existing topography of the Project site; and Contractor agrees that the existing topography is part of the surface and subsurface conditions for which Contractor is responsible, subject to Paragraph 14.5.3 of this Agreement.

**14.5.2.1      Bulk Excavation.**  Contractor shall perform all excavation and earth-moving operations within the footprint of the building on an unclassified basis, exception as otherwise expressly provided in this Paragraph 14.5.2 or on **Exhibit "D-2".**

**14.5.2.2      Planned Bottom of Foundations and Caissons.**  Contractor shall also be responsible for the importation and removal of all soil and other material to or from the Project site; provided, however, that if the subsurface conditions at the planned bottoms of the foundations or caissons differ materially from those indicated in the Contract Documents, then a Change Order shall be issued to the extent that such differing subsurface conditions at the planned bottoms of the foundations or caissons cause an increase or decrease in the Cost of the Work, or time required for, performance of the Work, subject to Article 4C of this Agreement.

**14.5.2.3      Existing Utilities.**  Contractor shall be responsible for all abandoned utilities and other utilities to be relocated as part of the scope of the Project, in accordance with and to the extent shown on the Contract Documents, or shown on the other information provided to Contractor by the Developer.  Contractor shall not be responsible for any utilities within or adjacent to the Project site that are not shown on the Contract Documents or on the other information provided to Contractor by the Developer.  If and to the extent that any such utilities are discovered, then a Change Order shall be issued to the extent that such utilities cause an increase in the Cost of the Work, or time required for, performance of the Work.

**14.5.2.4      Contaminated Soil.**  Contractor shall be responsible for the removal and proper disposal of approximately 5,500 cubic yards of petroleum contaminated soil from the Project site.  If additional quantities of contaminated soil, contaminated with petroleum or any other contaminant requiring special handling and/or disposal are discovered at the Project site, then a Change Order shall be issued to the extent that such contaminate soil causes an increase in the Cost of the Work, or time required for, performance of the Work.  Developer shall arrange for the Fee Owners to sign any required hazardous waste or residual waste manifest with respect to the removal of the foregoing contaminated materials.

**14.5.2.5      Intentionally Omitted**

---

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**14.5.2.6      Work Over and Adjacent to Existing SEPTA Tunnel.** Contractor shall be responsible for all work over and adjacent to the existing SEPTA tunnel, including all utilities, obstructions, and other subsurface conditions in accordance with and to the extent shown on the Contract Documents, or shown on the other information provided to Contractor by the Developer. Contractor shall not be responsible for any utilities, obstructions, and other subsurface conditions that are not shown on the Contract Documents or on the other information provided to Contractor by the Developer. If and to the extent that any such utilities, obstruction, or other subsurface conditions are discovered, then a Change Order shall be issued to the extent that such utilities cause an increase in the Cost of the Work, or time required for, performance of the Work.

**14.5.3**  As to other concealed or unknown conditions, see Section 4.3.6 of the General Conditions.

**14.5.4**  In the event that any applicable codes, laws, ordinances, regulations or other legal requirements applicable to the Project require that any permits be obtained by Developer, and this Agreement otherwise requires such permits to be obtained by Contractor, then Contractor shall provide Developer with all of the information necessary for Developer to obtain such permits.

**14.5.5**  The Contractor shall identify, purchase, and expedite the procurement of equipment, materials, and supplies which require lead time for procurement, fabrication, or manufacture in order to insure delivery, installation and construction in a timely manner. The Contractor shall provide or arrange for all temporary facilities and other requirements necessary to enable Contractor and all subcontractors of every tier to perform their work and to insure the safe and proper management, supervision, prosecution and inspection of the Project.

**14.5.6**  The purchase or maintenance of any types of insurance by Developer, whether required by the Contract Documents or otherwise, shall not waive, discharge or release any claims or other rights of Developer against Contractor for damages, losses, liabilities, costs or expenses covered (in whole or in part) by any such insurance, unless such a waiver, discharge or release is expressly stated in this Agreement.

**14.5.7**  The personnel assigned by Contractor to perform services pursuant to this Agreement shall be subject to the continuing approval of the Developer, which approval shall not be unreasonably withheld. Contractor agrees that its Project Team identified in Subparagraph **5.4.2.17.14** above shall not be changed without the prior written consent of Developer.

**14.5.8**  Subject to Paragraph 9.9 of the General Conditions, the Developer shall have the right, upon (10) days' written notice to the Contractor, to take possession of and use any completed or partially completed portions of the Work, notwithstanding that the time for completing the Work on such portions may not have expired; but such possession and use shall not be deemed an acceptance of the Work or any part thereof which is not in accordance with the Contract Documents. If such prior use materially impedes the operations of the Contractor, it shall be entitled to reasonable compensation therefor to the extent the Cost of the Work is increased and to a reasonable extension of time to the appropriate Milestone Dates, subject to Article 4C hereof.

**14.5.9.1**      Contractor shall perform all of the Work in compliance with all Laws, including without limitation all Environmental Laws relating to Hazardous Substances.

**14.5.9.2**      "Hazardous Substances" shall mean underground storage tanks, flammables, explosives, radioactive materials, asbestos-containing materials (ACMs), polychlorinated biphenyls (PCB), chemicals known to cause cancer or reproductive toxicity, pollutants, contaminants, hazardous waste, toxic substances, petroleum and petroleum products, chlorofluoro carbons (CFCs) and any other substances declared to be hazardous or toxic under any present or future, state or local law, ordinance or regulation, in a character or condition that requires remediation under Environmental Laws. "Environmental Laws" shall mean all federal, state and local laws and regulations, judgments, orders and permits governing the protection of the environment. "Hazardous Substances" includes, without limitation, (i) those Hazardous Substances described in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq.; (ii) gasoline, petroleum or other hydrocarbon products or by-products, (iii) asbestos or polychlorinated biphenyls; and (iv) any other substance subject to regulation under any local, state or federal Environmental Laws.

**14.5.9.3**      "Laws" shall mean all local, state and federal laws, ordinances, building codes (including any variances lawfully granted) and any other applicable requirements of duly constituted public authorities and of boards of fire insurance underwriters.

**14.5.10**      Contractor shall comply, and shall require that its Subcontractors comply, with the Economic Opportunity Plan for the Project, which is attached hereto as **Exhibit "Q"** and incorporated by reference. Contractor agrees to comply with all of the

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format A111 - 1987
AIA Licensed - Page #27

obligations of the Economic Opportunity Plan as they apply to "Liberty" and "Owner" and their contractors under Section III (Goals) of the Equal Opportunity Plan, and shall take all reasonable steps to comply with the remaining obligations of "Liberty," "Owner," and their contractors to the extent that such obligations relate to Contractor's Scope of Work for the Project (as distinguished under the terms of the EOP from professional services, including external design, project consulting, and contract administration, or the obligations of any separate contractors engaged by Developer). Contractor shall retain all records relating to such compliance for not less than three (3) years after final completion of the Project.

## 14.6   DIRECT PAYMENT TO SUBCONTRACTORS.

**14.6.1**   Notwithstanding anything to the contrary contained in the Contract Documents, the Contractor, Developer and the Fee Owners have agreed that the Contractor, acting pursuant to authorization by the Developer and Fee Owners, which authorization shall be given only by the Developer's and Fee Owners' written approval of the Subcontract Sum or total delivered material price for the subcontract or materials purchase in question, shall purchase materials and hire all labor and engage all Subcontractors, and the Fee Owners shall, and hereby does, (1) pledge its credit and agrees to be liable in the first instance to the Subcontractors and first tier material suppliers, whose Subcontract sums and delivered materials prices are so approved, for respectively such approved sums and delivered materials prices (to which they become entitled for performance of their agreements), as distinguished from merely guaranteeing payments to them or undertaking to reimburse the Contractor for the cost of such Subcontracts and materials contracts, and (2) agree to make payments, limited to the amounts so approved by the Developer and any Change Orders issued or approved by Developer, directly to the Subcontractors and first tier materialmen, when and if such payments are authorized by Developer and the Architect and the Contractor as more fully set forth in this Agreement. Other than as set forth in the immediately preceding sentence, the Contractor shall remain liable under each subcontract and materials contract as if and as though the Contractor were responsible for making all payments thereunder and for all of Contractor's obligations set forth in the Contract Documents with respect to the subcontracts, Subcontractors, materials contracts and materialmen. It is the intent of all parties to this Agreement that no other rights and responsibilities among Developer, Fee Owners, Architect, the Contractor and the Subcontractors and materialmen shall be affected hereby, including but not limited to the Contractor's responsibility to Developer for the proper and timely performance of the Work (whether performed by Contractor, the Subcontractors or anyone else on its or their behalf). As a result of this paragraph 14.6.1, Contractor shall not include in its invoices to Developer amounts allocated to the payment of the Philadelphia Business Privilege Tax, with respect to payments from Developer to Subcontractors and material suppliers; and Developer acknowledges that Contractor has not included the amount of said tax in the Guaranteed Maximum Price. The Fee Owners' Joinder acknowledging their obligations under this Paragraph 14.6.1 is attached as **Exhibit "AA"** hereto.

**14.6.2**   Contractor agrees that each Subcontract and material contract entered into by Contractor shall contain the following provision:

> COMPENSATION TO BE PAID BY CONTRACTOR. It is intended that [*name of Subcontractor or supplier*] shall be a third party beneficiary of Paragraph 14.6 of the Principal Contract, in which Developer and Fee Owners authorize Contractor in connection with the Project to purchase materials, hire labor and engage Subcontractors, in respect of which Fee Owners shall be responsible for paying each Subcontractor or vendor directly those subcontract sums and materials purchase amounts as are approved by Developer, and in any change orders issued pursuant to the Principal Contract in such amounts as are approved by Developer. No other right or responsibility under the Principal Contract or any other contract shall be affected in connection with the foregoing. No other provision in the Principal Contract or the Contract Documents shall create or give to Subcontractor, materialman or any third parties any claim or direct right of action against the Developer or Fee Owners. At the direction of the Developer and Contractor, Fee Owners shall make the monthly payments to Subcontractor that are approved in accordance with the payment provisions of the Principal Contract.

**14.6.3**   Provided that (a) Developer and/or Fee Owners have made all payments to the Contractor in accordance with the provisions and limitations of this Agreement, and (b) provided that the Fee Owners have made all payments to Subcontractors and suppliers in accordance with this Section 14.6 of this Agreement, the Contractor shall indemnify, defend with counsel reasonably satisfactory to the Developer, the Fee Owners, Comcast Corporation and its affiliates, including but not limited to 18A, and hold such parties harmless from any claim asserted by any Subcontractor or materialman against the Developer, the Fee Owners, Comcast Corporation and its affiliates, including but not limited to 18A, unless the Developer, the Fee Owners, Comcast Corporation and its affiliates, including but not limited to 18A, or any of them, are determined by judicial decision to be responsible or liable to such party under this Paragraph 14.6. Upon such determination, the Contractor shall be reimbursed for all reasonable costs, including attorney's

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Electronic Format A111 - 1987

1800 Arch Street – A111 – Driscoll Base Building FINAL – 6.26.14

AIA Licensed - Page #28

fees, incurred in defending the interests of the Developer (plus interest as set forth in the Contract Documents), unless the Contractor is determined by judicial decision to be the party primarily liable as between Developer and Contractor.

**14.6.4**  Developer shall have the right to withdraw any subcontract or material purchase from the application of Subparagraphs 14.6.1 and 14.6.2 by written notice to Contractor and the Subcontractor or materialman before Developer gives its written approval of the Subcontract sum or delivered materials price.

**14.6.5**  All payments made by Fee Owners to Subcontractors or others under Paragraph 14.6 of this Agreement, or otherwise, shall be credited against payments otherwise due by Developer to Contractor under this Agreement, and shall be included in and subject to the Guaranteed Maximum Price set forth in Paragraph 5.2 of this Agreement.

**14.6.6**  The contractor and subcontractor default insurance (or any payment bond or bonds) required under Subparagraph 10.5.1 of this Agreement shall apply, to the extent of the terms of the policy (or payment bonds), to all payments due by Contractor to each Subcontractor, materialman or other, or due by any them to any Sub-subcontractor, sub-materialman or other, irrespective of whether or not Developer or Fee Owners have agreed to make direct payment to Subcontractors or others under this Paragraph 14.6, and irrespective of any provision of this Paragraph 14.6.

**14.6.7**  The contractor and subcontractor default insurance (or any performance bond or bonds) required under Subparagraph 10.5.1 of this Agreement shall apply to all of the Work, irrespective of whether or not Developer has agreed to make direct payment to any of Contractor's Subcontractors or others under this Paragraph 14.6, and irrespective of any provision of this Paragraph 14.6.

**14.7**   **KEYSTONE OPPORTUNITY ZONE OR OTHER SPECIAL TAX ZONE:**  If the Developer notifies the Contractor that the Project is for a qualified business located within a Keystone Opportunity Zone ("KOZ"), Keystone Opportunity Improvement Zone ("KOIZ"), Keystone Opportunity Expansion Zone ("KOEZ"), or other special tax zone, as defined in the statutes of the Commonwealth of Pennsylvania, the Ordinances of Philadelphia or otherwise, such that it qualifies for exemptions to the Pennsylvania sales and use taxes, or other taxes, for certain building machinery and equipment purchased by the Contractor for the Project pursuant to this Agreement, then Developer hereby certifies that the building machinery and equipment provided by Contractor will be for the exclusive use, consumption and utilization by a qualified business in the KOZ, KOIZ, KOEZ or other special tax zone.  In such event, Contractor, when it purchases building machinery and equipment that is exempt from the sales and use taxes, as set forth above, shall tender, in a timely manner, a Pennsylvania Exemption Certificate, properly completed and executed, to the vendor.  In such event, Contractor shall also provide the appropriate exemption certificates to all subcontractors and suppliers providing building machinery and equipment which is exempt from the sales and use tax.  The cost to be reimbursed to Contractor under Article 7 of this Agreement shall not include any sales or use taxes for which an exemption was allowable by law as set forth in this paragraph, notwithstanding the fact that Contractor, or its subcontractor or supplier, failed to obtain the exemption, unless the failure to obtain the exemption was caused by the fault of Developer or because the machinery or equipment was not of a type that qualifies for such exemption.

**14.8**   <u>**Redevelopment Assistance Capital Program:**</u>  If the Project involves any Redevelopment Assistance Capital Program (RACP) funds, Contractor and its subcontractors shall comply in all respects with all of the requirements of the RACP program, including, without limitation, all of the requirements set forth on <u>**Exhibit "R"**</u> hereto.

**14.9**   **OTHER PROVISIONS**
   ***14.9.1 and 14.9.2 – Intentionally Omitted***
**14.9.3**  Hot Work Permit Procedures

**14.9.3.1**      In addition to all other requirements of the Contract Documents, Contractor shall strictly comply with the Hot Work Permit Procedures set forth on <u>**Exhibit "S"**</u> attached hereto, prior to, during and after performing any "hot work" in any portion of the building that constitutes the Project or within which the Project is located, commencing at the earlier of (a) Substantial Completion of the Project, (b) issuance of a temporary or permanent certificate of occupancy (or similar governmental document) for all or any portion of the Project, or (c) occupancy, or the right to occupy, by the Developer or any tenant of any portion of the building whether or not that portion of the building is part of the Project.  "Hot work" means any temporary operation involving an open flame, or producing heat and/or sparks which could ignite a fire or cause other damage, including but not limited to brazing, cutting, grinding, soldering, torch-applied roofing and welding.  The requirements on <u>**Exhibit "S"**</u> are in addition to all industry "best practices" procedures for hot work, whether performed before or after the time periods described above, with which Contractor shall also strictly comply.

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**14.9.4   Fire Protection Impairment Procedures**

**14.9.4.1**          In addition to all other requirements of the Contract Documents, the Contractor shall strictly comply with the Fire Protection Impairment Procedures set forth on **Exhibit "T"** when disabling, turning off or otherwise impairing (whether to work on, test, repair, change or for any other reason) any part of the fire protection system for all or any portion of the building that constitutes the Project or within which the Project is located, commencing at the earlier of (a) Substantial Completion of the Project, (b) issuance of a temporary or permanent certificate of occupancy (or similar governmental document) for all or any portion of the Project, or (c) occupancy, or the right to occupy, by the Developer or any tenant of any portion of the building covered by the fire protection system whether or not that portion of the building is part of the Project. The requirements set forth on **Exhibit "T"** are in addition to all industry "best practices" procedures when disabling, turning off or otherwise impairing any portion of a fire protection system, whether before or after the time periods described above, with which Contractor shall also strictly comply.

**14.9.5   LEED Certification.**

**14.9.5.1**          Developer represents (a) that it has caused or will cause the Architect to design the Project to achieve a Platinum level LEED certification from the U.S. Green Building Council ("USGBC"); (b) that the Architect or the Developer has retained or will retain a LEED Consultant to advise the Architect and the Developer with respect to the required content of the Design Documents to achieve LEED Platinum; and (c) the Developer has retained or will retain an independent Commissioning Agent who will be responsible for coordinating all LEED commissioning activities during the design and construction phases of the Project. Contractor shall take all actions and maintain all records with regard to the construction of the Project as required for such certification as set forth in the Construction Documents and any applicable requirements of the USGBC, which requirements are incorporated herein by reference as if fully set forth herein, and shall fully cooperate with Developer's design professionals and consultants, including without limitation Developer's Architect and Developer's LEED Consultant, with regard to satisfying the requirements of the USGBC for such certification that uniquely apply to Contractor's construction operations.

**14.9.5.2**          Developer acknowledges that Contractor cannot guarantee that any level of LEED certification will be achieved, because such certification is dependent on some factors that are beyond Contractor's control. In the event that upon Final Completion of the Project, Developer is denied the level of LEED certification requested by Developer from the USGBC and such denial is proximately caused by Contractor's negligent acts or omissions, or Contractor's failure to fulfill a specific responsibility under this Agreement to achieve the LEED Construction Points formally submitted as listed on **Exhibit "Y"**, Chart of Responsibility for LEED Points as the responsibility of the Contractor, then, in such event, Contractor shall be liable to Owner for all direct costs, expenses, losses, liabilities, or other direct damages incurred by Developer on a pro-rata basis as a result of not obtaining the requested level of LEED certification to the extent that such damages that are attributable to Contractor's negligent acts, omissions or failure to fulfill a specific responsibility under this Agreement to achieve the LEED Construction Points as listed on **Exhibit "Y"** as the responsibility of the Contractor; provided however, that in the event that Developer asserts a claim against Contractor pursuant to this Paragraph 14.9.5.2, Contractor shall be permitted a reasonable time to cure any deficiency in the Contractor's performance, and resubmit for the requested level of LEED certification to the extent permitted by the USGBC. Contractor's obligations under this Paragraph 14.9.5.2 shall be determined based on the LEED certification of the Project as of Final Completion, and Contractor shall have no continuing responsibility for Project LEED compliance. By way of example only, if the formal submission to USGBC seeks 84 points, and the actual LEED points awarded by USGBC fall 5 points short of the 84 points sought, and as a result the 80 points required for Platinum certification are not achieved, and Contractor is determined to be responsible pursuant to this Paragraph 14.9.5.2 for 1 of the 5 points that were not awarded, Contractor's liability shall be limited to 1/5 or 20% of the direct costs incurred by the Developer.

**14.9.6   Building Information Modeling**: The Developer, the Architect, and the Contractor shall develop a mutually satisfactory Building Information Modeling ("BIM") implementation plan (the "BIM Implementation Plan"). When finalized and approved by the Developer, the BIM Implementation Plan shall be attached to this Agreement, as **Exhibit "W"**. The Developer shall cause the Architect and its Consultants to perform all of their services in accordance with the Building Implementation Modeling Implementation Plan and the Contractor and its Subcontractors shall perform their work and services under this Agreement, including without limitation, preparation and submission of Shop Drawings, in accordance with the BIM Implementation Plan.

**14.9.7   Business Conduct by Manager:** Liberty Property Limited Partnership ("Manager") strives to maintain the highest ethical standards regarding its business relationships. All of the Manager's employees are subject to the requirements of its Code of Conduct (the "Code"), which prohibits the acceptance of any cash, cash equivalents or gifts exceeding a value of $300, by the Manager's employees from contractors. The Code is available on the Liberty Property Trust website at www.libertyproperty.com, under

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Corporate Governance in the Investors section.  Please be advised that if an employee of the Manager violates the requirements of the Code of Conduct previously noted, the contractor's eligibility to conduct future business with the Manager may be adversely affected. If there is any reason to question the ethical behavior of any of the Manager's employees, a report should be made to Liberty Property Trust's Director of Internal Audit at bgribbin@libertyproperty.com or 610-648-1763.  All such reports may be made anonymously and confidentially.

**14.10   INSURANCE REQUIREMENTS.**

**14.10.1** See **Exhibits "O" and "P"**, and Article 11 of the General Conditions, for Insurance Requirements.

**14.11   COUNTERPARTS.**  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same Agreement, notwithstanding that each party did not sign the same counterpart.

**14.12   INVALIDITY.**  If any one or more of the provisions (or any part thereof) contained in the Contract Documents are for any reason held to be illegal, invalid or otherwise unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision (or part thereof) of the Contract Documents.

**ARTICLE 15:  TERMINATION OR SUSPENSION**

See Article 14 of the General Conditions.

**ARTICLE 16:  ENUMERATION OF CONTRACT DOCUMENTS**

**16.1**   The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated as follows:

**16.1.1**   The Agreement is this executed Standard Form of Agreement Between Developer and Contractor, AIA Document A111, 1987 Edition, as revised herein.

**16.1.2**   The General Conditions are the General Conditions of the Contract for Construction, AIA Document A201, 1987 Edition, as revised by Developer and Contractor and attached hereto.

**16.1.3**   Other Documents, if any, forming part of the Contract Documents are as follows:

1.        General Conditions attached hereto.

2.        Exhibit "A" - Guaranteed Maximum Price Breakdown

3.        Exhibit "B" - Construction Schedule

4.        Exhibit "C-1" - Contractor's Affidavit, Release and Waiver of Liens for progress payments.

5.        Exhibit "C-2" - Subcontractor's Affidavit, Release and Waiver of Liens for progress payments.

6.        Exhibit "C-3" - Sub-subcontractor's Affidavit, Release and Waiver of Liens for progress payments.

7.        Exhibit "C-4" - Contractor's Final Payment Affidavit, Release and Waiver of Liens.

8.        Exhibit "C-5" - Subcontractor's and Supplier's Final Payment Affidavit, Release and Waiver of Liens.

9.        Exhibit "C-6" - Sub-subcontractor's Final Payment Affidavit, Release and Waiver of Liens.

10.       Exhibit "D-1" - List of Plans, Drawings and Other Documents for the Work.

11.       Exhibit "D-2" - Scope of Work Narrative

---

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

12.     Exhibit "E-1" – Required Milestone Completion Dates for the Work

13.     Exhibit "E-2" – Summary of Actual and Liquidated Damages for Delay for TI Work

14.     Exhibit "F" - RACP Requirements

15.     Exhibit "G" - Alternates (if any).

16.     Exhibit "H" - Unit Prices (if any).

17.     Exhibit "I" - Allowances (if any)

18.     Exhibit "J" - L.F. Driscoll Company, LLC Comcast Project Specific Default Insurance Manual, Dated May 12, 2014

19.     Exhibit "K" – Positions and Rates for Contractor's Reimbursable Supervisory & Administrative Personnel

20.     Exhibit "L" - Approved Subcontractor List

21.     Exhibit "M" - List of General Conditions Cost Items

22.     Exhibit "N" - Development Agreement dated June 30, 2014 (including Comcast Lease Work Letter)

23.     Exhibit "O" - OCIP Addendum and Insurance Requirements

24.     Exhibit "P" - OCIP Manual

25.     Exhibit "Q" - Economic Opportunity Plan

26.     Exhibit "R" - Phase I ESA

27.     Exhibit "S" - Hot Work Permit Procedures

28.     Exhibit "T" - Fire Protection Impairment Procedures

29.     Exhibit "U" - Geotechnical Report Dated March 28, 2014

30.     Exhibit "V" - Substance Abuse Prevention Program

31.     Exhibit "W" - BIM Implementation Plan

32.     Exhibit "X" - Notice of Intent to Award Subcontract

33.     Exhibit "Y" - Chart of Contractor "LEED" Responsibility

34.     Exhibit "Z" – List of Additional Insureds

35.     Exhibit "AA" – Fee Owner Joinder


**THIS SPACE INTENTIONALLY BLANK**

**SIGNATURE PAGE FOLLOWS**


AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

This Agreement is effective as of the day and year first written above.

LIBERTY PROPERTY LIMITED PARTNERSHIP
a Delaware limited partnership

By: LIBERTY PROPERTY TRUST, its general partner

By: _____
    John S. Gattuso
    Senior Vice President  & Regional Director


By: _____
    Jim Lutz
    Senior Vice President


L.F. DRISCOLL COMPANY, LLC,
a limited liability company

By: _____
    John J. Donnelly
    Chief Executive Officer

AIA DOCUMENT A111 - OWNER-CONTRACTOR AGREEMENT - TENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

# General Conditions of the Contract for Construction

## (AIA Document A201 – 1987 Ed. – As Revised by Developer and Contractor)

## TABLE OF ARTICLES

1. GENERAL PROVISIONS

2. DEVELOPER

3. CONTRACTOR

4. ADMINISTRATION OF THE CONTRACT

5. SUBCONTRACTORS

6. CONSTRUCTION BY DEVELOPER OR BY SEPARATE CONTRACTORS

7. CHANGES IN THE WORK

8. TIME

9. PAYMENTS AND COMPLETION

10. PROTECTION OF PERSONS AND PROPERTY

11. INSURANCE AND BONDS

12. UNCOVERING AND CORRECTION OF WORK

13. MISCELLANEOUS PROVISIONS

14. TERMINATION OR SUSPENSION OF THE CONTRACT

---

## GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION

### ARTICLE 1
### GENERAL PROVISIONS

## 1.1 BASIC DEFINITIONS

### 1.1.1 THE CONTRACT DOCUMENTS

The Contract Documents consist of the Agreement between Developer and Contractor (hereinafter, the Agreement), the Exhibits attached to the Agreement, the Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, addenda issued prior to execution of the Contract and listed in **Exhibit "D-1"** to the Agreement, other documents listed and described as such in the Agreement and Modifications issued after execution of the Contract. A Modification is (1) a written amendment to the Contract signed by both parties, (2) a Change Order, (3) a Construction Change Directive or (4) a written order for a minor change in the Work issued by the Developer. Unless specifically enumerated in the Agreement, the Contract Documents do not include other documents such as bidding requirements (advertisement or invitation to bid, Instructions to Bidders, sample forms, the Contractor's bid or portions of addenda relating to bidding requirements). The Contractor represents and warrants that it has closely examined all of the Contract Documents, that they are suitable and sufficient to enable the Contractor to complete the Work in a timely manner for the Contract Sum, and that they include all Work, whether or not shown or described, which reasonably may be inferred to be required or useful for the completion of the Work in compliance with all Laws.

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**1.1.2   THE CONTRACT**

The Contract Documents form the Contract for Construction. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. The Contract may be amended or modified only by a Modification. The Contract Documents shall not be construed to create a contractual relationship of any kind (1) between the Architect and Contractor, (2) between the Developer and a Subcontractor or Sub-subcontractor or (3) between any persons or entities other than the Developer and Contractor.

**1.1.3   THE WORK**

The term "Work" means the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project. Nothing in these General Conditions shall be interpreted as imposing on either the Developer or the Architect, or their respective agents, employees, officers, directors, or consultants, any duty, obligation, or authority with respect to any items that are not intended to be incorporated into the Work, including but not limited to the following: shoring, scaffolding, hoists, weatherproofing, or any temporary facility or activity, all of these items being the sole responsibility of the Contractor.

**1.1.4   THE PROJECT**

The Project is the total construction of which the Work performed under the Contract Documents may be the whole or a part and which may include construction by the Developer or by separate contractors.

**1.1.5   THE DRAWINGS**

The Drawings are the graphic and pictorial portions of the Contract Documents, wherever located and whenever issued, showing the design, location and dimensions of the Work, generally including plans, elevations, sections, details, schedules and diagrams.

**1.1.6   THE SPECIFICATIONS**

The Specifications are that portion of the Contract Documents consisting of the written requirements for materials, equipment, construction systems, standards and workmanship for the Work, and performance of related services.

**1.1.7   THE PROJECT MANUAL**

The Project Manual is the volume usually assembled for the Work which may include the bidding requirements, sample forms, Conditions of the Contract and Specifications.

**1.2   EXECUTION, CORRELATION AND INTENT**

**1.2.1**   The Contract Documents shall be signed by the Developer and Contractor as provided in the Agreement. If either the Developer or Contractor or both do not sign all the Contract Documents, the Architect shall identify such unsigned Contract Documents upon request.

**1.2.2**   Execution of the Contract by the Contractor is a representation that the Contractor has visited and inspected the site, become familiar with local conditions under which the Work is to be performed, including, without limitation, the location of adjacent structures and utilities and access to the site, and correlated personal observations with requirements of the Contract Documents.

**1.2.3**   The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Contractor. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Contractor shall be required to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the intended results. Without limiting the generality of the foregoing, the Contractor shall have the obligation to perform and provide all labor, supervision, materials and supplies, insurance other than that covered by the OCIP, tools, equipment, permits, licenses, tax payments, approvals, transportation, testing and field surveying and other services and items as are necessary to satisfactorily complete the Work. Matters not expressly included in the Contract Documents, but which are reasonably inferable therefrom as being necessary to produce the intended results shall be deemed included as part of the Work, and the scope of Work shall be deemed to include, without limitation: (1) items commonly associated with items of Work shown; (2) repetitive items; and (3) items commonly associated with the indicated purpose or quality.

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**1.2.4**   Organization of the Specifications into divisions, sections and articles, and arrangement of Drawings shall not control the Contractor in dividing the Work among Subcontractors or in establishing the extent of Work to be performed by any trade.

**1.2.5**   Unless otherwise stated in the Contract Documents, words which have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.   Words defined in one Contract Document shall have the same meaning in the other Contract Documents.

**1.2.6.**   The terms "knowledge," "recognize," "observe" and "discover," their respective derivatives, and similar terms in the Contract Documents, as used in reference to the Contractor, shall be interpreted to mean that which the Contractor knows (or should know), recognizes (or should recognize), discovers (or should discover) and observes (or should observe)) in exercising the care, skill, and diligence customarily required of a contractor familiar with the Project exercising a high degree of care, skill, and diligence, commensurate with that customarily exercised by experienced general contractors and at-risk construction managers in the construction of projects of similar size and complexity. The expression "reasonably inferable" and similar terms in the Contract Documents shall be interpreted to mean reasonably inferable by a general contractor and/or at-risk construction manager exercising the standard of care, skill and diligence described in the preceding sentence.

**1.2.7.**   The Developer assumes no liability arising out of jurisdictional issues or claims advanced by trade organizations or other interested parties based on the arrangement or manner of subdivision of the content of the Drawings and Specifications.  Issues or claims referred to in the preceding sentence will not entitle the Contractor to an increase in the Guaranteed Maximum Price or an extension of the Contract Time.

**1.2.8.**   If the Work is subject to any union and/or trade agreements, the Contractor shall obtain and review copies of the applicable agreements from the appropriate unions having jurisdiction, familiarize itself with the terms and conditions thereof and comply, and cause the Subcontractors and Sub-subcontractors to comply, with such portions of those union and/or trade agreements as may be applicable to the Work.  The Contractor is solely responsible for making its own assumptions regarding union and/or trade agreement labor rates and labor availability, and the Contractor shall have no claim of any nature against the Developer (except to the extent it is entitled to an extension of the Contract Time pursuant to Article 4C of the Agreement as a result of an industry-wide strike), including but not limited to a claim on account of additional costs the Contractor may incur as a result of the unavailability of labor because of a strike or job action against the Contractor or any Subcontractors or Sub-subcontractors or suppliers, or the unavailability of labor at such assumed labor rates, as a result of changes in labor rates under union and/or trade agreements or collective bargaining negotiations during the period of the Contractor's performance hereunder.  It is the Contractor's obligation to use commercially reasonable efforts to prevent any persons performing the Work from engaging in any disruptive activities such as strikes, picketing, slowdowns, job actions or work stoppages of any nature or ceasing to work due to picketing or other such activities.

## 1.3   OWNERSHIP AND USE OF ARCHITECT'S DRAWINGS, SPECIFICATIONS AND OTHER DOCUMENTS

**1.3.1**   The Drawings, Specifications and other documents prepared by the Architect are instruments of the Architect's service through which the Work to be executed by the Contractor is described.  The Contractor may retain one contract record set. Neither the Contractor nor any Subcontractor, Sub-subcontractor or material or equipment supplier shall own or claim a copyright in the Drawings, Specifications and other documents prepared by the Architect, and unless otherwise indicated the Architect shall be deemed the author of them, subject to any separate agreement between Developer and Architect with regard to ownership rights.  All copies of them, except the Contractor's record set, shall be returned or suitably accounted for to the Developer and the Architect, on request, upon completion of the Work.  The Drawings, Specifications and other documents prepared by the Architect, and copies thereof furnished to the Contractor, are for use by the Contractor solely with respect to this Project.  They are not to be used by the Contractor or any Subcontractor, Sub-subcontractor or material or equipment supplier on other projects or for additions to this Project outside the scope of the Work without the specific written consent of the Developer and the Architect, subject to any separate agreement between Developer and Architect with regard to ownership rights.  The Contractor, Subcontractors, Sub-subcontractors and material or equipment suppliers are granted a limited license to use and reproduce applicable portions of the Drawings, Specifications and other documents prepared by the Architect appropriate to and for use in the execution of their Work under the Contract Documents.  All copies made under this license shall bear the statutory copyright notice, if any, shown on the Drawings, Specifications and other documents prepared by the Architect.  Submittal or distribution to meet official regulatory requirements or for other purposes in connection with this Project is not to be construed as publication in derogation of any Architect's or Developer's copyright or other reserved rights.  Nothing in this paragraph is intended to affect any agreement between the Architect and the Developer with regard to ownership and use of the Architect's Drawings, Specifications or other documents.

**1.3.2**   If the parties intend to transmit any information or documentation in digital form, they shall endeavor to establish necessary protocols governing such transmissions, unless otherwise already provided in the Contract Documents.

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

## 1.4    CAPITALIZATION

**1.4.1**    Terms capitalized in these General Conditions include those which are (1) specifically defined herein or in the Agreement, (2) the titles of numbered articles and identified references to Paragraphs, Subparagraphs and Clauses in the document or (3) the titles of other documents published by the American Institute of Architects.

## 1.5    INTERPRETATION

**1.5.1**    In the interest of brevity the Contract Documents frequently omit modifying words such as "all" and "any" and articles such as "the" and "an," but the fact that a modifier or an article is absent from one statement and appears in another is not intended to affect the interpretation of either statement.

**ARTICLE 2**
**DEVELOPER**

## 2.1    DEFINITION

**2.1.1**    The Developer is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The Developer shall designate in writing a representative who shall have express authority to bind the Developer with respect to all matters requiring the Developer's approval or authorization under the Contract Documents, but the Developer's authorized representative shall not have the authority to amend or modify this Contract. The term "Developer" means the Developer or the Developer's authorized representative.

**2.1.2**    Developer's Authorized Representative shall be appointed by Developer by written notice to Contractor.

## 2.2    INFORMATION AND SERVICES REQUIRED OF THE OWNER

**2.2.1**    The Developer shall, at the written request of the Contractor, prior to commencement of the Work, furnish to the Contractor reasonable evidence that financial arrangements have been made to fulfill the Developer's obligations under the Contract. Furnishing of such information shall be a condition precedent to commencement of the Work. If the Developer materially alters such financial arrangements after such evidence has been furnished to Contractor, then Developer shall promptly provide Contractor with notice of such alterations.

**2.2.2**    The Developer shall furnish, surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, a legal description of the site to the extent reasonably required for the Project, and soil boring information for the Project site. The Contractor shall be entitled to rely on the accuracy of the surveys and other information provided by the Developer, except as otherwise expressly provided in the Agreement and General Conditions.

**2.2.3**    Except for permits and fees, which are the responsibility of the Contractor under the Contract Documents, including without limitation those required under Subparagraph 3.7.1., the Developer shall secure and pay for necessary approvals, easements, assessments and charges required for construction, use or occupancy of permanent structures or for permanent changes in existing facilities.

**2.2.4**    Information or services under the Developer's control shall be furnished by the Developer with reasonable promptness to avoid unreasonable delay in the progress of the Work.

**2.2.5**    Unless otherwise provided in the Contract Documents, the Contractor will be furnished, free of charge, such copies of Drawings and the Project Manual as are reasonably necessary for execution of the Work. The Developer shall request the Architect to also provide a set of the Drawings to Contractor in CAD format, on CD-Rom, and Auto-CAD compatible, using Auto-CAD Release 14.0 or Auto-CAD 2000 or such later format as the parties may agree upon in writing; provided, however, that it shall be the responsibility of the Contractor to ensure that no unauthorized alterations are made to such Drawings.

**2.2.6**    The foregoing are in addition to other duties and responsibilities of the Developer enumerated herein and especially those in respect to Article 6 (Construction by Developer or by separate contractors), Article 9 (Payments and Completion) and Article 11 (Insurance and Bonds).

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

## 2.3    DEVELOPER'S RIGHT TO STOP THE WORK

**2.3.1**    If the Contractor fails to correct Work which is not in accordance with the requirements of the Contract Documents as required by Paragraph 12.2 or repeatedly fails to carry out Work in accordance with the Contract, the Developer, by written order signed personally or by an agent specifically so empowered by the Developer in writing, may order the Contractor to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the right of the Developer to stop the Work shall not give rise to a duty on the part of the Developer to exercise this right for the benefit of the Contractor or any other person or entity, or give rise to any right of the Contractor for damages or an extension of the Contract Time.   Notwithstanding the foregoing, Developer shall have the right to stop work immediately in an emergency to prevent damage to persons or property.

## 2.4    DEVELOPER'S RIGHT TO CARRY OUT THE WORK

**2.4.1**    If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within a ten (10)-day period after receipt of written notice from the Developer to commence and continue correction of such default or neglect with diligence and promptness, the Developer may, without prejudice to other remedies the Developer may have, correct such deficiencies, provided, that no notice need be given in the event of an emergency.   If the Developer corrects such deficiencies, an appropriate Change Order shall be issued deducting from payments then or thereafter due the Contractor the cost of correcting such deficiencies, including compensation for the Architect's additional services and expenses made necessary by such default, neglect or failure.   If payments then or thereafter due the Contractor are not sufficient to cover such amounts, the Contractor shall pay the difference to the Developer, in addition to any other damages incurred by Developer.

## 2.5    NO DEVELOPER RESPONSIBILITY

**2.5.1**    The Developer will not be responsible for the Contractor's failure to carry out the Work in accordance with the Contract Documents.   The Developer will not be responsible for or have control or charge over the acts or omissions of the Contractor, Subcontractors, Sub-subcontractors or suppliers of any tier or any of their agents or employees, or any other persons performing any of the Work.   No implied approvals, reviews, consents or failures to approve, review or consent on the part of the Developer shall relieve the Contractor from any of its obligations to perform the Work in accordance with the Contract Documents; provided, however, that Developer shall be bound by its express written approvals and consents.   The rights stated in this Article 2 and elsewhere in the Contract Documents are cumulative and not in limitation of any rights of the Developer (i) granted in the Contract Documents, (ii) at law, or (iii) in equity.   In no event shall the Developer have control over, charge of, or any responsibility for construction means, methods, techniques, sequences, or procedures or for safety precautions and programs in connection with the Work, notwithstanding any of the rights and authority granted the Developer in the Contract Documents.

### ARTICLE 3
### CONTRACTOR

## 3.1    DEFINITION

**3.1.1**    The Contractor is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number.   The Contractor shall designate in writing a representative who shall have express authority to bind the Contractor with respect to all matters requiring the Contractor's approval or authorization under the Contract Documents, but the Contractor's authorized representative shall not have the authority to amend or modify this Contract.   The term "Contractor" means the Contractor or the Contractor's authorized representative.

## 3.2    REVIEW OF CONTRACT DOCUMENTS AND FIELD CONDITIONS BY CONTRACTOR

**3.2.1**    The Contractor shall carefully study and compare the Contract Documents with each other and with information furnished by the Developer or the Contractor pursuant to Subparagraph 2.2.2 and shall at once report to the Developer and the Architect errors, inconsistencies or omissions discovered.   The Contractor shall not be liable to the Developer or Architect for damage resulting from errors, inconsistencies or omissions in the Contract Documents, provided Contractor gives written notice to Developer and Architect of any errors, omissions or inconsistencies promptly following Contractor's discovery thereof.   If the Contractor performs any construction activity knowing it involves a recognized error, inconsistency or omission in the Contract Documents without such notice to the Architect, the Contractor shall assume appropriate responsibility for such performance and shall bear an appropriate amount of the attributable costs for correction.

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.   WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.   This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**3.2.2**   The Contractor shall take field measurements and verify field conditions and shall carefully compare such field measurements and conditions and other information known to the Contractor with the Contract Documents before commencing activities. Errors, inconsistencies or omissions discovered shall be reported in writing to the Architect and Developer at once.

**3.2.3**   The Contractor shall perform the Work in accordance with the Contract Documents and submittals approved pursuant to Paragraph 3.12.

**3.2.4**   The mechanical and electrical systems, equipment, fixtures, piping, ductwork, conduits, specialty items, and accessories shown on the Drawings are diagrammatic. All variations in alignment, elevation, and detail required to avoid interferences are not necessarily shown. In supervising and carrying out the Work, the Contractor shall prepare coordination drawings to cause the actual layout of the Work to be carried out to fit within the space limitations of the Work, and shall perform the same in such sequence and manner as to avoid conflicts, provide clear access to all control points, including valves, control devices, and specialty items of every nature related to such systems and equipment, obtain maximum available headroom, and provide adequate clearance as required for operation and maintenance. In providing coordination drawings, the Contractor shall provide the level of coordination expected of a professional construction manager on projects of similar size and complexity. Notwithstanding the foregoing, the Contractor does not assume Architect's responsibility for design of the Project, except to the extent that the Contract Documents require any aspect of the Contractor's Work, that is customarily performed on a design-build basis such as fire sprinklers, to be provided on a design-build basis.

**3.2.5**   The exactness of elevations, dimensions, or locations given on any Drawings, or the work installed by other contractors, is not guaranteed by the Architect or the Developer. The Contractor shall therefore satisfy itself as to the accuracy of all elevations, dimensions, and locations. In all cases of interconnection of the Work with existing or other work, Contractor shall verify at the site all dimensions relating to such existing or other work. Any errors due to the Contractor's failure to so verify in accordance with this Subparagraph 3.2.5 shall be promptly rectified by the Contractor without any additional cost to Developer. Having observed the site and reviewed the requirements of the Contract Documents, the Contractor represents and warrants that it has confirmed all relevant dimensions, available utility services, topographic features, and other conditions that will in any manner affect the Work, and satisfied itself that it can complete the Work within the Contract Time in compliance with the Contract Documents.

**3.2.6**   The Developer shall not be required to make any adjustment in either the Guaranteed Maximum Price or the Contract Time in connection with any failure by the Contractor to have complied with the requirements of this Paragraph 3.2.

## 3.3.   SUPERVISION AND CONSTRUCTION PROCEDURES

**3.3.1**   The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall only furnish skilled and properly trained staff for performance of the Work. The Contractor shall be solely responsible for and have sole control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters.

**3.3.2**   The Contractor shall be responsible to the Developer for acts and omissions of the Contractor's employees, Subcontractors, Sub-subcontractors and their agents and employees, and other persons performing portions of the Work under a contract with the Contractor or otherwise.

**3.3.3**   The Contractor shall not be relieved of obligations to perform the Work in accordance with the Contract Documents either by activities or duties of the Architect in the Architect's administration of the Contract, or by tests, inspections or approvals required or performed by persons other than the Contractor.

**3.3.4**   The Contractor shall be responsible for inspection of portions of Work already performed under this Contract to determine that such portions are in proper condition to receive subsequent Work.

**3.3.5**   The Contractor shall inspect all materials delivered to the site and shall reject any that will not conform to the Contract Documents when installed.

**3.3.6**   The Contractor shall assist the Developer and the Architect and their representatives and employees and all Subcontractors in the startup, testing, commissioning, training and operation of the completed Work, including but not limited to all utilities, equipment and systems.

**3.3.7**   The Contractor certifies that its employees have and will at all times during performance of the Work continue to have appropriate working papers or foreign labor certifications; and Contractor shall maintain all paperwork necessary for payroll purposes

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

for such employees is on file and properly documented. The Contractor shall obligate Subcontractors to require that their employees have and will at all times during performance of the Work continue to have appropriate working papers or foreign labor certifications; and shall require that Subcontractors maintain all paperwork necessary for payroll purposes for such employees is on file and properly documented. The Contractor shall keep, and shall require each Subcontractor to keep, accurate payment records showing the name, trade and actual hourly rate of wage, including but not limited to premiums paid to each worker employed by it in connection with the Work, and the Contractor shall, and shall cause each of the Subcontractors, to preserve such records for the longer of the following periods: (i) one year beyond the date of final payment or termination of the Contract, and (ii) such longer period as is otherwise provided by Laws. The Contractor shall permit the Developer to copy all such records upon request.

## 3.4    LABOR AND MATERIALS

**3.4.1**    Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for all labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

**3.4.2**    The Contractor shall enforce strict discipline and good order among the Contractor's employees and other persons carrying out the Work. The Contractor shall not permit employment of unfit persons or persons not skilled in tasks assigned to them.

**3.4.3**    Unless specifically agreed otherwise by Developer and Contractor in writing in each instance, where two or more requirements in the Contract Documents conflict, the most stringent requirement shall prevail.

**3.4.4**    Where no specific kind, make or quality of material is specified, a first class standard article shall be furnished, subject to the prior written approval of the Developer and the Architect.

**3.4.5**    Where materials or makes are specified, and where the words "or equal" or "approved equal" or similar terms are used, it shall be the Contractor's responsibility to obtain prior written approval of the Developer and the Architect of any proposed manufacturer other than those named.

**3.4.6**    Where materials or makes are specified, and where the words "or equal" or "approved equal" or similar terms are not used, only the makes specified shall be furnished and installed unless prior written approval of the Developer and the Architect of proposed substitutions has been obtained.

**3.4.7**    All such materials and makes, as set forth in Subparagraphs 3.4.4 through 3.4.6 above, shall be submitted to Developer and Architect (i) in sufficient time to enable Developer and Architect to review and evaluate them, and to obtain such additional information with respect to them as Developer or Architect may request, in order to enable Developer and Architect to approve or disapprove the proposed material or make prior to Contractor's award of a subcontract or purchase order for such materials and makes, or (ii) as specified for the material or make in a submittal schedule agreed upon in writing among Developer, Architect and Contractor.

**3.4.8**    In the performance of the Work, the Contractor shall transport, store, use, handle and/or dispose of all materials categorized by any applicable Laws or governmental authority as petroleum products or Hazardous Substances in strict compliance with all applicable Laws relating thereto. The Contractor shall indemnify, defend with counsel reasonably satisfactory to the Developer and hold harmless the Developer, Fee Owners, Architect, Comcast Corporation and its affiliates, including but not limited to 18A, and their respective partners, contractors, consultants, agents, and employees, from and against all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from the Contractor's failure to comply with this Paragraph. Nothing contained in this Paragraph or in these General Conditions shall obligate the Contractor to handle or remove petroleum products or hazardous materials requiring remediation presently located on the Project site.

## 3.5    WARRANTY

**3.5.1**    The Contractor warrants to the Developer and Architect that all materials, machinery and equipment furnished under the Contract will be of good quality (or higher, if a higher quality is specified) and new unless approved in writing by the Developer, that the Work will be free from defects, and that the Work will conform with the requirements of the Contract Documents. Work (including, but not limited to, materials and equipment) not conforming to these requirements, including, but not limited to, substitutions not properly approved and authorized by the Developer, may, at the Developer's option, be considered defective. The Contractor's warranty excludes remedy for damage or defect caused by abuse (except abuse caused by a Responsible Party),

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

modifications to the Work not executed by the Contractor or another Responsible Party, maintenance or operation (not undertaken by a Responsible Party) not in accordance with written instructions delivered to Developer on or before Substantial Completion, or normal wear and tear under normal usage.  If required by the Architect or Developer, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment.  This warranty is in addition to all other warranties set forth in the Contract Documents.

**3.5.2**   The Contractor hereby assigns to the Developer any and all manufacturers' warranties relating to materials, machinery or equipment used in the Work, and shall perform the Work in such manner as to preserve all such warranties.  All manufacturers' warranties shall commence upon Substantial Completion, and Contractor shall be solely responsible to obtain any extension of any manufacturers' warranty necessary to ensure that such coverage will commence upon substantial completion, regardless of when the materials, machinery or equipment subject to the warranty was installed or completed.

## 3.6   TAXES

**3.6.1**   Except to the extent otherwise set forth in the Agreement, the Contractor shall pay all sales, consumer, use and similar taxes for the Work or portions thereof provided by the Contractor, which are legally enacted as of the date of the Agreement between Developer and Contractor, whether or not yet effective or merely scheduled to go into effect, including but not limited to all sales taxes, use taxes, occupational taxes, excise taxes, social security taxes, unemployment compensation taxes, and similar levies on all materials, labor, tools, and equipment furnished under the Contract.

## 3.7   PERMITS, FEES, NOTICES AND COMPLIANCE WITH LAWS

**3.7.1**   Unless otherwise provided in the Contract Documents, the Contractor shall secure and pay for the building permit and all other permits and governmental fees, licenses and inspections necessary for proper execution and completion of the Work which are customarily secured after execution of the Contract and which are legally required as of the date of the Agreement between Developer and Contractor.

**3.7.2**   The Contractor shall comply with and give notices required by laws, ordinances, rules, regulations and lawful orders of public authorities and requirements of Developer's property insurer, bearing on performance of the Work.

**3.7.3**   It is not the Contractor's responsibility to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations.  However, if the Contractor observes that portions of the Contract Documents are at variance therewith, the Contractor shall promptly notify the Architect and Developer in writing, and necessary changes shall be accomplished by appropriate Modification.

**3.7.4**   If the Contractor performs Work knowing it to be contrary to laws, statutes, ordinances, building codes, and rules and regulations without such notice to the Architect and Developer, the Contractor shall assume full responsibility for such Work and shall bear the attributable costs.

## 3.8   ALLOWANCES

**3.8.1**   The Contractor shall include in the Guaranteed Maximum Price all allowances stated in the Contract Documents.  Items covered by allowances shall be supplied for such amounts and by such persons or entities as the Developer may direct, but the Contractor shall not be required to employ persons or entities against which the Contractor makes reasonable objection.

**3.8.2**   Unless otherwise provided in the Contract Documents:

   **.1**   materials and equipment under an allowance shall be selected promptly by the Developer to avoid unreasonable delay in the Work;

   **.2**   allowances shall cover the cost to the Contractor of materials and equipment delivered at the site and all required taxes, less applicable trade discounts;

   **.3**   Contractor's costs for unloading and handling at the site, labor, installation costs, overhead, profit and other expenses contemplated for stated allowance amounts shall be included in the Guaranteed Maximum Price and not in the allowances;

   **.4**   whenever costs are more than or less than allowances, the Guaranteed Maximum Price shall be adjusted accordingly by Change Order.  The amount of the Change Order shall reflect (1) the difference between actual costs and the allowances

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  WARNING: Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

under Clause 3.8.2.2 and (2) changes in Contractor's costs for unloading and handling at the site, off-site storage, and labor and installation costs under Clause 3.8.2.3.

**3.8.2.1**  The Contractor shall provide prompt written notice to the Developer if it believes any allowance amount will be exceeded.

## 3.9     PROJECT MANAGER AND SUPERINTENDENT

**3.9.1**     The Contractor shall employ a competent superintendent and necessary assistants who shall be in attendance at the Project site during performance of the Work. The superintendent shall represent the Contractor, and communications given to the superintendent shall be as binding as if given to the Contractor. Important communications shall be confirmed in writing. Other communications shall be similarly confirmed on written request in each case. The Contractor shall also employ a competent project manager.

**3.9.2**     The project manager, project superintendent and other personnel assigned by Contractor to perform services pursuant to the Contract Documents shall be subject to the continuing approval of the Developer, from inception and throughout the Project, which approval shall not be unreasonably withheld.  Contractor shall request and must obtain Developer's written consent, at the inception of the Project, to its proposed construction team members, with supporting references and evidence of their competency to construct the Project, which consent shall not be unreasonably withheld. Once proposed to and approved by Developer at the inception of the project, the Contractor's construction team members shall not be changed without the prior written consent of Developer. Contractor shall not employ or retain a construction team member to whom Developer has reasonably objected.

**3.9.3**     The Contractor shall provide to Developer and Architect telephone numbers and cellular phone numbers of the project superintendent where he/she can be reached twenty-four (24) hours a day, seven (7) days a week, for the duration of the Project.

**3.9.4**     If the project superintendent is not reachable via the means required by Subparagraph 3.9.3 at any time during the duration of the Project, Contractor shall provide alternate contact numbers or shall have other designated personnel that will be knowledgeable of the status and all other material aspects of the Project, and that will be reachable at all times by the Developer and Architect.

## 3.10     CONTRACTOR'S CONSTRUCTION SCHEDULES

**3.10.1**  The Contractor's baseline Construction Schedule is attached to the Agreement as **Exhibit "B"**. The Construction Schedule shall be in a detailed precedence-style critical path method format reasonably satisfactory to the Developer and shall also (i) provide a graphic representation of all activities and events that will occur during performance of the Work, (ii) identify each phase of construction and occupancy, and (iii) set forth dates that are critical in ensuring the timely and orderly completion of the Work in accordance with the requirements of the Contract Documents. The Construction Schedule shall include, without limitation, the Milestone Dates in Paragraph 4.2.2 and **Exhibit "E-1"** of the Agreement.  The Contractor shall utilize the Primavera P-6 computer scheduling program, unless the use of another computer program is approved in writing by Developer in its sole discretion; and Contractor shall provide such reports and updates to Developer as and when requested by Developer.  The Construction Schedule shall not exceed time limits current under the Contract Documents, shall be revised at least monthly and at other appropriate intervals as required by the conditions of the Work and Project, shall be related to the entire Project to the extent required by the Contract Documents, and shall provide for expeditious and practicable execution of the Work.  Such updates shall detail all elements of Project progress and shall identify any delays relating to any activity on the critical path of the Project, the cause and extent of same, the projected impact on Substantial Completion by the required date and steps being taken and recommendations for eliminating or reducing the extent of such delays.  All such updates shall be subject to the Developer's reasonable approval.  In addition, Contractor shall also provide two-week "look ahead" schedules at least monthly during the construction of the Project and other "look-ahead" schedules of various durations as necessary to properly coordinate and manage the Project.  In no event shall updates to the Construction Schedule provided by Contractor, whether or not objected to or approved by Developer, constitute evidence of an adjustment in the Contract Time or the Guaranteed Maximum Price.

**3.10.2**  The Contractor shall prepare and keep current, for the Architect's and Developer's approval, a schedule and status report of submittals (as approved by the Developer and the Architect, and as it may be modified; such modifications being subject to the approval of the Developer and the Architect) (the "Submittal Schedule") which is coordinated with the Construction Schedule and allows the Architect and Developer reasonable time to review submittals.

**3.10.3**  The Contractor shall conform to the most recent Developer-approved Construction Schedule.  Contractor is responsible for taking such actions as are necessary to make sure that all Subcontractors perform their Work in such sequence and in such separate stages as required by the Project and the work of other Subcontractors.

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**3.11     DOCUMENTS AND SAMPLES AT THE SITE**

**3.11.1**   The Contractor shall maintain at the site for the Developer one record copy of the Drawings, Specifications, addenda, Change Orders and other Modifications, in good order and marked currently to record changes and selections made during construction, and in addition approved Shop Drawings, Product Data, Samples and similar required Submittals (as hereinafter defined).  These shall be available in an organized fashion to the Architect and Developer, and shall be delivered to the Architect for submittal to the Developer upon completion of the Work.

**3.11.2**   The Drawings and Specifications shall be marked by the Contractor to reflect all changes made during Construction (as so marked, the "As-Built Plans") and associated construction work shall be monitored on a daily basis by the Contractor.  The As-Built Plans shall be updated weekly, as the Work progresses, showing what was actually constructed, the dimensions and grades of all Work, located horizontally and vertically to the nearest 0.1 of a foot, indicating all exposed features uncovered during the Work and all other construction Work items completed under the Contract Documents.  The Contractor shall require the Subcontractors to participate as necessary in the As-Built Plans updates, which shall show all Work, as it was built or discovered, including the Work of all Subcontractors.  The As-Built Plans of hidden features shall be based upon measurements taken by the Contractor before covering them.  At the Developer's request from time to time, the Contractor shall forward the current As-Built Plans to the Developer.  As a minimum, for underground utilities (uncovered, existing or installed) the As-Built Plans shall show the type of feature, material, size, elevation (top and/or flow line) and horizontal position by the project datum (northing, easting and elevation) at every change in direction and minimally every 50 feet.

**3.12     SHOP DRAWINGS, PRODUCT DATA AND SAMPLES**

**3.12.1**   Shop Drawings are drawings, diagrams, schedules and other data specially prepared for the Work by the Contractor or a Subcontractor, Sub-subcontractor, manufacturer, supplier or distributor to illustrate some portion of the Work.

**3.12.2**   Product Data are illustrations, standard schedules, performance charts, instructions, brochures, diagrams and other information furnished by the Contractor to illustrate materials or equipment for some portion of the Work.

**3.12.3**   Samples are physical examples which illustrate materials, equipment or workmanship and establish standards by which the Work will be judged.

**3.12.4**   Shop Drawings, Product Data, Samples and similar submittals (collectively referred to as "Submittals") are not Contract Documents.  The purpose of their submittal is to demonstrate for those portions of the Work for which Submittals are required the way the Contractor proposes to conform to the information given and the design concept expressed in the Contract Documents. Review by the Architect is subject to the limitations of Subparagraph 4.2.7.1.

**3.12.5**   The Contractor shall review for compliance with the Contract Documents, approve and submit to the Architect and Developer in an organized fashion Submittals required by the Contract Documents in such sequence and within the times shown on the Submittal Schedule as to cause no delay in the Work or in the activities of the Developer or of separate contractors.  Submittals made by the Contractor which are not required by the Contract Documents, or which do not comply with the Contract Documents, shall not be submitted with those that are required and do comply, and may be returned without action.

**3.12.6**   The Contractor shall perform no portion of the Work requiring submittal and review of Submittals until the respective Submittal has been approved by the Architect.  Such Work shall be in accordance with approved Submittals.

**3.12.7**   By submitting Submittals the Contractor represents to the Developer and Architect that the Contractor has (a) reviewed and approved them, (b) determined and verified materials, field measurements and field construction criteria related thereto, or will do so in a timely manner, and (c) checked and coordinated the information contained within such Submittals with the requirements of the Work and of the Contract Documents.

**3.12.8**   The Contractor shall not be relieved of responsibility for deviations from requirements of the Contract Documents by the Architect's or Developer's approval of Submittals unless the Contractor has specifically informed the Architect and the Developer in writing of such deviation at the time of submittal and the Architect and Developer have given written approval to the specific deviation.  The Contractor shall not be relieved of responsibility for errors or omissions in Submittals by the Architect's or Developer's approval thereof.

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**3.12.9**  The Contractor shall direct specific attention, in writing or on resubmitted Submittals, to revisions other than those requested by the Architect on previous submittals.  In the absence of such written notice, the Architect's approval of a resubmission shall not apply to such revisions.

**3.12.10** Informational submittals upon which the Architect is not expected to take responsive action may be so identified in the Contract Documents.

**3.12.11** When professional certification of performance characteristics of materials, systems or equipment is required by the Contract Documents, the Architect shall be entitled to rely upon such certifications to establish that the materials, systems or equipment will meet the performance criteria required by the Contract Documents; provided, that as between the Architect and the Developer, such reliance shall be subject to any qualifications set forth in the Developer's agreement with the Architect.

**3.12.12** If professional design services or certifications by a design professional related to systems, materials or equipment are required of the Contractor in order to fulfill its obligations under the Contract Documents, the Developer or the Architect will specify the material performance and design criteria that such services must satisfy.  The Contractor shall cause such services or certifications to be provided by a properly licensed design professional, carrying appropriate levels of professional liability insurance, whose signature and seal shall appear on all drawings, calculations, specifications, certifications, Shop Drawings and other submittals prepared by such professional.  Shop Drawings and other submittals related to the Work designed or certified by such professional, if prepared by others, shall bear such professional's written approval when submitted to the Architect. The Developer and the Architect shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals, but Such reliance does not relieve the Architect from its obligations under its agreement with the Developer.

## 3.13    USE OF SITE

**3.13.1**  The Contractor shall confine operations at the site to areas permitted by Laws, ordinances, codes, rules and regulations, lawful orders of public authorities, and conditions of any permits and the Contract Documents, and shall not unreasonably encumber the site with materials or equipment.

**3.13.2**  Only materials and equipment that are to be used directly in the Work shall be brought to and stored on the site by the Contractor.  After equipment is no longer required for the Work, it shall be promptly removed from the site.  Protection of construction materials and equipment stored at the site from weather, theft, damage, and all other adversity is solely the responsibility of the Contractor.  The Work shall be performed, to the fullest extent reasonably possible, in such a manner that public areas adjacent to the site shall be free from all debris, building materials, and equipment likely to cause hazardous conditions.

**3.13.3**  Neither the Contractor nor any other Responsible Party shall erect any sign on the site, except for signs required by law, without the prior written consent of the Developer, which may be withheld in the sole discretion of the Developer.

**3.13.4**  Without limitation of any other provision of the Contract Documents, Contractor shall use its best efforts to minimize any interference with the occupancy or beneficial use of any areas and buildings adjacent to the Project.  Without prior approval of the Developer, the Contractor shall not permit any workers to use any existing facilities at the site, including, without limitation, parking areas, other than those designated by the Developer.

## 3.14    CUTTING AND PATCHING

**3.14.1**  The Contractor shall be responsible for cutting, fitting or patching required to complete the Work or to make its parts fit together properly.  All areas requiring cutting, fitting or patching shall be restored to their original condition after such cutting, fitting or patching is completed, unless otherwise required by the Contract Documents.

**3.14.2**  The Contractor shall not damage or endanger a portion of the Work or fully or partially completed construction of the Developer or separate contractors by cutting, patching or otherwise altering such construction, or by excavation.  The Contractor shall not cut or otherwise alter such construction by the Developer or a separate contractor except with written consent of the Developer and of such separate contractor; such consent shall not be unreasonably withheld, conditioned or delayed.  The Contractor shall not unreasonably withhold, condition or delay from the Developer or a separate contractor the Contractor's consent to cutting or otherwise altering the Work.

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

## 3.15   CLEANING UP

**3.15.1**  The Contractor shall keep the site and surrounding area free from accumulation of waste materials or rubbish caused by operations under the Contract; and, in that regard, Contractor shall clean up the site and surrounding area on a regular basis and as frequently as necessary to keep them so free to the Developer's satisfaction.  At completion of the Work the Contractor shall promptly remove from and about the site all waste materials, rubbish, the tools, construction equipment, machinery and surplus materials.  The Contractor shall be responsible for the timely and expeditious removal and lawful off-site disposal of all debris and excess materials resulting from the Work.  In addition, the Contractor shall remove all marks, stains and spills, fingerprints and other soil and dirt from the finished Work to the Developer's satisfaction.

**3.15.2**  If the Contractor fails to clean up as provided in the Contract Documents, the Developer may do so and the cost thereof shall be charged to the Contractor.

## 3.16   ACCESS TO WORK

**3.16.1**  The Contractor shall provide the Developer, Developer's designees and Architect access to the Work at all times in preparation and progress wherever located.  Contractor shall provide and maintain access roads to the Building(s) during construction.

## 3.17   ROYALTIES, PATENTS AND COPYRIGHTS

**3.17.1**  The Contractor shall pay all royalties and license fees.  The Contractor shall defend suits or claims for infringement of copyrights and patent rights and shall hold the Developer and Architect harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer or manufacturers is required by the Contract Documents, or where copyright violations are contained in the Drawings and Specifications.  However, if the Contractor has reason to believe that the required design, process or product is an infringement of a copyright or patent, the Contractor shall be responsible for such loss unless such information is promptly furnished in writing to the Architect and Developer.

## 3.18   INDEMNIFICATION

**3.18.1**  To the fullest extent permitted by law, the Contractor shall indemnify, defend with counsel reasonably acceptable to the Developer and hold harmless the Developer and the Fee Owners, Comcast Corporation, Liberty Property Limited Partnership, and their affiliates, including but not limited to 18A LLC, a Delaware limited partnership and their respective partners, the Developer's separate project representative or construction manager (if any), the Developer's consultants, the Developer's separate contractors, the Architect and its consultants, and the officers, directors, agents and employees of all of them, from and against all claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of, or failure to perform, the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including but not limited to loss of use resulting therefrom, but only to the extent caused in whole or in part by the willful misconduct or the negligent acts or omissions of a Responsible Party, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.  Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Paragraph 3.18.

**3.18.2**  In claims against any person or entity indemnified under this Paragraph 3.18 by an employee of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under this Paragraph 3.18 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Contractor or a Subcontractor under workers' or workmen's compensation acts, disability benefit acts or other employee benefit acts.

**3.18.3**  In addition to the indemnity obligations set forth in Sections 3.18.1 to 3.18.2 of the General Conditions, the Contractor shall indemnify and hold harmless the Developer, the Fee Owners, their respective partners, Architect, consultants and separate contractors, and any of their subcontractors, sub-subcontractors, agents and employees, from and against any claims against them any of them, by any employee of the Contractor, its contractors, anyone directly or indirectly employed by it or them or anyone for whose

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

acts it or they may be liable, in the event of injury or death to such employee, except to the extent, on a pro rata basis, that such injury or death to the employee was caused by the negligent acts or omissions of the Developer or any of the other indemnitees.

**3.18.4** The obligations of the Contractor under this Paragraph 3.18, and under Subparagraph 14.5.10 of the Agreement, shall not extend to the liability of the Architect, the Architect's consultants, and agents and employees of any of them arising out of (1) the preparation or approval of maps, drawings, opinions, reports, surveys, Change Orders, designs or specifications, or (2) the giving of or the failure to give directions or instructions by the Architect, the Architect's consultants, and agents and employees of any of them provided such giving or failure to give is the primary cause of the injury or damage.

**3.18.5** Subject to the limited exception in Subparagraph 3.18.4 above with regard to the Architect, Subparagraphs 3.18.1 through 3.18.4 above are not intended to, and shall not, limit in any way the indemnification obligations of Contractor under Subparagraph 14.5.10 of the Agreement or under any other provision of the Contract Documents; and, in the event of any conflict or inconsistency between any of the various indemnification obligations of Contractor, the broadest indemnification obligation of Contractor that is the most beneficial to Developer and the other indemnitees shall apply in all instances.

**3.18.6** Developer shall include indemnification provisions substantially the same as this Section 13.8, listing Contractor and its Subcontractors as indemnified parties, in all contracts with its separate contractors and other contractors with respect to this Project or any of the Related Projects, and shall use reasonable commercial efforts to cause Fee Owners and Tenant to do the same.

## 3.19    REPORTS; WEBSITE

**3.19.1** The Contractor shall provide monthly written progress reports to the Developer in accordance with the Developer's reasonable requirements, which reports shall include, at a minimum, the following:   (i) a statement of the current status of construction in relation to the Construction Schedule; (ii) an estimate of the remaining time to achieve Substantial Completion and whether any delays have been encountered; (iii) any proposed change in the Construction Schedule; (iv) project GMP accounting records that include a listing of outstanding, proposed and approved change orders; (v) site safety report; (vi) a detailed description of the use of any funds in the Contingency since the last report; (vii) a report of actual versus projected cash flow; and (viii) such other information as the Developer may reasonably request.

**3.19.2** The Contractor shall provide and administer web-based project management software and a project website, all as is reasonably required by the Developer.

**ARTICLE 4**
**ADMINISTRATION OF THE CONTRACT**

## 4.1    ARCHITECT

**4.1.1**    The Architect is the person lawfully licensed to practice architecture or an entity lawfully practicing architecture identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number.  The term "Architect" means the Architect or the Architect's authorized representative.

**4.1.2**    Duties, responsibilities and limitations of authority of the Architect as set forth in the Contract Documents shall not be restricted, modified or extended without written consent of the Developer.

**4.1.3**    In case of termination of employment of the Architect, the Developer shall appoint an architect whose status under the Contract Documents shall be that of the former architect.

## 4.2    ARCHITECT'S ADMINISTRATION OF THE CONTRACT

**4.2.1**    In collaboration with the Developer, the Architect will provided administration of the Contract as described in the Contract Documents.  The Architect will advise and consult with the Developer.  The Architect will have authority to act on behalf of the Developer only to the extent provided in the Contract Documents, unless otherwise modified by written instrument in accordance with other provisions of the Contract.

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**4.2.2**    The Architect will visit the site at intervals appropriate to the stage of construction to become reasonably familiar with the progress and quality of the completed Work and to determine if the Work is being performed in a manner indicating that the Work, when completed, will be in accordance with the Contract Documents.  On the basis of on-site observations as an architect, the Architect will keep the Developer informed of the progress of the Work, and will endeavor to guard the Developer against defects and deficiencies in the Work.

**4.2.3**    The Architect will not have control over or charge of and will not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's responsibility as provided in Paragraph 3.3.  The Architect will not be responsible to the Contractor for the Contractor's Construction Schedule or failure to carry out the Work in accordance with the Contract Documents.  The Architect will not have control over or charge of and will not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons performing portions of the Work.

**4.2.4    Intentionally Omitted.**

**4.2.5**    Based on the Architect's observations and evaluations of the Contractor's Applications for Payment, the Architect will review and certify the amounts due the Contractor and will issue Certificates for Payment in such amounts, subject to Developer's approval.

**4.2.6**    The Architect will have authority to recommend that Developer, and Developer will have authority to, reject Work which does not conform to the Contract Documents.  Whenever the Architect considers it necessary or advisable for implementation of the intent of the Contract Documents, subject to the prior approval of the Developer, the Architect will have authority to require additional inspection or testing of the Work in accordance with Subparagraphs 13.5.2 and 13.5.3, whether or not such Work is fabricated, installed or completed.  However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees, or other persons performing portions of the Work.

**4.2.7.1** The Architect will review and approve or take other appropriate action upon the Submittals, including but not limited to Shop Drawings, Product Data, Mockups and Samples, for the limited purpose of checking for conformance with the Contract Documents.  The Architect's action will be taken in accordance with the Submittal Schedule, or in the absence of a Submittal Schedule, with such reasonable promptness as to cause no delay in the Work or in the activities of the Developer, Contractor or separate contractors, while allowing sufficient time in the Architect's professional judgment to permit adequate review.  Review of Submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems designed by the Contractor, all of which remain the responsibility of the Contractor as required by the Contract Documents.  The Architect's review of the Submittals shall not relieve the Contractor of its obligations under Paragraphs 3.3, 3.5 and 3.12.  The Architect's review shall not constitute approval of safety precautions or, unless otherwise specifically stated by the Architect, of any construction means, methods, techniques, sequences or procedures.  The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

**4.2.7.2**    The Developer shall request the Architect to use the following stamps upon its review of Contractor's Shop Drawings: (a) Approved, (b) Approved as noted, (c) Revise and resubmit, or (d) Rejected.  Contractor shall not proceed unless and until the Architect stamps the Contractor's shop drawing "Approved" or "Approved as noted."

**4.2.8**    The Architect will prepare Change Orders and Construction Change Directives, all of which are subject to  approval and execution by Developer.

**4.2.9**    The Architect will conduct inspections to determine the date or dates of Substantial Completion and the date of final completion and other required dates under Article 4A of the Agreement, and will receive and forward to the Developer for the Developer's review and records written warranties and related documents required by the Contract and assembled by the Contractor, and will issue a final Certificate for Payment upon compliance by the Contractor with the requirements of the Contract Documents, subject to approval by Developer.

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

A201 – Driscoll – 1800 Arch Street – BASE BUILDING & HOTEL – 6.30.14 – FINAL

**4.2.10**  If the Developer and Architect agree, the Architect will provide one or more project representatives to assist in carrying out the Architect's responsibilities at the site. The duties, responsibilities and limitations of authority of such project representatives shall be as set forth in an exhibit to be incorporated in the Contract Documents.

**4.2.11**  The Architect will interpret and decide matters concerning performance of the Contractor under and requirements of the Contract Documents on written request of the Developer, subject to approval by Developer of decisions by Architect. The Architect's response to such requests will be made with reasonable promptness and within any time limits agreed upon. If no agreement is made concerning the time within which interpretations required of the Architect shall be furnished in compliance with this Subparagraph 4.2.11, then delay shall not be recognized on account of failure by the Architect to furnish such interpretations until 15 days after written request is made for them.

**4.2.12**  Interpretations and decisions of the Architect will be consistent with the intent of and reasonably inferable from the Contract Documents and will be in writing or in the form of drawings, and subject to Developer's approval. When making such interpretations and decisions, the Architect will endeavor to secure faithful performance by both Developer and Contractor, and will not show partiality to either.

**4.2.13**  The Architect's decisions, if approved by Developer, on matters relating to aesthetic effect will be final if consistent with the intent expressed in the Contract Documents.

**4.2.14**  The Architect will review and respond to requests for information about the Contract Documents, and shall copy the Developer on all responses. The Architect's response to such requests shall be in writing within any time limits to which it has agreed or otherwise with reasonable promptness. If appropriate, the Architect will prepare and issue supplemental Drawings and Specifications in response to requests for information.

## 4.3      CLAIMS AND DISPUTES

**4.3.1     Definition.**  A Claim is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Developer and Contractor arising out of or relating to the Contract. Claims must be made by written notice. The responsibility to substantiate Claims shall rest with the party making the Claim.

**4.3.2     Intentionally Omitted.**

**4.3.3     Time Limits on Claims.**  Claims by the Contractor must be made within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the Contractor first recognizes or should have recognized the condition giving rise to the Claim (except to the extent a different time period is set forth for a particular type of Claim elsewhere the Contract Documents), whichever is later. Claims must be made by written notice. Failure to comply with such time limits for making a Claim shall be deemed a waiver of such Claim.

**4.3.4     Continuing Contract Performance.**  Pending final resolution of a Claim, including mediation and litigation, the Contractor shall proceed diligently with performance of the Contract and the Developer shall continue to make undisputed payments in accordance with the Contract Documents, subject to Paragraphs 6.5 through 6.7 of the Agreement. In order to avoid delays to the Project, Contractor shall continue to perform all of the Work, and shall not delay, slow down or refuse to perform any of the Work, pending the resolution of any or all Claims and disputes; subject, however, to a reservation of rights by Contractor and Developer against each other with regard to all such Claims and disputes, subject to Subparagraph 4.3.3.

**4.3.5     No Waiver or Acceptance.**  No entrance, use or occupancy of all or part of the Project shall constitute an acceptance of Work or a waiver of the Developer's Claims against Contractor.

**4.3.6     Claims for Concealed or Unknown Conditions.**  Subject to the provisions of Paragraph 14.5.2 of the Agreement, Contractor shall be responsible for all bulk excavation and earth-moving operations within the foot print of the building proper on an unclassified basis. Contractor shall also confirm all existing topography of the Project site, and Contractor agrees that the existing topography is part of the surface and subsurface conditions for which Contractor is responsible under the Contract. Contractor shall

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

also be responsible for the importation and removal of all soil and other material to or from the Project site. Contractor represents and warrants that it has carefully examined, evaluated and satisfied itself as to the nature, location and character of the Project site and of the Work, including without limitation the surface and subsurface conditions, and the subsurface information provided by the Developer, and has made reasonable provision in the Guaranteed Maximum Price for the such conditions. Contractor acknowledges (a) that Developer has provided Contractor with access to the Project site, and (b) that Contractor has conducted such examinations, investigations, explorations, borings, tests and studies concerning surface and subsurface conditions at and/or contiguous to the Project site as Contractor deemed appropriate. Except as otherwise expressly provided in Paragraph 14.5.2 of the Agreement, Contractor shall bear full responsibility and risk for all concealed or unknown physical conditions, whether surface or subsurface, regardless of whether such conditions are of an unusual nature, and regardless of whether such conditions differ materially from those ordinarily found to exist and/or recognized as inherent in construction activities of the type provided for in the Contract Documents.

**4.3.7   Claims for Additional Cost.**   If the Contractor wishes to make a Claim for an increase in the Guaranteed Maximum Price, written notice as provided herein shall be given before proceeding to execute the Work. Prior notice is not required for Claims relating to an emergency endangering life or property arising under Paragraph 10.3. If the Contractor believes additional cost is involved for reasons including but not limited to (1) a written interpretation from the Architect, (2) an order by the Developer to stop the Work where the Contractor was not at fault, (3) a written order for a minor change in the Work issued by the Developer, (4) failure of payment by the Developer, (5) termination of the Contract by the Developer, (6) Developer's suspension or (7) other reasonable grounds, a Claim shall be made in accordance with the procedure established herein.

**4.3.8   Claims for Additional Time**

**4.3.8.1** If the Contractor wishes to make a Claim for an increase in the Contract Time, written notice as provided herein shall be given. The Contractor's Claim shall include an estimate of cost and of probable effect of delay on progress of the Work. In the case of a continuing delay only one Claim is necessary.

**4.3.8.2** If adverse weather conditions are the basis for a Claim for additional time, such Claim shall be documented by data substantiating that weather conditions were abnormal for the period of time and could not have been reasonably anticipated, and that weather conditions had an adverse effect on the scheduled construction.

**4.3.9   Injury or Damage to Person or Property.** If either party to the Contract suffers injury or damage to person or property because of an act or omission of the other party, of any of the other party's employees or agents, or of others for whose acts such party is legally liable, written notice of such injury or damage, whether or not insured, shall be given to the other party within a reasonable time not exceeding 21 days after first observance. The notice shall provide sufficient detail to enable the other party to investigate the matter. If a Claim for additional cost or time related to this Claim is to be asserted by the Contractor, it shall be made as provided in Subparagraphs 4.3.7 or 4.3.8.

**4.3.10   Claims for Consequential Damages.** The Contractor and Developer waive Claims against each other for consequential damages arising out of or relating to this Contract, except for damages as specifically provided in Sections 4.9 and Paragraph 14.9.5.2 of the Agreement, and damages arising out of or related to defective or non-conforming work. This mutual waiver, subject to the above exceptions, includes:

> .1   damages incurred by the Developer for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and

> .2   damages incurred by the Contractor for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit except profit on–Work actually performed on the Project.

This mutual waiver is applicable, without limitation other than the exceptions set forth above, to all consequential damages due to either party's termination in accordance with Article 14.   Nothing contained in this Subparagraph 4.3.10 shall be deemed to preclude an award of actual or liquidated delay damages under Section 4.9 of the Agreement, or damages under section 14.9.5.2 of the Agreement, or damages arising out of or related to defective or non-conforming work, when applicable.

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

## 4.4    RESOLUTION OF CLAIMS AND DISPUTES

**4.4.1**    See Section 14.3 of the Agreement.

**ARTICLE 5**
**SUBCONTRACTORS**

## 5.1    DEFINITIONS

**5.1.1**    A Subcontractor is a person or entity who has a direct contract with the Contractor to perform a portion of the Work at the site. The term "Subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Subcontractor or an authorized representative of the Subcontractor. The term "Subcontractor" does not include a separate contractor or subcontractors of a separate contractor. All parts of the Work that Contractor does not perform with its own forces shall be performed by Subcontractors pursuant to subcontracts entered into between Contractor and the Subcontractors. Contractor shall monitor the work of the Subcontractors in order to ensure compliance with the Contract Documents. Contractor is responsible to Developer for the proper performance by the Subcontractors of the parts of the Work that they perform.

**5.1.2**    A Sub-subcontractor is a person or entity who has a direct or indirect contract with a Subcontractor to perform a portion of the Work at the site. The term "Sub-subcontractor" is referred to throughout the Contact Documents as if singular in number and means a Sub-subcontractor or an authorized representative of the Sub-subcontractor. The Contractor shall bear the same level of responsibility with respect to Sub-subcontractors as the Contractor bears with respect to Subcontractors.

**5.1.3**    The Contractor's subcontracting of the Work shall not relieve Contractor from any liability or obligation under the Contract Documents or under any applicable Laws. Contractor shall be responsible for any and all acts, defaults, omissions and negligence of its Subcontractors, Sub-subcontractors and consultants, and shall be and remain liable and obligated to Developer for all Work subcontracted.

## 5.2    AWARD OF SUBCONTRACTS AND OTHER CONTRACTS FOR PORTIONS OF THE WORK

**5.2.1**    Unless otherwise stated in the Contract Documents or the bidding requirements, the Contractor, as soon as practicable after award of the Contract, shall furnish in writing to the Developer and the Architect the names of persons or entities (including those who are to furnish materials or equipment fabricated to a special design) proposed for each principal portion of the Work, including the results of the Contractor's prequalification process to certify the proposed subcontractors' technical, managerial and financial capability to successfully complete the Work. The Developer will promptly reply to the Contractor in writing and stating whether or not the Developer, has reasonable objection to any such proposed person or entity. Failure of the Developer to reply within fifteen (15) days after receipt of such names shall constitute notice of no reasonable objection.

**5.2.2**    The Contractor shall not contract with a proposed person or entity to whom the Developer has made reasonable and timely objection. The Contractor shall not be required to contract with anyone to whom the Contractor has made reasonable objection.

**5.2.3**    If the Developer has reasonable objection to a person or entity proposed by the Contractor, the Contractor shall propose another to whom the Developer has no reasonable objection.

**5.2.4**    The Contractor shall not change a Subcontractor, person or entity previously selected if the Developer makes reasonable objection to such change.

## 5.3    SUBCONTRACTUAL RELATIONS

**5.3.1**    By appropriate written agreement, the Contractor shall require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities which the Contractor, by the Contract Documents, assumes toward the Developer and Architect. Each subcontract agreement shall preserve and protect the rights of the Developer and Architect under the Contract Documents with respect to the Work to be performed by the Subcontractor so that subcontracting thereof will not prejudice such

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

rights, and shall allow to the Subcontractor, unless specifically provided otherwise in the subcontract agreement, the benefit of all rights, remedies and redress against the Contractor that the Contractor, by the Contract Documents, has against the Developer. The Contractor shall require each Subcontractor to enter into similar agreements with Sub-subcontractors. The Contractor shall make available to each proposed Subcontractor, prior to the execution of the subcontract agreement, copies of the Contract Documents to which the Subcontractor will be bound, and, upon written request of the Subcontractor, identify to the Subcontractor terms and conditions of the proposed subcontract agreement which may be at variance with the Contract Documents. Subcontractors shall similarly make copies of applicable portions of such documents available to their respective proposed Sub-subcontractors.

**5.3.2**   Without limiting the other requirements set forth in Subparagraph 5.3.1 and elsewhere in the Contract Documents, each subcontract agreement shall provide for the resolution of claims and disputes in the same manner as Paragraph 14.3 of the Agreement.

**5.3.3**   Contractor shall provide Developer with (a) copies of all subcontracts as they are signed, including any subsequent amendments thereto, and (b) a list of the expiration dates of all labor agreements with unions that are in effect during the performance of the Work.

**5.3.4**   In addition to any requirements set forth elsewhere in the Contract Documents, each subcontract shall be in form reasonably satisfactory to the Developer and include the following, unless the Developer agrees otherwise in writing:

(i)   termination provisions substantially similar to those contained in Article 14;
(ii)  an indemnification provision in favor of the indemnitees described in Paragraph 3.18 substantially similar to that contained in Paragraph 3.18;
(iii) a provision waiving rights of subrogation against the Developer with respect to damages to items covered by the Developer's builder's risk insurance policy or other property insurance applicable to the Work, and acknowledging that in no event shall the Developer bear any responsibility for damage or loss to the Subcontractor's tools and equipment or temporary structures;
(iv)  if the Developer has established an Owner Controlled Insurance Program for the Project, a provision whereby the Subcontractor agrees to promptly provide all information required by the Developer or its insurance administrator in connection with the Developer's insurance program; and
(v)   an agreement that the Developer is a third-party beneficiary of the subcontract.

## 5.4   CONTINGENT ASSIGNMENT OF SUBCONTRACTS

**5.4.1**   Each existing and future subcontract agreement for a portion of the Work is hereby assigned by the Contractor to the Developer, provided that:

.1   assignment is effective only after termination of the Contract by the Developer for cause pursuant to Paragraph 14.2, or termination of the Contract for convenience pursuant to Paragraph 14.4, and only for those subcontract agreements which the Developer accepts in its sole discretion by notifying the Subcontractor in writing; and

.2   assignment is subject to the prior rights of the surety, if any, obligated under any bond relating to the Contract.

**5.4.2**   If the Work has been suspended for more than 90 days, the Subcontractor's compensation shall be equitably adjusted, if the Developer accepts the Subcontractor agreement under section 5.4.1 above.

**5.4.3**   The Developer may, in its sole discretion, assign to a replacement contractor any subcontract agreement which it accepts under Section 5.4.1 above.

**5.4.4**   Each subcontract agreement shall provide for its contingent assignment to Developer under Section 5.4.1 above, and shall provide that the Developer has no liability for default of the Contractor occurring before assumption by the Developer, except for non-payment of any amounts payable by Developer or Fee Owners to Subcontractor pursuant to Paragraph 14.6 of the Agreement.

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**ARTICLE 6**
**CONSTRUCTION BY DEVELOPER OR BY SEPARATE**
**CONTRACTORS**

## 6.1 DEVELOPER'S RIGHT TO PERFORM CONSTRUCTION AND TO AWARD SEPARATE CONTRACTS

**6.1.1** The Developer reserves the right to perform construction or operations related to the Project with the Developer's own forces, and to award separate contracts to separate contractors in connection with other portions of the Project or other construction or operations on the site. If the Contractor claims that delay or additional cost is involved because of such action by the Developer, the Contractor shall make such Claim as provided elsewhere in the Contract Documents. References in this Article 6 to "separate contractors" refer to contractors (including but not limited to vendors supplying machinery, equipment and/or any items furnished by the Developer to the Contractor outside the Guaranteed Maximum Price) engaged by Fee Owners, Developer or Comcast Corporation, as applicable.

**6.1.2** When separate contracts are awarded by Developer for different portions of the Project or other construction or operations on the site, the term "Contractor" in the Contract Documents in each case shall mean the separate contractor who executes each such separate Developer-Contractor Agreement (hereinafter "separate contractor").

**6.1.3** In addition to, and not in derogation of, the Contractor's responsibilities pursuant to Article 3, the Contractor shall, as part of the Work, provide for the coordination of work to be performed by each separate contractor with the Work to be performed by the Contractor and its Subcontractors and Sub-subcontractors. The Contractor shall use commercially reasonably efforts to cooperate with the Developer and all separate contractors, their subcontractors, and any other entity involved in the performance of the Work. In order to cause the Work and any work to be performed by separate contractors to be completed in an expeditious manner, the Contractor agrees that it will provide such separate contractors a reasonable opportunity to complete their work as and when required. Without limiting the generality of the foregoing, the Contractor shall fully coordinate the Work with the Hotel FF&E Work, the TI Work and the Post-TI Work.

**6.1.4** Developer shall require each of its other contractors to name Contractor and its Subcontractors as additional insureds by endorsement on form CG 20 26 07/04 (ADDITIONAL INSURED – DESIGNATED PERSON OR ORGANIZATION) or equivalent on their respective commercial liability and excess liability insurance policies for ongoing operations, and by endorsement on form CG 20 37 07/04 (ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS) or equivalent for completed operations. Developer shall provide Contractor with a copy of the endorsements prior to the time that the separate contractor is allowed access to the Project Site. A list of the parties required to be named as Additional Insureds is attached as Exhibit "Z" to the Agreement.

## 6.2 MUTUAL RESPONSIBILITY

**6.2.1** The Contractor shall afford the Developer and the separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities, and shall connect and coordinate the Contractor's construction and operations with theirs as required by the Contract Documents.

**6.2.2** If part of the Contractor's Work depends for proper execution or results upon construction or operations by the Developer or a separate contractor, the Contractor shall, prior to proceeding with that portion of the Work, promptly report to the Architect and Developer any apparent discrepancies or defects in such other construction that would render it unsuitable for such proper execution and results. Failure of the Contractor so to report shall constitute an acknowledgment that the Developer's or separate contractors' completed or partially completed construction is fit and proper to receive the Contractor's Work, except as to defects not then reasonably discoverable.

**6.2.3** Costs caused by delays or by improperly timed activities or defective construction shall be borne by the party responsible therefor.

**6.2.4** The Contractor shall promptly remedy damage caused by the Contractor to completed or partially completed construction or to property of the Developer or separate contractors as provided in Subparagraph 10.2.5.

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**6.2.5**    Claims and other disputes and matters in question between the Contractor and a separate contractor shall be subject to the provisions of Paragraph 4.3 provided the separate contractor has reciprocal obligations.

**6.2.6**    The Developer and each separate contractor shall have the same responsibilities for cutting and patching as are described for the Contractor in Paragraph 3.14.

## 6.3    DEVELOPER'S RIGHT TO CLEAN UP

**6.3.1**    If a dispute arises among the Contractor, separate contractors and the Developer as to the responsibility under their respective contracts for maintaining the site and surrounding area free from waste materials and rubbish as described in Paragraph 3.15, the Developer may clean up and allocate the cost among those responsible as the Developer determines to be just.

**ARTICLE 7**
**CHANGES IN THE WORK**

## 7.1    CHANGES

**7.1.1**    Changes in the Work may be accomplished after execution of the Contract, and without invalidating the Contract, by Change Order, Construction Change Directive or order for a minor change in the Work, subject to the limitations stated in this Article 7 and elsewhere in the Contract Documents.  A change in the Guaranteed Maximum Price or the Contract Time shall be accomplished only by Change Order or Construction Change Directive.  Accordingly, no course of conduct or dealings between the parties, nor express or implied acceptance of alterations or additions to the Work, and no Claim that the Developer has been unjustly enriched by any alteration of or addition to the Work (regardless of any actual enrichment) shall be the basis of any Claim to an increase in any amounts due under the Contract Documents or a change in any time period provided for in the Contract Documents.

**7.1.2**    A Change Order shall be based upon agreement between the Developer and Contractor; a Construction Change Directive may be issued unilaterally by the Developer and may or may not be agreed to by the Contractor; an order for a minor change in the Work may be issued by the Developer alone.  Agreement on any Change Order shall constitute a final settlement of all the Contractor's Claims relating to the change in Work that is that subject of the Change Order, including, but not limited to, all direct and indirect costs associated with such change and any and all adjustments to the Guaranteed Maximum Price and the Contract Time.

**7.1.3**    Changes in the Work shall be performed under applicable provisions of the Contract Documents, and the Contractor shall proceed promptly, unless otherwise provided in the Change Order, Construction Change Directive or order for a minor change in the Work.

**7.1.4**    If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are so changed in a proposed Change Order or Construction Change Directive that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Developer or Contractor, the applicable unit prices shall be equitably adjusted.

**7.1.5**    If requested in a bulletin issued by Developer, the Contractor shall submit to Developer a Change Order proposal within ten (10) days after the Contractor's receipt of such bulletin, and which shall include an itemized breakdown (as applicable) of the following:

    (i)     Quantities of materials;

    (ii)    Unit cost of materials;

    (iii)   Total hours for each classification of labor;

    (iv)   Hourly rates applicable to each classification of labor;

    (v)    Costs of Social Security, old age and unemployment insurance, and fringe benefits required by agreement or custom;

    (vi)   Bond premiums, if any;

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

(vii)  Rental cost and value of equipment, delivery charges and applicable trade discounts;

(viii)  Additional cost of supervision and field office personnel directly attributable to the proposed change;

(ix)  Subcontractors' and Sub-subcontractors' predetermined allowance for overhead and profit, if any;

(x)  Transportation costs;

(xi)  Additional premiums for insurance not provided by the OCIP, if any;

(xii)  All impact or "ripple" costs;

(xiii)  Total cost to Developer;

(xiv)  Number of additional calendar days, if any, required to complete the additional Work and any proposed changes to the Construction Schedule;

(xv)  Any allowance for overhead and profit expressly provided for in the Contract Documents; and

(xvi)  Any other information required by any of the Contract Documents.

Notwithstanding the foregoing, to the extent the information described above in this Subparagraph 7.1.5 is not reasonably obtainable within such ten (10)-day period, the Contractor shall receive a reasonable extension of such deadline so long as it diligently and in good faith seeks to provide such information.

## 7.2    CHANGE ORDERS

**7.2.1**    A Change Order is a written instrument prepared by the Architect or Developer and signed by the Developer, Contractor and, if Developer requests, Architect, stating their agreement upon all of the following:

.1  a change in the Work;

.2  the amount of the adjustment in the Guaranteed Maximum Price, if any; and

.3  the extent of the adjustment in the Contract Time, if any.

**7.2.2**    Methods used in determining adjustments to the Guaranteed Maximum Price may include those listed in Subparagraph 7.3.3.

## 7.3    CONSTRUCTION CHANGE DIRECTIVES

**7.3.1**    A Construction Change Directive is a written order prepared by the Architect or the Developer and signed by the Developer and, if the Developer requests, Architect, directing a change in the Work and stating a proposed basis for adjustment, if any, in the Guaranteed Maximum Price, or Contract Time, or both.  The Developer may by Construction Change Directive, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions (including repair of damaged work), the Guaranteed Maximum Price and Contract Time being adjusted accordingly.

**7.3.2**    A Construction Change Directive shall be used in the absence of total agreement on the terms of a Change Order.

**7.3.3**    If the Construction Change Directive provides for an adjustment to the Guaranteed Maximum Price, the adjustment shall be based on one of the following methods:

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

.1    mutual written acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;

.2    unit prices stated in the Contract Documents or subsequently agreed upon in writing;

.3    cost to be determined in a manner agreed upon by the parties in writing and a mutually acceptable fixed or percentage fee; or

.4    as provided in Subparagraph 7.3.6 of these General Conditions.

**7.3.4**    Upon receipt of a Construction Change Directive, the Contractor shall promptly (unless otherwise provided in the applicable Construction Change Directive) proceed with the change in the Work involved and advise the Architect and Developer of the Contractor's agreement or disagreement with the method, if any, provided in the Construction Change Directive for determining the proposed adjustment in the Guaranteed Maximum Price or Contract Time.

**7.3.5**    A Construction Change Directive signed by the Contractor indicates the agreement of the Contractor therewith, including adjustment in Guaranteed Maximum Price and Contract Time or the method for determining them. Such agreement shall be effective immediately and shall be recorded as a Change Order.

**7.3.6**    If the Contractor does not respond promptly or disagrees with the method for adjustment in the Guaranteed Maximum Price, the method and the adjustment shall be determined by the Developer on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including, in case of a change in the Guaranteed Maximum Price, a corresponding increase or decrease (as appropriate) in the Contractor's Fee pursuant to Paragraph 5.1 of the Agreement, subject to Paragraphs 6.4 through 6.7 of the Agreement. In such case, and also under Clause 7.3.3.3 of these General Conditions, the Contractor shall keep and present, in such form as the Developer may prescribe, an itemized accounting together with appropriate supporting data. Unless otherwise provided in the Contract Documents, costs for the purposes of this Subparagraph 7.3.6 shall be limited to the following:

.1    costs of labor, including social security, old age and unemployment insurance, fringe benefits required by agreement or custom, and workers' or workmen's compensation insurance;

.2    costs of materials, supplies and equipment, including cost of transportation. whether incorporated or consumed;

.3    rental costs of machinery and equipment, exclusive of hand tools, whether rented from the Contractor or others; and

.4    costs of premiums for all bonds and insurance, permit fees, and sales, use or similar taxes related to the Work.

**7.3.7**    Pending final determination of cost to the Developer, amounts not in dispute may be included in Applications for Payment. The amount of credit to be allowed by the Contractor to the Developer for a deletion or change which results in a net decrease in the Guaranteed Maximum Price shall be actual net cost as confirmed by the Developer. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of net increase, if any, with respect to that change.

**7.3.8**    If the Developer and Contractor do not agree with the adjustment in Contract Time or Guaranteed Maximum Price, the dispute shall be resolved pursuant to Paragraphs 4.3 and 4.4 hereof.

**7.3.9**    When the Developer and Contractor agree with the recommendation made by the Architect concerning the adjustments in the Guaranteed Maximum Price and Contract Time, or otherwise reach agreement upon the adjustments, such agreement shall be effective immediately and shall be recorded by preparation and execution of an appropriate Change Order.

## 7.4    MINOR CHANGES IN THE WORK

**7.4.1**    The Developer will have authority to order minor changes in the Work not involving adjustment in the Guaranteed Maximum Price or extension of the Contract Time and not inconsistent with the intent of the Contract Documents. Such changes

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

shall be effected by written order and shall be binding on the Developer and Contractor. The Contractor shall carry out such written orders promptly, unless otherwise provided in the minor change.

## ARTICLE 8
## TIME

### 8.1   DEFINITIONS

**8.1.1**   Unless otherwise provided, Contract Time is the period of time, including authorized adjustments, allotted in the Contract Documents for Substantial Completion of the Work.

**8.1.2**   The date of commencement of the Work is the date established in the Agreement. The date shall not be postponed by the failure to act of the Contractor or of persons or entities for whom the Contractor is responsible.

**8.1.3**   The date of Substantial Completion is the date certified by the Architect (and approved by the Developer, in its reasonable discretion) in accordance with Paragraph 9.8 of these General Conditions, provided that appropriate certificates of occupancy have been issued by all governmental authorities having jurisdiction with regard to the Project, and further provided that all of the requirements contained in the Contract Documents for Substantial Completion of the Work have also been satisfied.

**8.1.4**   The term "day" as used in the Contract Documents shall mean calendar day unless otherwise specifically defined.

### 8.2   PROGRESS AND COMPLETION

**8.2.1**   Time limits stated in the Contract Documents are of the essence of the Contract. By executing the Agreement the Contractor confirms that the Contract Time is a reasonable period for performing the Work.

**8.2.2**   The Contractor shall not knowingly, except by agreement or instruction of the Developer in writing, prematurely commence operations on the site or elsewhere prior to the effective date of insurance required by Article 11 to be furnished by the Contractor or Developer. The date of commencement of the Work shall not be changed by the effective date of such insurance. Unless the date of commencement is established by a notice to proceed given by the Developer, the Contractor shall notify the Developer in writing not less than five days or other agreed period before commencing the Work to permit the timely filing of mortgages and other security interests.

**8.2.3**   The Contractor shall proceed expeditiously and continuously with adequate forces and shall achieve Substantial Completion within the Contract Time.

### 8.3   DELAYS AND EXTENSIONS OF TIME

**8.3.1**   See Paragraphs 4.4 through 4.6 of the Agreement.

**8.3.2**   Claims relating to time shall be made in accordance with applicable provisions of Paragraph 4.3 hereof.

## ARTICLE 9
## PAYMENTS AND COMPLETION

### 9.1   CONTRACT SUM

**9.1.1**   The Contract Sum is stated in the Agreement and, including authorized adjustments, is the total amount payable by the Developer to the Contractor for performance of the Work under the Contract Documents.

### 9.2   SCHEDULE OF VALUES

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**9.2.1** Before the first Application for Payment, the Contractor shall submit to the Developer a schedule of values (as it may be revised in accordance with the Contract Documents, the "Schedule of Values") allocating the entire Guaranteed Maximum Price to various portions of the Work, prepared in such form and supported by such data to substantiate its accuracy as the Developer may require. The Schedule of Values shall separately list, among other things, the values for the Work for each floor of the high-rise building, and also for each different area of the Work outside of the building. This Schedule of Values, unless objected to by the Developer, shall be used as a basis for reviewing the Contractor's Applications for Payment.

## 9.3   APPLICATIONS FOR PAYMENT

**9.3.1** At least thirty days before the date established for each progress payment, the Contractor shall submit to the Developer and Architect an itemized Application for Payment, prepared in accordance with the latest Schedule of Values, for completed portions of the Work. Such application shall be notarized, if required, and supported by such data substantiating the Contractor's right to payment as the Developer or Architect may require, such as copies of requisitions from Subcontractors and material suppliers, and reflecting retainage if provided for elsewhere in the Contract Documents.

**9.3.1.1** Such applications may include requests for payment on account of changes in the Work which have been properly authorized by Construction Change Directives but not yet included in Change Orders.

**9.3.1.2** Such applications shall not include requests for payment of amounts the Contractor does not intend to pay to a Subcontractor or material supplier because of a dispute or other reason.

**9.3.2** Payments shall be made on account of materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work. If approved in advance by the Developer, payment may similarly be made for materials and equipment suitably stored off the site at a location agreed upon in writing. Payment for materials and equipment stored on or off the site shall be conditioned upon compliance by the Contractor with procedures satisfactory to the Developer to establish the Developer's title to such materials and equipment and otherwise protect the Developer's interest, and shall include applicable insurance, storage, and transportation to the site for such materials and equipment stored off the site.

**9.3.3** The Contractor warrants that title to all Work covered by an Application for Payment will pass to the Developer no later than the earlier of the time of payment or incorporation of such Work into the completed construction. The Contractor further warrants that upon submittal of an Application for Payment all Work for which Certificates for Payment have been previously issued and payments received from the Developer shall, be free and clear of liens, claims, security interests or encumbrances favor of the Contractor, Subcontractors, material suppliers, or other persons or entities making a claim by reason of having provided labor, materials and equipment relating to the Work.

**9.3.4** Each Application for Payment shall bear the signature of Contractor's project manager, which signature shall constitute Contractor's representation and warranty to Developer that:

(i)     the Work indicated in the Application for Payment has progressed to the level represented;
(ii)    the Work has been properly and timely performed as required by the Contract Documents;
(iii)   that no Work has been covered contrary to the request of the Developer, or contrary to any provisions in the Contract Documents;
(iv)    that expenses and costs claimed in the Application for Payment have been actually incurred;
(v)     that all obligations of Contractor covered by prior Applications for Payment have been paid in full; and
(vi)    that, to the best of Contractor's knowledge, information and informed belief, the amount requested is currently due and owing, there being no reason known to Contractor that payment of any portion thereof should be withheld.

## 9.4   CERTIFICATES FOR PAYMENT

**9.4.1** The Architect will, within seven days after receipt of the Contractor's Application for Payment, together with all supporting documentation required under the Contract Documents, either issue to the Developer a Certificate for Payment, subject to Developer's approval and with a copy to the Contractor, for such amount as the Architect determines is properly due, or notify the Contractor and Developer in writing of the Architect's reasons for withholding certification in whole or in part as provided in Subparagraph 9.5.1 of these General Conditions.

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**9.4.2**  The issuance of a Certificate for Payment will constitute a representation by the Architect to the Developer, based on the Architect's observations at the site and the data comprising the Application for Payment, that the Work has progressed to the point indicated and that, to the best of the Architect's knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject to results of subsequent tests and inspections required by the Contract Documents, to minor deviations from the Contract Documents correctable without cost to the Developer prior to completion and to specific qualifications expressed by the Architect. The issuance of a Certificate for Payment will further constitute a representation that the Contractor is entitled to payment in the amount certified. However, the issuance of a Certificate for Payment will not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, or (3) made examination to ascertain how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

## 9.5  DECISIONS TO WITHHOLD CERTIFICATION

**9.5.1**  The Architect may decide not to certify payment and may withhold a Certificate for Payment in whole or in part, to the extent reasonably necessary to protect the Developer, if in the Architect's opinion the representations to the Developer required by Subparagraph 9.4.2 cannot be made. If the Architect is unable to certify payment in the amount of the Application, the Architect will notify the Contractor and Developer as provided in Subparagraph 9.4.1. If the Contractor and Architect cannot agree on a revised amount, the Architect will promptly issue a Certificate for Payment for the amount for which the Architect is able to make such representations to the Developer, subject to Developer's approval. The Architect may also decide not to certify payment or, because of subsequently discovered evidence or subsequent observations, may nullify the whole or a part of a Certificate for Payment previously issued, to such extent as may be necessary in the Architect's opinion to protect the Developer from loss, and the Developer may withhold payment to the extent it reasonably deems necessary to protect itself from loss and damage, because of:

.1  defective Work not remedied;

.2  incomplete Application for Payment;

.3  third party claims or liens filed or reasonable evidence indicating probable filing of such claims or liens;

.4  failure of the Contractor to make payments properly to Subcontractors or for labor, materials or equipment;

.5  reasonable evidence that the Work cannot be completed for the unpaid balance of the Guaranteed Maximum Price;

.6  damage to the Developer or another contractor;

.7  reasonable evidence that the Work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay;

.8  failure to carry out the Work in accordance with, or other default under, the Contract Documents; or

.9  any material claims of Developer against Contractor.

**9.5.2**  When the above reasons for withholding certification and payment are removed, certification and payment will be made for amounts previously withheld.

**9.5.3**  If the Architect withholds certification or if the Developer does not approve the Architect's certification, the Developer may, at the Developer's sole option and in its sole discretion, issue joint checks, pursuant to the provision for "joint checks" in the Agreement, to the Contractor and any Subcontractor or supplier to whom the Contractor has failed to make payment for Work properly performed or materials or equipment properly supplied and delivered.

## 9.6  PROGRESS PAYMENTS

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**9.6.1**   After the Architect has issued and Developer has approved a Certificate for Payment, the Developer shall make payment in the manner and within the time provided in the Contract Documents.

**9.6.2**   The Contractor shall promptly pay each Subcontractor, upon receipt of payment from the Developer, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled, reflecting percentages actually retained from payments to the Contractor on account of such Subcontractor's portion of the Work. The Contractor shall, by appropriate agreement with each Subcontractor, require each Subcontractor to make payments to Sub-subcontractors in similar manner.

**9.6.3**   The Architect or Developer may, on request, furnish to a Subcontractor, if practicable, information regarding percentages of completion or amounts applied for by the Contractor and action taken thereon by the Architect and Developer on account of portions of the Work done by such Subcontractor.

**9.6.4**   The Developer has the right to request written evidence from the Contractor that the Contractor has paid its Subcontractors and suppliers the amounts paid by the Developer to the Contractor for the Work performed and materials and equipment supplied by such Subcontractors and suppliers. If the Contractor fails to provide such evidence within seven days, the Developer shall have the right to contact Subcontractors and suppliers to ascertain whether they have been paid. This right of Developer is in addition to whatever rights that Developer may otherwise have to contact Subcontractors and suppliers to ascertain whether they have been paid. Neither the Developer nor Architect shall have an obligation to pay or to see to the payment of money to a Subcontractor or supplier except as may otherwise be required by law.

**9.6.5**   Payment to material and equipment suppliers shall be treated in a manner similar to that provided in Subparagraphs 9.6.2, 9.6.3 and 9.6.4.

**9.6.6**   A Certificate for Payment, a progress payment, or partial or entire use or occupancy of the Project by the Developer shall not constitute acceptance of Work not in accordance with the Contract Documents.

## 9.7    FAILURE OF PAYMENT

**9.7.1**   If the Developer without reasonable cause does not pay the Contractor within seven days after the date established in the Contract Documents the amount certified by the Architect and approved by the Developer, then the Contractor may, upon seven additional days' written notice to the Developer and Architect, stop the Work until payment of the amount owing has been received. Thereafter, the Contract Time, subject to Article 4C of the Agreement, shall be extended appropriately and the Guaranteed Maximum Price shall be increased by the amount of the Contractor's reasonable costs of shut-down, delay and start-up, which shall be accomplished as provided in Article 7. Notwithstanding anything to the contrary in this Subparagraph 9.7.1, however, if the Developer and the Contractor have a dispute with regard to any particular items included in the Contractor's Application for Payment, then such disputes shall be resolved pursuant Subparagraph 4.3.1 of these General Conditions, and the Contractor shall not stop, delay, slow down or refuse to perform any of the Work and rather shall abide by Subparagraph 4.3.1.

## 9.8    SUBSTANTIAL COMPLETION

**9.8.1**   Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof the Developer has agreed in writing to accept separately, is sufficiently complete in accordance with the Contract Documents so the Developer can occupy or utilize the Work for its intended use and the requirements for Substantial Completion set forth in the  Development Agreement and Work Letter have been met, subject to the requirements set forth in paragraph 8.1.3 above.

**9.8.2**   When the Contractor considers that the Work, or a portion thereof which the Developer agrees in writing to accept separately, is substantially complete, the Contractor shall prepare and submit to the Architect and Developer a comprehensive list of items to be completed or corrected.  The Contractor shall proceed promptly to complete and correct items on the list.  Failure to include an item on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents.  Upon receipt of the Contractor's list, the Architect and Developer will make an inspection to determine whether the Work or designated portion thereof is substantially complete.  If such inspection discloses any item, whether or not included on the Contractor's list, which is not in accordance with the requirements of the Contract Documents, the Contractor shall, before issuance of the Certificate of Substantial Completion, complete or correct such item, upon notification by the Architect.  The Contractor shall

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

then submit a request for another inspection by the Architect and Developer to determine Substantial Completion. When the Work or such designated portion thereof is substantially complete in the Developer's reasonable opinion and the Architect's opinion, the Architect will prepare a Certificate of Substantial Completion which shall establish the date of Substantial Completion, shall establish responsibilities of the Developer and Contractor for security, maintenance, heat, utilities, damage to the Work and insurance, and shall fix the time within which the Contractor shall finish all items on the list accompanying the Certificate, which shall be within thirty (30) days of the date of Substantial Completion; except for items as to which Developer and Architect agree in writing will require more than thirty (30) days for Contractor to complete, which items shall be identified in writing by Contractor with a schedule for completion acceptable to Developer and Architect. Warranties required by the Contract Documents shall commence on the date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion, or unless otherwise deemed not acceptable by Architect or Developer in writing, or unless the item which is the subject of the warranty is on the punch list. The Certificate of Substantial Completion shall be submitted to the Developer and Contractor for their written acceptance of responsibilities assigned to them in such Certificate, which shall not be unreasonably withheld, conditioned or delayed by either.

**9.8.3**  Upon Substantial Completion of the Work or designated portion thereof and upon application by the Contractor, certification by the Architect and approval by the Developer, not to be unreasonably withheld, the Developer shall make payment, reflecting adjustment in retainage, if any, for such Work or portion thereof as provided in the Contract Documents.

## 9.9    PARTIAL OCCUPANCY OR USE

**9.9.1**    The Developer may occupy or use any completed or partially completed portion of the Work at any stage, provided such occupancy or use is consented to by the insurer as required under Subparagraph 11.3.11 and authorized by public authorities having jurisdiction over the Work.  Such partial occupancy or use may commence whether or not the portion is substantially complete, provided the Developer and Contractor have accepted in writing the responsibilities assigned to each of them for payments, retainage, if any, security, maintenance, heat, utilities, damage to the Work and insurance, and have agreed in writing concerning the period for correction of the Work and commencement of warranties required by the Contract Documents.  When the Contractor considers a portion substantially complete, the Contractor shall prepare and submit a list to the Architect as provided under Subparagraph 9.8.2. Consent of the Contractor to partial occupancy or use shall not be unreasonably withheld, conditioned or delayed.  The stage of the progress of the Work for these purposes shall be determined by written agreement between the Developer and Contractor.

**9.9.2**    Immediately prior to such partial occupancy or use, the Developer, Contractor and Architect shall jointly inspect the area to be occupied or portion of the Work to be used in order to determine and record the condition of the Work.

**9.9.3**    Unless otherwise agreed upon, partial occupancy or use of a portion or portions of the Work shall not constitute acceptance of Work not complying with the requirements of the Contract Documents.

## 9.10    FINAL COMPLETION AND FINAL PAYMENT

**9.10.1**  Upon receipt of written notice from the Contractor that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the Architect and Developer will promptly make such inspection and, when the Architect and Developer find the Work acceptable under the Contract Documents and the Contract fully performed, the Architect will promptly issue a final Certificate for Payment stating that to the best of the Architect's knowledge, information and belief, and on the basis of the Architect's observations and inspections, the Work has been completed in accordance with terms and conditions of the Contract Documents and that the entire balance found to be due the Contractor and noted in said final Certificate is due and payable, subject to Developer's approval.  The Architect's final Certificate for Payment will constitute a further representation to Developer that conditions listed in Subparagraph 9.10.2 as precedent to the Contractor's being entitled to final payment have been fulfilled.

**9.10.2**  Neither final payment nor any remaining retained percentage shall become due until the Contractor submits to the Architect and Developer, in form and substance reasonably acceptable to the Developer, (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Developer or the Developer's property might be responsible or encumbered (less amounts withheld by Developer) have been paid or otherwise satisfied, (2) a certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Developer, (3) a written statement that the Contractor knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Documents, (4) consent of surety, if any, to final payment, (5) if required by the Developer, other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, and (6) all other items required by the Contract Documents. If a Subcontractor refuses to furnish a release or waiver required by the Developer, the Contractor may furnish a bond satisfactory to the Developer to indemnify the Developer against such lien. If such lien remains unsatisfied after payments are made, the Contractor shall refund to the Developer all money that the Developer may be compelled to pay in discharging such lien, including all costs and reasonable attorneys' fees.

**9.10.3** Notwithstanding anything to the contrary, final completion shall not be deemed to have occurred until the following are delivered to the Developer: (i) hard copies and electronic copies (in a format to be identified by Developer) of operating, maintenance and service manuals, instruction books, and other information required by the Contract Documents to be delivered to Developer at or before final completion; (ii) duly executed assignments of manufacturers' warranties required under the Contract Documents or otherwise provided by manufacturers of materials or equipment, in form and substance reasonably satisfactory to Developer, and municipal and state approval certificates which the Contractor is required to deliver pursuant to the Contract Documents (indexed and bound as required by the Contract Documents or as is otherwise reasonably satisfactory to Developer); (iii) a hard copy and an electronic copy (in a format to be identified by Developer) of a spare parts list for all installed equipment; (iv) for each subdivision of Work, the names and addresses of all parties furnishing labor and/or materials; (v) the final As-Built Plans; and (vi) any other items required by the Contract Documents.

**9.10.4** If, after Substantial Completion of the Work, final completion thereof is materially delayed through no fault of the Contractor or by issuance of Change Orders affecting final completion, and the Architect so confirms (subject to the Developer's approval, not to be unreasonably withheld), the Developer shall, upon application by the Contractor and certification by the Architect, and without terminating the Contract, make payment of the balance due in the Developer's reasonable opinion, for that portion of the Work fully completed and accepted. If the remaining balance for Work not fully completed or corrected is less than retainage stipulated in the Contract Documents, and if bonds have been furnished, the written consent of surety to payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by the Contractor to the Architect and Developer prior to certification of such payment. Such payment shall be made under terms and conditions governing final payment.

**9.10.5** Acceptance of final payment by the Contractor, a Subcontractor, Sub-subcontractor or supplier shall constitute a waiver of all claims by that payee.

**ARTICLE 10**
**PROTECTION OF PERSONS AND PROPERTY**

**10.1   SAFETY PRECAUTIONS AND PROGRAMS**

**10.1.1** Contractor, and through delegation, its Subcontractors, shall be solely responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract. Developer shall have no obligation or responsibility for initiating, maintaining and supervising site safety, which shall remain solely the responsibility of Contractor and its Subcontractors.

**10.1.2** The Contractor shall comply with, and shall ensure that all other Responsible Parties comply with all Laws relating to the environment. In the event the Contractor encounters on the site material reasonably believed to be Hazardous Substances which have not been remediated, the Contractor shall immediately stop Work in the area affected and report the condition to the Developer and Architect in writing; provided that this Subparagraph 10.1.2 shall not apply to the extent Contractor's scope of work under this Agreement includes services relating to asbestos. The Work in the affected area shall not thereafter be resumed except by written agreement of the Developer and Contractor if in fact the material is a Hazardous Substance and has not been remediated. The Work in the affected area shall be resumed in the absence of Hazardous Substances requiring remediation, or when it has been remediated, by written agreement of the Developer and Contractor, not to be unreasonably withheld, conditioned or delayed by either.

**10.1.3** The Contractor shall not be required pursuant to Article 7 to perform without consent any Work relating to asbestos or polychlorinated biphenyl (PCB).

**10.1.4** Except for services included within Contractor's scope of Work under the Contract Documents, as to which this Subparagraph 10.1.4 shall not apply, the Developer shall indemnify, defend with counsel reasonably acceptable to the Contractor and

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

hold harmless the Contractor and its Subcontractors and their agents and employees, from and against claims, damages, losses and expenses, including but not limited to reasonable attorneys' fees, arising out of or resulting from performance of the Work in the affected area pursuant to Subparagraph 10.1.2, if in fact the materials found are Hazardous Substances, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including loss of use resulting therefrom. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Subparagraph 10.1.4.

**10.1.5** The Contractor agrees that the Developer may suspend the performance of the Work, in whole or part, to the extent necessary to ensure compliance with, and enforcement of any site safety plan promulgated by the OCIP or SDI insurance carriers and all Laws as necessary to ensure the safety of the public, adjacent properties, and workers. Any costs incurred by the Contractor provider as a result thereof are included in the Contract Sum. Any such action shall not be construed as acceptance by Developer of any safety responsibility.

**10.1.6** When all or a portion of the Work is suspended for any reason, the Contractor shall take reasonable measures to secure and protect the Work, as necessary. During the period of suspension, the Contractor shall remain responsible for the security and protection of the Work. Costs incurred by the Contractor pursuant to this subparagraph are reimbursable as a Cost of the Work and the Guaranteed Maximum Price shall be increased accordingly.

**10.1.7** The Developer shall not be responsible for the security, safety, or storage of the Contractor's tools and/or equipment.

**10.1.8** The Contractor is responsible for protecting the completed construction and its appurtenances, located on the Project or adjacent to the site. Contractor shall take reasonable measures to maintain adequate protection of the Work and all property adjacent to or otherwise affected by the Work from damage. The Contractor shall protect streets, roads, alleys, elevator cabs, interior common building spaces, stairs and walks free from damage and maintain them free of dirt and debris caused by Contractor's operations. The Contractor acknowledges that due to the location of the site it may encounter certain areas requiring special coordination involving traffic congestion, building access, material delivery, etc., all of which may change from time to time. The Guaranteed Maximum Price includes all costs required to provide all necessary traffic control, including without limitation, flagmen, barricades, cones, etc. required as a result of the hoisting, deliveries and all other ongoing construction activities at the site, in order to control vehicular traffic, protect the public from potential hazards, and control pedestrian traffic during all of its delivery, roll out and staging operations.

**10.1.9** The Contractor shall restore to former condition all private and public property damaged as a result of Contractor's operations or the activities of any Responsible Party, including, without limitation, premises adjoining the Project site and overhead and underground utilities, paying for all cost and damage; provided, however, that if such damage was reasonably necessary for the proper performance of the Work, such restoration shall be included in the Cost of the Work, subject to the Guaranteed Maximum Price.

## 10.2   SAFETY OF PERSONS AND PROPERTY

**10.2.1** The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to:

  **.1**   employees on the Work and other persons who may be affected thereby;

  **.2**   the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody or control of the Contractor or the Contractor's Subcontractors or Sub-subcontractors; and

  **.3**   other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

**10.2.2** The Contractor shall give notices and comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on safety of persons or property or their protection from damage, injury or loss.

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**10.2.3**  The Contractor shall erect and maintain, as required by existing conditions and performance of the Contract, reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent sites and utilities.

**10.2.4**  When use or storage of explosives or other hazardous materials or equipment or unusual methods are necessary for execution of the Work, the Contractor shall exercise utmost care and carry on such activities under supervision of properly qualified personnel.

**10.2.5**  The Contractor shall promptly remedy damage and loss at its expense (including, without limitation, damage or loss insured under property insurance required by the Contract Documents) to property referred to in Clauses 10.2.1.2 and 10.2.1.3 caused in whole or in part by the Contractor, or any other Responsible Party, and for which the Contractor is responsible under Clauses 10.2.1.2 and 10.2.1.3, except damage or loss attributable to acts or omissions of the Developer or Architect or anyone directly or indirectly employed by either of them, or by anyone for whose acts either of them may be liable, and not attributable to the fault or negligence of the Contractor.  The foregoing obligations of the Contractor are in addition to the Contractor's obligations under Paragraph 3.18.

**10.2.6**  The Contractor shall designate a responsible member of the Contractor's organization at the site whose duty shall be the prevention of accidents.  This person shall be the Contractor's superintendent unless otherwise designated by the Contractor in writing to the Developer and Architect.

**10.2.7**  The Contractor shall not load or permit any part of the construction or site to be loaded so as to cause damage or create an unsafe condition.

**10.2.8**  The Contractor shall promptly report to the Developer and Architect in writing all accidents arising out of or in connection with the Work that cause death, personal injury, or property damage.  The report shall give full details including statements of witnesses, hospital records, and other information in the possession of the Contractor.  In addition, in the event of any serious injury or damage, the Contractor shall immediately notify the Developer and the Architect by telephone of such accident.

**10.2.9**  The Contractor shall establish and administer and industry-standard program of drug-screening, and shall ensure that all personnel who will be providing services on the Project site, including, without limitation, all employees of Contractor, Contractor's Subcontractors and their Sub-subcontractors, have undergone such drug screening and are certified as drug-free prior to their first appearance on the Project site.   Contractor's drug-screening program shall comply in all respects with the provisions of the Substance Abuse Prevention Program attached as **Exhibit "V"** to the Agreement.

**10.2.10** The contractor shall maintain an industry-standard Onsite Medical Facility for the onsite treatment of work-related injuries.

**10.3**   **EMERGENCIES**

**10.3.1**  In an emergency affecting safety of persons or property, the Contractor shall act, at the Contractor's discretion, to prevent threatened damage, injury or loss.  Additional compensation or extension of time claimed by the Contractor on account of an emergency shall be determined as provided in Paragraph 4.3 and Article 7.

**ARTICLE 11**
**INSURANCE AND BONDS**

**11.1**   **CONTRACTOR'S LIABILITY INSURANCE**

**11.1.1**  Any insurance required to be provided by Contractor shall be written for not less than limits of liability specified in the Contract Documents or required by law, whichever coverage is greater.  Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from the date of commencement of the Work until the date of final payment and termination of any coverage required to be maintained after final payment and, with respect to Contractor's completed operations coverage, until the expiration of the time period set forth in **Exhibit "O"**.  Limits of insurance shall be the greater of the limits on **Exhibit "O"** or as required by law.

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**11.1.2**  Certificates of Insurance acceptable to the Developer shall be filed with the Developer prior to commencement of the Work and thereafter upon renewal or replacement of each required policy of insurance and as otherwise required by **Exhibit "O"**.  These Certificates and the insurance policies required by this Paragraph 11.1 shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Developer.  An additional certificate evidencing continuation of such liability coverage for completed operations shall be submitted with the final Application for Payment as required by Subparagraph 9.10.2 and thereafter upon renewal or replacement of such coverage until the expiration of the time required by **Exhibit "O"**.  Information concerning reduction of coverage shall be furnished by the Contractor with reasonable promptness in accordance with the Contractor's information and belief.

## 11.2   INSURANCE PROVIDED BY THE DEVELOPER

**11.2.1**  The Developer shall be responsible for purchasing and maintaining the Developer's usual liability insurance.  Optionally, the Developer may purchase and maintain other insurance for self-protection against claims which may arise from operations under the Contract.  The Contractor shall not be responsible for purchasing and maintaining this optional Developer's liability insurance unless specifically required by the Contract Documents.

**11.2.2  Owner-Controlled Insurance Program:**

**11.2.2.1**  Developer has elected to implement an Owner-Controlled Insurance Program (OCIP) for this Project, and the Contractor and Subcontractors of any tier will be required to participate as further described in this contract.  The Developer will, through an OCIP, procure and maintain at all times during the performance of this Agreement, and for such extension periods for completed operations, at its own expense Commercial General Liability and Umbrella/Excess Liability described in the "Insurance Provided by the Developer" section of this document, for the benefit of enrolled parties.  Contractor shall comply with, and shall require all Subcontractors and Sub-subcontractors to comply with, the safety procedures and requirements of the CIP.

**11.2.2.2:**  Contractor shall comply with, and shall require all of its Subcontractors of any tier to comply with, all requirements set forth in the OCIP Addendum, attached as **Exhibit "O"** to the Agreement, and with the OCIP Manual, attached as **Exhibit "P"** to the Agreement.

## 11.3   PROPERTY INSURANCE

**11.3.1**  Unless otherwise provided, the Developer shall purchase and maintain (or cause to be purchased and maintained), in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, property insurance in the amount of the initial Guaranteed Maximum Price as well as subsequent modifications thereto for the entire Work at the site on a replacement cost basis.  Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made as provided in Paragraph 9.10 or until no person or entity other than the Fee Owners has an insurable interest in the property required by this Paragraph 11.3 to be covered, whichever is earlier.  This insurance shall include interests of the Developer, the Fee Owners the Contractor, Subcontractors and Sub-subcontractors in the Work.

**11.3.1.1**  Property insurance shall be on an all-risk policy form and shall insure against the perils of fire and extended coverage and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements.

**11.3.1.2**  If the Developer does not intend to purchase (or cause to be purchased) such property insurance required by the Contract and with all of the coverages in the amount described above, the Developer shall so inform the Contractor in writing prior to commencement of the Work.  The Contractor may then effect insurance which will protect the interests of the Contractor, Subcontractors and Sub-subcontractors in the Work, and by appropriate Change Order the cost thereof shall be charged to the Developer.  If the Contractor is damaged by the failure or neglect of the Developer to purchase or maintain insurance as described above, without so notifying the Contractor, then the Developer shall bear all reasonable costs properly attributable thereto.

**11.3.1.3**  If the property insurance purchased pursuant to this Paragraph 11.3 has deductibles, the Contractor shall pay costs not covered because of each such deductible to the extent that the loss or damage was caused by Contractor.

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**11.3.1.4**    Unless otherwise provided in the Contract Documents, this property insurance shall cover portions of the Work stored off the site after written approval of the Developer at the value established in the approval, and also portions of the Work in transit.

**11.3.2  Boiler and Machinery Insurance.**   The Developer shall purchase and maintain (or cause to be purchased and maintained) boiler and machinery insurance required by the Contract Documents or by law, which shall specifically cover such insured objects during installation, start-up, testing and until final acceptance by the Developer; this insurance shall include interests of the Developer, Contractor, Subcontractors and Sub-subcontractors in the Work, and the Developer, the Fee Owners and Contractor shall be named insureds.

**11.3.3  Loss of Use Insurance.**   The Developer shall purchase and maintain (or cause to be purchased and maintained) such insurance as will insure the Developer against loss of use of the Developer's property due to fire or other hazards, however caused. If the Developer purchases and maintains (or cause to be purchased and maintained) such insurance, then the Developer, subject to and except for Paragraph 4.6 of the Agreement, waives all rights of action against the Contractor for loss of use of the Developer's property, including consequential losses due to fire or other hazards however caused, to the extent that the Developer's losses and other damages are covered and paid for by such insurance.

**11.3.4**   If the Contractor requests in writing that insurance for risks other than those described herein or for other special hazards be included in the property insurance policy, the Developer shall, if possible, include such insurance, and the cost thereof shall be charged to the Contractor by appropriate Change Order.

**11.3.5**   If during the Project construction period the Developer insures properties, real or personal or both, adjoining or adjacent to the site by property insurance under policies separate from those insuring the Project, or if after final payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, the Developer shall waive all rights in accordance with the terms of Subparagraph 11.3.7 for damages caused by fire or other perils covered by this separate property insurance.  All separate policies shall provide this waiver of subrogation by endorsement or otherwise.

**11.3.6**   Before an exposure to loss may occur, the Developer shall file with the Contractor a copy of each policy that includes insurance coverages required by this Paragraph 11.3. Each policy shall contain all generally applicable conditions, definitions, exclusions and endorsements related to this Project. Each policy shall contain a provision that the policy will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Contractor.

**11.3.7  Waivers of Subrogation.**   The Developer and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the Architect, Architect's consultants, separate contractors described in Article 6, if any, and any of their subcontractors, sub-subcontractors, agents and employees, for damages caused by fire or other perils to the extent of the amount of such damages covered by property insurance obtained pursuant to this Paragraph 11.3 or any other property insurance applicable to the Work, and existing or adjoining property of the Developer or the Fee Owners, except such rights as they have to proceeds of such insurance held by the Developer.  The Developer or Contractor, as appropriate, shall require of the Architect, Architect's consultants, separate contractors described in Article 6, if any, and the subcontractors, sub-subcontractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein.  The policies shall provide such waivers of subrogation by endorsement or otherwise.  A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.  The waivers of subrogation also do not apply to damages covered by any contractor or subcontractor default insurance policy purchased pursuant to Article 10B of the Agreement.  The waivers of subrogation contained in this Paragraph 11.3.7 are in addition to, and without waiver of, any waiver of subrogation related to the OCIP, including, without limitation, any waiver of subrogation contained within Exhibit "O" or Exhibit "P"

**11.3.8**   A loss insured under Developer's property insurance shall be adjusted by the Developer and made payable to the Developer, subject to requirements of any applicable mortgagee clause.

**11.3.9   Intentionally Omitted.**

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**11.3.10** The Developer shall have power to adjust and settle a loss with insurers.

**11.3.11** Partial occupancy or use in accordance with Paragraph 9.9 shall not commence until the insurance company or companies providing property insurance have consented to such partial occupancy or use by endorsement or otherwise. The Developer and the Contractor shall take reasonable steps to obtain consent of the insurance company or companies and shall, without mutual written consent, take no action with respect to partial occupancy or use that would cause cancellation, lapse or reduction of insurance.

## 11.4   PERFORMANCE BOND AND PAYMENT BOND

**11.4.1   Intentionally Omitted.**

**11.4.2** Upon the request of any person or entity appearing to be a potential beneficiary of bonds covering payment of obligations arising under the Contract, the Contractor shall promptly furnish a copy of the bonds or shall permit a copy to be made.

**ARTICLE 12**
**UNCOVERING AND CORRECTION OF WORK**

## 12.1   UNCOVERING OF WORK

**12.1.1** If a portion of the Work is covered contrary to the Architect's or the Developer's request or to requirements specifically expressed in the Contract Documents, or to the requirements of any insurance body (of which insurance body requirements the Developer shall have notified the Contractor) which is responsible for inspection of any portion of the Work, it must, if requested in writing by the Architect or Developer, be uncovered for the Architect's or Developer's observation and be replaced at the Contractor's expense without change in the Contract Time.

**12.1.2** If a portion of the Work has been covered which the Architect or Developer has not specifically requested to observe prior to its being covered, the Architect may request, with Developer's approval, to see such Work and it shall be uncovered by the Contractor. If such Work is in accordance with the Contract Documents, costs of uncovering and replacement shall, by appropriate Change Order, be charged to the Developer. If such Work is not in accordance with the Contract Documents, such costs and the costs of correction shall be at the Contractor's expense unless the condition was caused by the Developer or a separate contractor, in which event the Developer shall be responsible for payment of such costs.

## 12.2   CORRECTION OF WORK

**12.2.1** The Contractor shall promptly correct Work rejected by the Developer or failing to conform to the requirements of the Contract Documents, whether observed before or after Substantial Completion and whether or not fabricated, installed or completed. The Contractor shall bear costs of correcting such rejected Work, including additional testing and inspections, the cost of uncovering and replacement, and compensation for the Architect's services and expenses made necessary thereby.

**12.2.2** If, within one year after the later of (a) the date of Substantial Completion of the Work, or (b) the date of occupancy, or (c) the date for commencement of warranties established under Subparagraph 9.9.1, or (d) by terms of an applicable special warranty required by the Contract Documents, any of the Work is found to be not in accordance with the requirements of the Contract Documents, the Contractor shall correct it promptly after receipt of written notice from the Developer to do so unless the Developer has previously given the Contractor a written acceptance of such condition. This period of one year shall be extended with respect to portions of Work first performed after Substantial Completion by the period of time between Substantial Completion and the later of (a) the actual completion of that portion of the Work, or (b) the correction of that portion of the Work. This obligation under this Subparagraph 12.2.2 shall survive acceptance of the Work under the Contract and termination of the Contract. The Developer shall give such notice reasonably promptly after discovery of the condition. If by the terms of the Contract Documents the Contractor is required during the correction period to correct the Work, then the Contractor's obligation as to such corrected Work shall be extended for one year from such correction. On a date reasonably acceptable to the Contractor, between one and two months before the expiration of the one-year period described above in this Subparagraph 12.2.2, the Contractor shall participate with the Architect

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

and the Developer in an inspection of the Project to identify items that may require correction before the end of such period.  Any repairs or replacements that the Contractor is required to make pursuant to this Paragraph 12.2 shall be prosecuted to completion by the Contractor even if such repairs or replacements may not be completed until after the expiration of the correction period.  If the Developer determines that an emergency exists which requires more immediate action than the Contractor is able to provide, the Developer may, without sending any notice to the Contractor, perform or cause to be performed such repairs or replacements, in which event the Contractor shall compensate the Developer for the cost thereof, upon demand.  The Contractor shall reimburse the Developer for any damages caused by defective Work and the repair thereto.

**12.2.3**  The Contractor shall remove from the site portions of the Work which are not in accordance with the requirements of the Contract Documents and are neither corrected by the Contractor nor accepted by the Developer.

**12.2.4**  If the Contractor fails to correct nonconforming Work within a reasonable time, the Developer may correct it in accordance with Paragraph 2.4.  If the Contractor does not proceed with correction of such nonconforming Work within a reasonable time fixed by written notice from the Developer or Architect, the Developer may remove it and store the salvable materials or equipment at the Contractor's expense.  If the Contractor does not pay costs of such removal and storage within ten days after written notice, the Developer may upon ten additional days' written notice sell such materials and equipment at auction or at private sale and shall account for the proceeds thereof, after deducting costs and damages that should have been borne by the Contractor, including compensation for the Architect's services and expenses made necessary thereby.  If such proceeds of sale do not cover costs which the Contractor should have borne, the Guaranteed Maximum Price shall be reduced by the deficiency.  If payments then or thereafter due the Contractor are not sufficient to cover such amount, the Contractor shall promptly pay the difference to the Developer.

**12.2.5**  The Contractor shall bear the cost of correcting destroyed or damaged construction, whether completed or partially completed, of the Developer or separate contractors caused by the Contractor's correction or removal of Work which is not in accordance with the requirements of the Contract Documents.

**12.2.6**  Nothing contained in this Paragraph 12.2 shall be construed to establish a period of limitation with respect to other obligations which the Contractor might have under the Contract Documents, including without limitation Contractor's liability to Developer in damages for defective or non-conforming work.  Establishment of the time period of one year as described in Subparagraph 12.2.2 relates only to the specific obligation of the Contractor to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Contractor's liability with respect to the Contractor's obligations other than specifically to correct the Work.

## 12.3    ACCEPTANCE OF NONCONFORMING WORK

**12.3.1**  If the Developer prefers to accept Work which is not in accordance with the requirements of the Contract Documents, the Developer may do so instead of requiring its removal and correction, provided that the Developer's acceptance must be in writing, in which case the Guaranteed Maximum Price will be reduced as appropriate and equitable.  Such adjustment shall be effected whether or not final payment has been made.

**ARTICLE 13**
**MISCELLANEOUS PROVISIONS**

## 13.1    GOVERNING LAW

**13.1.1**  The Contract shall be governed by the law of the Commonwealth of Pennsylvania, without reference to choice of law principles.

## 13.2    SUCCESSORS AND ASSIGNS

**13.2.1**  The Developer and Contractor respectively bind themselves, their partners, successors, assigns and legal representatives to the other party hereto and to partners, successors, assigns and legal representatives of such other party in respect to covenants, agreements and obligations contained in the Contract Documents.  Contractor shall not assign the Contract or sublet it as a whole

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

without the prior written consent of Developer; nor shall Contractor assign any monies due or to become due to Contractor hereunder, without the prior written consent of the Developer.


## 13.3    WRITTEN NOTICE

**13.3.1   Notices.** All notices of default, termination or otherwise not in the ordinary course must be in writing and shall be sent to each of the parties listed below, by either registered or certified mail, return receipt requested and postage prepaid, or by reputable overnight delivery service with tracking capabilities, or by email, if the email is followed by and received within one (1) business day thereafter by either of the first two methods of delivery, and addressed:

> If to the Developer:
>
>> Liberty Property Limited Partnership
>> c/o Liberty Property Trust
>> 1628 John F. Kennedy Boulevard
>> Philadelphia, Pennsylvania 19103
>> Attention: John S. Gattuso, Senior Vice President and Regional Director
>> Email: jgattuso@libertyproperty.com
>
> with a copy to:
>
>> Liberty Property Trust
>> 500 Chesterfield Parkway
>> Malvern, PA 19359
>> Attention: Herman C. Fala, General Counsel
>> Email:  hfala@libertyproperty.com
>
> If to the Contractor:
>
>> L.F. Driscoll Company, LLC
>> 9 Presidential Boulevard
>> Bala Cynwyd, Pennsylvania 19004
>> Attention:  Mack Stulb, President
>> Email: MStulb@lfdriscoll.com
>
> with a copy to:
>
>> L.F. Driscoll Company, LLC
>> 9 Presidential Boulevard
>> Bala Cynwyd, Pennsylvania 19004
>> Attention:  Michael Delaney, Executive Vice President
>> Email: mdelaney@lfdriscoll.com

All notices shall be deemed to have been served and given on the date of delivery or refusal of delivery or the date e-mailed, provided such email is followed by a copy by registered or certified mail, return receipt requested and postage prepaid, or by reputable overnight delivery service with tracking capabilities, which copy is received within one (1) day thereafter in accordance with the provisions of this Paragraph 13.3.

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

## 13.4    RIGHTS AND REMEDIES

**13.4.1**  Duties and obligations imposed by the Contract Documents and rights and remedies available thereunder shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law.

**13.4.2**  No action or failure to act by the Developer, Architect or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing.

## 13.5    TESTS AND INSPECTIONS

**13.5.1**  Tests, inspections and approvals of portions of the Work required by the Contract Documents or by laws, ordinances, rules, regulations or orders of public authorities having jurisdiction shall be made at an appropriate time.  Unless otherwise provided, the Contractor shall make arrangements for such tests, inspections and approvals with an independent testing laboratory or entity acceptable to the Developer, or with the appropriate public authority, and shall bear all related costs of tests, inspections and approvals.  The Contractor shall give the Architect and Developer timely notice of when and where tests and inspections are to be made so the Architect and Developer may observe such procedures.  The Developer shall bear the costs of tests, inspections or approvals which do not become requirements until after the Agreement was signed.

**13.5.2**  If the Architect, Developer or public authorities having jurisdiction determine that portions of the Work require additional testing, inspection or approval not included under Subparagraph 13.5.1, the Architect will, upon written authorization from the Developer, instruct the Contractor to make arrangements for such additional testing, inspection or approval by an entity acceptable to the Developer, and the Contractor shall give timely notice to the Architect and Developer of when and where tests and inspections are to be made so the Architect and Developer may observe such procedures.  The Developer shall bear such costs except as provided in Subparagraph 13.5.3.

**13.5.3**  If such procedures for testing, inspection or approval under Subparagraphs 13.5.1 and 13.5.2 reveal failure of the portions of the Work to comply with requirements established by the Contract Documents, the Contractor shall bear all costs made necessary by such failure including without limitation those of repeated procedures and compensation for the Architect's services and expenses.  Costs incurred for re-inspections for rejected materials or failed inspections will be borne by the Contractor without reimbursement by the Developer.  The Contractor shall perform any corrective Work recommended by the inspection firm.  The corrective Work is included in the Guaranteed Maximum Price.  Costs incurred for re-inspections for rejected materials or failed inspections will be borne by the Contractor.

**13.5.4**  Required certificates of testing, inspection or approval shall, unless otherwise required by the Contract Documents, be secured by the Contractor and promptly delivered to the Architect and Developer.

**13.5.5**  If the Architect and Developer are to observe tests, inspections or approvals required by the Contract Documents, the Architect and Developer will do so promptly and, where practicable, at the normal place of testing.

**13.5.6**  Tests or inspections conducted pursuant to the Contract Documents shall be made promptly to avoid unreasonable delay in the Work.

## 13.6    INTEREST

**13.6.1**  Payments due and unpaid under the Contract Documents shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.

## 13.7    **Intentionally Omitted.**

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**13.8    LIMITATION ON CLAIMS BY CONTRACTOR**

Whether based on changes, claims for equitable adjustments, claims of breach of contract, termination of contract, suspension of Work, or any other types of claims of any kind, or otherwise, the Contractor shall not request and shall not in any event be entitled to (i) consequential damages, (ii) lost profits on work not performed, (iii) attorneys' fees except as provided under applicable law, or (iv) any other damages, costs or expenses of any kind except for actual costs incurred on this Project which are reimbursable costs under Article 7 of the Agreement, or as otherwise expressly provided in the Agreement, plus the Contractor's Fee, as provided in Subparagraph 5.1.2 of the Agreement. The foregoing limitation of claims does not apply to claims of the Contractor against arising from third party claims for bodily injury or property damage.

**13.9    RELATIONSHIP OF PARTIES**

**13.9.1**  The parties agree that the contractual relationship of Contractor and Developer is one solely of independent contractor in all respects and that the Contract Documents do not in any way create a partnership, joint venture or any other relationship between Developer and Contractor other than the contractual relationship as specified in the Contract.

**ARTICLE 14**
**TERMINATION OR SUSPENSION OF THE**
**CONTRACT**

**14.1    TERMINATION BY THE CONTRACTOR**

**14.1.1**  The Contractor may terminate the Contract if the Work is stopped for a period of sixty (60) continuous work days through no act or fault of the Contractor or any other Responsible Party, for any of the following reasons:

   **.1**  issuance of an order of a court or other public authority having jurisdiction;

   **.2**  an act of government, such as a declaration of national emergency, making material unavailable;

   **.3**  because the Developer has not made an undisputed payment within the time stated in the Contract Documents;

**14.1.2**  If one of the above reasons exists, the Contractor may, upon seven additional days' written notice to the Developer and Architect, terminate the Contract and recover from the Developer payment as set forth in Paragraph 14.5.

**14.1.3**  The Contractor may not terminate the Contract for any reason except as provided in Subparagraph 14.1.1.

**14.2    TERMINATION BY THE DEVELOPER FOR CAUSE**

**14.2.1**  The Developer may terminate the Contract if the Contractor:

   **.1**  persistently or repeatedly refuses or fails to supply enough properly skilled workers or proper materials;

   **.2**  fails to make payment to Subcontractors for materials or labor in accordance with the respective agreements between the Contractor and the Subcontractors;

   **.3**  disregards in any material respect laws, ordinances, or rules, regulations or orders of a public authority having jurisdiction ;

   **.4**  otherwise is in material breach of a provision of the Contract Documents; or

   **.5**  has been terminated for cause on any of the Related Projects.

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**14.2.2**   When any of the above reasons exist, the Developer, may without prejudice to any other rights or remedies of the Developer and after giving the Contractor and the Contractor's surety, if any, seven days' written notice and opportunity to cure, terminate employment of the Contractor; provided, however, that the Developer shall not terminate the employment of the Contractor if the Contractor cures the default within the seven day period, or, if the cure cannot be effectuated within the cure period, if the Contractor has commenced a satisfactory cure within the seven day period and thereafter pursues the cure continuously until it is fully effectuated.  In the event of termination, the Developer may, subject to any prior rights of the surety:

    .1   take possession of the site and of all materials, equipment, tools, and construction equipment and machinery thereon owned by the Contractor;

    .2   accept assignment of subcontracts pursuant to Paragraph 5.4; and

    .3   finish the Work by whatever reasonable method the Developer may deem expedient.

**14.2.3**   When the Developer terminates the Contract for one of the reasons stated in Subparagraph 14.2.1, the Contractor shall not be entitled to receive further payment until the Work is finished, subject to offsets for the Developer's damages.

**14.2.4**   If the costs of finishing the Work, including but not limited to compensation for the Architect's services and expenses made necessary thereby, plus damages incurred by the Developer because of such default, exceed the unpaid balance of the Guaranteed Maximum Price, the Contractor shall pay the difference to the Developer upon demand.  This obligation for payment shall survive termination of the Contract, and is in addition to all other rights and remedies of Developer against Contractor, including without limitation Contractor's liability to Developer under Paragraph 4.9 of the Agreement.  If such costs and damages do not exceed the Guaranteed Maximum Price, the Contractor shall be entitled to payment of amounts earned under the Contract before termination to the extent such amounts, together with such costs and damages, do not exceed the Guaranteed Maximum Price.

**14.2.5**   If the Developer terminates the Contract for cause, and if it is subsequently determined in any judicial or other proceeding that the termination for cause was not justified, then the termination shall be deemed to be a termination by the Developer for convenience pursuant to Paragraph 14.4 below, and Contractor's right to recover damages shall be as set forth in Paragraph 14.5.

## 14.3   SUSPENSION BY THE DEVELOPER FOR CONVENIENCE

**14.3.1**   The Developer may, without cause, order the Contractor in writing to suspend, delay or interrupt the Work in whole or in part for such period of time as the Developer may determine.

**14.3.2**   If the Developer exercises its rights under Subparagraph 14.3.1 above, an adjustment shall be made only for increases in the Cost of the Work, plus the Contractor's Fee on the increased Cost of the Work, caused by suspension, delay or interruption.  No adjustment shall be made to the extent:

    .1   that performance is, was or would have been so suspended, delayed or interrupted by another cause for which the Contractor or any other Responsible Party is responsible; or

    .2   that an equitable adjustment is made or denied under another provision of this Contract.

## 14.4   TERMINATION BY THE DEVELOPER FOR CONVENIENCE

**14.4.1**   The Developer may, at any time, terminate the Contract for the Developer's convenience and without cause.

**14.4.2**   Upon receipt of written notice from the Developer of such termination for the Developer's convenience, the Contractor shall:

    .1   cease operations as directed by the Developer in the notice;

    .2   take actions necessary, or that the Developer may direct, for the protection and preservation of the Work; and

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292.  WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**.3**   except for Work directed to be performed prior to the effective date of termination stated in the notice, terminate all existing subcontracts and purchase orders and enter into no further subcontracts and purchase orders.

**14.4.3**   In case of such termination for the Developer's convenience, the Contractor shall be entitled to receive payment only as set forth in Subparagraph 14.5 below.  In the event of a termination by the Developer for convenience, the Developer may accept assignment of subcontracts pursuant to Paragraph 5.4 above, and the Developer may take possession of and utilize in completing the Work such materials, tools, equipment, and appliances as may be on the site or stored off-site for the Project and necessary therefor.

**14.4.4**   In the event of a termination by the Developer for convenience, the Contractor shall remain liable to the Developer for (a) defective work performed prior to the termination (whether discovered before or after termination), (b) late completion damages to the extent of the delays to the critical path of the Project for which the Contractor was responsible as of the date of the termination, (c) any other damages that accrued before termination, and (d) for any indemnification, defense or hold harmless obligations accruing before termination; and Developer shall remain liable to Contractor only as set forth in Paragraph 14.5 below.

**14.4.5**   Contractor shall expressly incorporate this Paragraph 14.4.1 and Paragraph 14.4.5 below in each of its subcontracts.

**14.5**       **LIABILITY OF DEVELOPER TO CONTRACTOR IN THE EVENT OF TERMINATION OR SUSPENSION**

**14.5.1**   If the Contract is terminated by the Contractor as provided in Article 14.1 of these General Conditions, or if the Contract is suspended or terminated by the Developer for convenience as provided in Article 14.3 or 14.4 of these General Conditions, then the Contractor may recover from the Developer, less any offsets by the Developer, only for (a) payment under the terms of the Contract for Work actually performed and non-refundable contractual commitments actually made by the Contractor on the Project before termination or suspension, (b) for costs incurred as a result of the termination, including without limitation, costs incurred to terminate purchase orders in accordance with their terms, and (c) costs incurred to secure the Project site after termination, as applicable, including a reasonable allowance for overhead and profit on the foregoing costs (which reasonable allowance for overhead and profit shall be Contractor's Fee applicable to such Work).  In the event of suspension or termination of the Contract under any provision of Article 14 of the General Conditions or otherwise, whether by Contractor or Developer, and whether for cause or not, Contractor shall not be entitled in any event to recover (i) consequential damages, (ii) lost profits on work not performed, (iii) attorneys' fees or (iv) any other damages, costs or expenses of any kind except as set forth in this Paragraph 14.5.

**14.6**       **SURVIVAL OF OBLIGATIONS**

All obligations of Contractor under the Contract, which relate to or are based upon work performed prior to termination of the Contract, shall survive termination of the Contract under any Subparagraph of this Article 14, in addition to any other obligations of Contractor which by their nature survive termination.

AIA DOCUMENT A201 - GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION - FOURTEENTH EDITION - AIA - COPYRIGHT 1987 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON D.C. 20006-5292. WARNING; Unlicensed photocopying violates U.S. copyright laws and is subject to legal prosecution.  This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

# EXHIBIT 2

# L.F. DRISCOLL COMPANY, LLC

**MAY 12, 2014**

**COMCAST PROJECT SPECIFIC DEFAULT INSURANCE**

## Table of Contents

1.  **Coverage Summary** ........................................................................**2-5**

2.  **Appendix** ..................................................................................**6**

**A: Specimen Policy Documents**

.

# 1. Coverage Summary

**Coverage Summary**

# L.F. DRISCOLL COMPANY, LLC
## INDIAN HARBOR INSURANCE COMPANY (Non Admitted)
## PROJECT SPECIFIC PROGRAM - COMCAST

**Proposed Program / Policy Term**:      June 1, 2014 to April 1, 2017
**Estimated Program Volume**:      $513,560,000
**Proposed Attachment**:      Project

## COVERAGE A – CAPASSURE FINANCIAL STRUCTURE:

| Limits of Insurance | Per Project Limit | $35,000,000 |
|---|---|---|
| | Aggregate Limit | $50,000,000 |
| | | |
| Insured Retention(s) | Project Deductible (Each Loss) | 90% of Limit Provided |
| | | |
| Loss Payee Retention(s) | Minimum SIR | $500,000 |
| | | |
| Estimated Coverage Term | Project Duration | 34 Months |
| | | |

## STANDARD PROGRAM TERMS AND CONDITIONS
## COVERAGE A - CAPASSURE

- Please refer to the Appendix section of this document for a complete copy of the Specimen coverage form – ConstructAssure Project Attaching Coverage Form (Subcontractor Default Insurance). CapAssure Combined Project Attaching Coverage Form.(Contractor Default Insurance).
- The insurance offered is through Indian Harbor Insurance Company, which is a Non-Admitted Carrier and is subject to Surplus Lines Taxes and Fees.
- Coverage Trigger – Insolvency of the Named Insured and Default for Cause.
- Loss Payee(s) – Project Owner as underwritten by the Company and endorsed on to the policy
- The Aggregate Limit of Insurance is the total limit available at any one time (all policies / all years).
- Loss Payee Retention – Self Insured Retention (for Loss Payee) as enumerated in project endorsement.  Minimum SIR of $500,000 applies only in the event of a default for cause that is not caused by insolvency of the insured.

**Coverage Summary**

# L.F. DRISCOLL COMPANY, LLC
## INDIAN HARBOR INSURANCE COMPANY (Non Admitted)
## PROJECT SPECIFIC PROGRAM – COMCAST

Proposed Program / Policy Term:          June 1, 2014 to April 1, 2017
Estimated Program Volume:                $513,560,000
Proposed Attachment:                     Project

## COVERAGE B - PROGRAM FINANCIAL STRUCTURE:

| Limits of Insurance | | | |
|---|---|---|---|
| | Per Loss Limit | | $75,000,000 |
| | Aggregate Pol Limit | | $150,000,000 |
| | Indirect Cost Sub Limit | | $5,000,000 |
| Deductible Structure | Retention (Each Loss) | | $2,000,000 |
| | | | |
| Single Subcontracts | >$40MIL - <$60MIL | | $2,500,000 |
| Single Subcontracts | >$60MIL | | $3,000,000 |
| | Co-Pay% | | 20% |
| | Co-Pay Layer | | $5,000,000 |

## STANDARD PROGRAM TERMS AND CONDITIONS
## COVERAGE B

- Please refer to the Appendix section of this document for a complete copy of the Specimen coverage form – ConstructAssure Project Attaching Coverage Form (Subcontractor Default Insurance). CapAssure Combined Project Attaching Coverage Form.(Contractor Default Insurance).
- The insurance offered is through Indian Harbor Insurance Company, which is a Non-Admitted Carrier and is subject to Surplus Lines Taxes and Fees.
- The limits of insurance quoted under these options will not reinstate annually as the term is a multi-year policy.
- The method of risk attachment for the program being offered is Project Attaching and is specifically being offered for the Comcast Project.
- The Program proposed herein requires that all subcontracts and purchase order agreements on the covered project you determine to be eligible be enrolled, unless specifically bonded out of the program or otherwise excluded via endorsement to your policy.

Coverage Summary

## L.F. DRISCOLL COMPANY, LLC– PROJECT SPECIFIC - COMCAST STANDARD PROGRAM TERMS AND CONDITIONS COVERAGE B - CONTINUED

## STANDARD PROGRAM EXCLUSIONS
## COVERAGE B

- Power Plant Exclusion – The policy does not cover power plant work.
- Maximum Value of Subcontract – This policy does not cover individual subcontracts or purchase orders in excess of $40M.  This is quoted to include subcontracts or purchase orders in excess of this amount, but they will require special underwriting referral and policy endorsement.
- Maximum Subcontract Term 36 months – This policy does not cover individual subcontracts or purchase orders with a duration greater than 36 months.  Subcontracts or purchase orders in excess of this duration require special underwriting referral and policy endorsement.
- Minimum Value of Subcontracts – This policy does not cover subcontracts less than $250,000 at final closeout unless otherwise endorsed for coverage.  This threshold can be modified to $100K or $150K alternatively.

# 2. Appendix



**Regulatory Office**
(Select One)
505 Eagleview Blvd., Ste. 100
Dept: Regulatory
Exton, PA 19341-0636
(800) 688-1840

# Cap*Assure*
## POLICY DECLARATIONS

<ADD SURPLUS LINES LANGUAGE HERE>

**Policy Number:** _____

**Renewal of:** _____

Item 1.  **Insured:** _____
         **Address:** _____
                     _____
                     _____
                     _____

         **Producer Name:** _____
         **Address:** _____
                     _____

Item 2.  **Loss Payee:**  (set forth in the Project Endorsement)
         **Address:** _____
                     _____
                     _____

Item 3.  **Policy Period:**

         From: _____ To: _____
                at 12:01 A.M. Standard Time at the **Insured's** address set forth in Item 1.

KAX 000 0412                                              Page 1 of 3

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

**Item 4.**    **Limits of Insurance:**

    (a)    Part A – Contractor Default $_____ in the aggregate; $_____ Project Limit of Insurance (set forth in the Project Endorsement)

    (b)    Part B – Subcontractor Default

        1.    Variable Subcontractor Loss Limit    _____ % of Contract Amount

        2.    Each Subcontractor Loss Limit    $ _____

        3.    Aggregate Limit    $ _____

        4.    Indirect Costs Sublimit    $ _____ per Subcontractor Loss

**Item 5.**    **Self Insured Retention:**   $ _____ for the **Loss Payee** (if applicable)

**Item 6.**    **Deductible:**

    (a)    Part A – Contractor Default    $ _____ each and every General Construction Loss

    (b)    Part B – Subcontractor Default    $ _____ each and every **Subcontractor Loss**

**Item 7.**    **Co-Payment Deductible Amount:**    $ _____

    (a)    Co-Payment Percentage    _____ %

    (b)    Co-Payment Layer Amount    $ _____

    (c)    Maximum Co-Payment Amount    $ _____

**Item 8.**    **Retention Aggregate:**   $ _____     Adjustable at a rate of $_____ / $1,000 of enrolled volume

**Item 9.**    **Premium:**

    (a)    Part A – Contractor Default    $ _____ which is $_____ minimum and earned.

    (b)    Part B – Subcontractor Default

        1.    $ _____ Subject to a minimum and earned amount of $_____.

        2.    Premium Rate of $_____ per $1,000 of Covered Subcontract(s) or **Purchase Order Agreement**

    Premiums do not include taxes and surcharges

**Item 10.**    **Interim Percentage:**   _____ %

**Item 11.**    **Covered Project:**    (set forth in the Project Endorsement)

**Item 12.**    **Scheduled Projects:**   Refer to the monthly reports as specified in Definitions, Item s.

**Item 13.**    **Enrolled Contract Amount Maximum:**   $ _____

**Item 14.**    **Enrolled Contract Amount Minimum**   $ _____

KAX 000 0412

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

**Item 15.**     **Reporting Period:**

**Item 16.**     **ENDORSEMENTS ATTACHED AT POLICY ISSUANCE:**

| Endorsement Number | Endorsement Form Number | Endorsement Title |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

<br>

_____
Authorized Representative

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# Cap*Assure*
## GENERAL CONDITIONS

Words in bold have special meaning; refer to Part C - Definitions.

**1. COVERAGE TERRITORY**

This insurance only applies to claims made or brought in the United States (including its territories and possessions) and Canada.

**2. ARBITRATION**

Any dispute or other matter in question arising between the **Loss Payee** and the Company or the **Insured** and the Company arising under, out of, in connection with or in relation to this Policy shall be submitted to arbitration within thirty (30) days of a request by either party to the other for such arbitration. The parties hereby agree to pursue such arbitration though the American Arbitration Association (AAA) in accordance with its then existing Commercial Arbitration Rules.

The parties further agree that from the list of arbitrators provided by AAA a panel of three (3) neutral arbitrators shall be agreed upon. In the event of disagreement as to the panel or any member thereof, the selection of that arbitrator or those arbitrators shall rest with AAA. A decision in writing signed by a majority of the arbitrators, when served upon both parties, shall be binding upon both and judgment thereon may be entered in any court having jurisdiction thereof.

The arbitrators shall not be required or obliged to follow judicial formalities or the rules of evidence except to the extent required by governing law which is agreed between the parties to be the state law of the situs of the arbitration as herein agreed. Any decision of the arbitrator(s) shall be subject to the Limit of Insurance under this Policy. The parties shall submit their respective cases to the arbitrators within such period as may be mutually agreed between the parties or failing such agreement, within thirty (30) days of the appointment of the panel of arbitrators.

**3. ASSIGNMENT**

This Policy may not be assigned unless agreed to by the Company in writing, and via endorsement to this Policy.

**4. CANCELLATION**

(a) The Company is not permitted to cancel this Policy except for:

(i) Nonpayment of premium;

(ii) As provided in GENERAL CONDITIONS, Item 6. False or Fraudulent Statements, Reports or Claims Concealment; or

(iii) As provided in GENERAL CONDITIONS, Item 11. Change in Composition of the **Insured**;

(iv) Upon repeated violations in the application of the **Insured's Qualification Procedures**. In the event of repeated violations in the application of the **Qualification Procedures**, the Company will send the **Insured** a notification of the Company's intent to cancel this Policy by certified mail. This notification will delineate the violations of the **Qualification Procedures** for which the Company is cancelling the Policy, and will provide the **Insured** thirty (30) days to provide a cure. If the **Insured** has not provided a reasonably satisfactory cure during this period, the Policy will be cancelled thirty (30) days after the notification which initiated the cure period.

(b) In the event of such cancellation under Subparagraphs (i) through (iv.) above, the Company must deliver via certified mail to the Sole Agent (as defined in Item 10. below) a written notice stating that not less than ten (10) days after the date of the notice such cancellation shall be effective.

(c) If the Policy is canceled, there will be no return of Part A – Contractor Default premium set forth in Item 9(a) of the Declarations to the **Insured**.

(d) If the Policy is canceled, a return of Part B – Subcontractor Default premium set forth in Item 9(b). of the Declarations will be made to the **Insured**. The amount of return premium will be calculated as the Policy premium paid less the premium attributable to all **Covered Subcontracts** on **Scheduled Projects** subject to this Policy and executed during the **Policy Period** prior to the effective date of cancellation.

© 2012 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

(e) The effective date of cancellation stated in the notice shall become the end of the **Policy Period**. The Company's cancellation of this Policy will not affect coverage under Part B – Subcontractor Default for **Subcontractor Loss** arising out of a **Default of Performance** under any **Covered Subcontract or Purchase Order Agreement** on a **Scheduled Project** executed during the **Policy Period** prior to the date of cancellation.

(f) The effective date of cancellation stated in the notice shall become the end of the **Policy Period**.

(g) If there has been no event of **General Contractor Insolvency** during the **Policy Period**, there will be no coverage under Part A – Contractor Default of this Policy.

5.  **CHANGES**
    Notice to any agent or by any other persons shall not affect a waiver or a change in any part of the Policy or stop the Company from asserting any right under the terms of this Policy; nor shall the terms of this Policy be waived or changed, except by endorsement issued to form a part of the Policy.

6.  **FALSE OR FRAUDULENT STATEMENTS, REPORTS OR CLAIMS CONCEALMENT**
    If the **Loss Payee** makes any statement, report, or claim known to be false or fraudulent, or if the **Loss Payee** or **Insured** knowingly conceals any material fact, the Company may, at the Company's option, void this Policy. All claim amounts paid shall be returned to the Company with interest by the **Loss Payee** or **Insured** upon demand. All premium paid by the **Loss Payee** or **Insured** hereunder shall be returned by the Company. The conditions contained in Item 6. represent the sole reasons by which the Company may void this Policy.

7.  **INSPECTION AND AUDIT**
    The Company is permitted, but not obligated, to inspect, sample and monitor the **Loss Payee's** or the **Insured's** property or operations, examine or require to be produced copies of any corporate records or books, internal documents and correspondence, letters or other documentation or records (including all electronic files, documents and records) in whatever form and wherever situated in the **Loss Payee's** or the **Insured's** possession or control relating to or connected with this Policy, a claim hereunder, a **General Contractor Loss** or **Subcontractor Loss** or any transaction between the **Loss Payee** or subcontractor **Loss Payee** a person, organization

or entity completing a **General Construction Covered Contract** or **Covered Subcontract or Purchase Order Agreement**. At the Company's request, the **Loss Payee** or the **Insured** must take any and all reasonable steps to obtain such information in the possession of others relating to or connected with this Policy or any **General Contractor Loss** or **Subcontractor Loss**. This section does not apply to information which the **Loss Payee** or subcontractor **Loss Payee** has been required by a court order or federal agency to provide restricted access.

The Company will treat the **Loss Payee's** and subcontractor **Loss Payee's** proprietary information as confidential.

8.  **OTHER INSURANCE**
    This insurance is excess only and non-contributing over any other valid and collectible insurance or performance bond available to the **Loss Payee** or the **Insured**, whether such other insurance is stated to be primary, pro-rata, contributory, excess, contingent, or otherwise.

9.  **EXAMINATION UNDER OATH**
    At the Company's request, the **Loss Payee** or the **Insured** shall permit the Company to question under oath the **Loss Payee** or the **Insured** and its agents, and to obtain verified answers under oath at such times as may be reasonably required, concerning any matter relating to this insurance or the **Loss Payee's** or **Insured's** claim, including, without limitation, the **Loss Payee's** or the **Insured's** books and records.

10. **SOLE AGENT**
    The **Insured** named in Item 1. of the Declarations shall act on behalf of all **Insured(s)** for all purposes, including but not limited to the payment or return of premium, receipt, and acceptance of any endorsement issued to form a part of this Policy, complying with all applicable notice provisions, and giving and receiving notice of cancellation or non-renewal.

11. **CHANGE IN COMPOSITION OF THE INSURED**
    The **Insured** must notify the Company within thirty (30) days in writing if, during the **Policy Period**, the **Insured** consolidate, merge with, or sell all or substantially all of the **Insured's** assets to any other person or entity, or if another person or entity should acquire beneficial ownership of shares having a majority of the ordinary voting power in the election of directors. Upon receipt of such notice, the Company may at the Company's option cancel this Policy effective thirty (30) days after the date of such change in the composition of the **Insured**.

KAX 050 0412

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

## 12. INSPECTION AND AUDIT

The Company is permitted, but not obligated, to inspect, sample and monitor the **Insured's** property or operations, examine or require to be produced copies of any corporate records or books, internal documents and correspondence, letters or other documentation or records (including all electronic files, documents and records) in whatever form and wherever situated in the **Insured's** possession or control relating to or connected with this Policy, a claim hereunder, a **General Contractor Loss** or **Subcontractor Loss** or any transaction between the **Insured** and a **Subcontractor/Supplier** or a person, organization or entity completing a **Covered Subcontract or Purchase Order Agreement**. At the Company's request, the **Insured** must take any and all reasonable steps to obtain such information in the possession of others relating to or connected with this Policy or any **Subcontractor Loss**. This section does not apply to information which the **Insured** has been required by a court order or federal agency to provide restricted access.

The Company will treat the **Insured's** proprietary information as confidential.

## 13. EXAMINATION UNDER OATH

At the Company's request, the **Insured** shall permit the Company to question under oath the **Insured** and its agents, and to obtain verified answers under oath at such times as may be reasonably required, concerning any matter relating to this insurance or the **Insured's** claim, including, without limitation, the **Insured's** books and records.

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# Cap*Assure*
## PART A
## CONTRACTOR DEFAULT

Words in bold have special meaning; refer to Part C - Definitions.

1. **INSURING AGREEMENT**
   The Company will indemnify the **Loss Payee** for **General Contractor Loss,** but only to the extent of a **General Contractor Insolvency** of the **Insured** which results in a **Default and Termination of Performance.** The amount paid by the Company will be subject to the Limits of Insurance set forth in the Project Endorsement.

2. **LIMITS OF INSURANCE**
   For this Part A, the Company will never pay more than the Limit of Insurance listed in Item 4(a). of the Declarations in the aggregate. For this Part A, the Company will never pay more than the Project Limit of Insurance set forth in the Project Endorsement. This Limit of Insurance is the most the Company will pay in aggregate for the policy term.

3. **EXCLUSIONS**
   This insurance does not apply to any **General Contractor Loss,** or portions thereof:

   a. To the extent that the **General Contractor Loss** is caused by any dishonest or fraudulent act or omission, or any intentional misrepresentation committed by the **Loss Payee.**

   b. Of any type, however caused, arising directly or indirectly, out of:
      (1) war, including undeclared or civil war;
      (2) warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or
      (3) insurrection, rebellion, revolution, usurped power, or action taken by governmental authority.

   c. Arising from nuclear reaction or nuclear radiation or radioactive contamination.

   d. To the extent that the **General Contractor Loss** includes damages awarded by a court that are punitive or consequential in nature, such as:
      (1) punitive or exemplary damages,
      (2) double or triple damages (or any other multiple of actual damages), or
      (3) consequential or incidental damages.

4. **CLAIMS**
   a. The **Loss Payee** bears the burden of proving that it has complied with all terms and conditions of this Policy and that the **General Contractor Loss** is recoverable under this Policy.

   b. Notice of **General Contractor Loss** must be submitted in writing to the Company within thirty (30) days from the time the **Loss Payee** sends written notice of **Default and Termination of Performance** by the **Insured** as a result of **General Contractor Insolvency.**

   c. In the event of a **General Contractor Loss,** the **Loss Payee** must submit to the Company a satisfactory **General Construction Proof of Loss.** Submission of a **General Construction Proof of Loss** must be made within ninety (90) days after the final completion of the contract.

   d. The Company will indemnify the **Loss Payee** within thirty (30) days of receipt of a satisfactory **General Construction Proof of Loss.** In the event the **Loss Payee** provides the Company with documentation that the **Loss Payee** presents as a **General Construction Proof of Loss** that the Company finds deficient, the Company will notify the **Loss Payee** of the deficiencies within thirty (30) days after the Company's receipt of such documentation. The Company will make payment for a **General Contractor Loss** within thirty (30) days of receipt of information necessary to cure such deficiencies. If the Company notifies the **Loss Payee** of a deficiency in a **General Construction Proof of Loss,** the Company will pay any covered amount, up to the Limit of Insurance, as to which the **General Construction Proof of Loss** is not deficient.

   e. If the **Loss Payee** pays **General Contractor Loss(es)** over a period of time greater than thirty (30) days, the **Loss Payee** may submit interim proofs of **General Contractor Loss.** If an amount would constitute a **General Contractor Loss** except that the amount of the **General Contractor Loss** has not been finally determined, the Company will indemnify the **Loss Payee** for the Interim Percentage as stated in Item 10. of the Declarations, of the **General Contractor Loss** payment which would have been payable as

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

calculated above, after the Company accepts a satisfactory **General Construction Proof of Loss**.

f.  The **General Construction Proof of Loss** and any amounts claimed as covered **General Contractor Loss(es)** under this Policy are subject to audit by the Company in accordance with GENERAL CONDITIONS, Item 7, Inspection and Audit, of this Policy.

g.  In the event that the **Loss Payee** and the Company cannot agree that a claim is a **General Contractor Loss**, or cannot agree on the amount of **General Contractor Loss** the **Loss Payee** has incurred or paid, either party may commence arbitration proceedings in accordance with GENERAL CONDITIONS, Item 2, Arbitration, of this Policy.

**5. CONDITIONS**

a.  **Conditions of Coverage**
As a condition precedent of coverage provided under this Policy, the **Loss Payee** warrants and agrees to use all reasonable measures to prevent and to mitigate **General Contractor Loss** at all times.

b.  **Action Against the Company**
No one may bring legal action against the Company under this Policy unless all terms of the Policy have been complied with and such action is commenced by the later of:
(1) one (1) year following the date of substantial completion of the **General Construction Covered Contract;**

(2) one (1) year after the Company's first disposition of a specific claim which is the basis for the action or proceeding.

**6. APPRAISAL**
In case the **Loss Payee** and the Company fail to agree as to correct adjusted amount of any covered claim under this Policy then, on the written demand of either, the **Loss Payee** and the Company each shall select a competent and disinterested appraiser and notify the other of the person selected within thirty (30) days of such demand. The appraiser shall first select a competent and disinterested umpire, and failing for fifteen (15) days after consulting to agree upon such umpire, then, on request of the **Loss Payee** or the Company, such umpire shall be selected by a judge of a court of record in the state in which the insured property sustaining damage is located. If the location is outside the United States, the umpire shall be selected by a judge of a court of record in New York. The originally appointed appraisers shall then appraise the **General Contractor Loss**, stating separately the amount of actual cash value and all other amounts potentially due hereunder for each item of insured property; and, failing to agree, shall submit their differences, only, to the umpire. An award in writing, so itemized, of any two (2) appraisers when filed with the Company shall conclusively, without right of appeal, determine all amounts submitted to appraisal. Each appraiser shall be paid by the party selecting him and the expenses of appraisal and umpire shall be paid by the **Loss Payee** and the Company equally.

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# Cap*Assure*
## PART B
## SUBCONTRACTOR DEFAULT

Words in bold have special meaning; refer to Part C - Definitions.

**1. INSURING AGREEMENT**

The Company will indemnify the **Insured** for **Subcontractor Loss** after application of the Deductible and Co-payment Deductible amounts as stated in Item 6(b). and Item 7. of the Declarations and subject to the Retention Aggregate stated in Item 8. of the Declarations, but only to the extent of a **Default of Performance** by the **Insured's Subcontractor/Supplier** as respects any **Covered Subcontract or Purchase Order Agreement.** The amount paid by the Company will be subject to the Limits of Insurance stated in Item 4(b)3. of the Declarations and will not be eroded by the Deductible and Co-payment Amounts stated in Item 6(b). and 7. of the Declarations page.

**2. LIMITS OF INSURANCE**

a. The Company will never pay more than the Aggregate Limit of Insurance listed in Item 4(b)3. of the Declarations. This Aggregate Limit of Insurance is the most the Company will pay regardless of the number of:

   (1) **Insured(s)**;

   (2) **Subcontractor(s)/Supplier(s)**;

   (3) **Covered Subcontracts or Purchase Order Agreement(s)**;

   (4) **Scheduled Project(s)**; or

   (5) claims made or suits brought.

b. The Aggregate Limit of Insurance listed in Item 4(b). of the Declarations is the most the Company will pay for the sum of all **Subcontractor Loss(es)** in excess of the Deductible and Co-payment Deductible Amount from all **Defaults of Performance** as respects all **Covered Subcontracts or Purchase Order Agreements** executed during the **Policy Period.**

Once the Aggregate Limit of Insurance in any **Policy Period** is completely exhausted, the Company shall have no further obligation to indemnify the **Insured** for **Subcontractor Loss(es).**

c. Subject to Item 2.b. above, the most the Company will pay for any one **Subcontractor Loss** will be the lesser of:

   (1) the Variable Subcontractor Loss Limit Factor times the **Subcontract Amount**; or

   (2) the Each Subcontractor Loss Limit of Insurance listed in Item 4(b)2. of the Declarations.

In the event the Variable Subcontractor Loss Limit Factor is listed as "Not Applicable" or "N/A", the most the Company will pay for any one **Subcontractor Loss** will be the Each Subcontractor Loss Limit of Insurance listed in Item 4(b)2. of the Declarations.

d. Subject to Item 2.c. above, the Company will not pay more than the Indirect Costs Sublimit of Insurance shown in Item 4(b)4. of the Declarations for all **Indirect Costs** from any one **Subcontractor Loss.** Any amounts that the Company pays to indemnify **Indirect Costs** under this Item 2.d. will erode the Each Subcontractor Loss Limit of Insurance applicable to the coverage provided for any one **Subcontractor Loss.**

**3. DEDUCTIBLE AND CO-PAYMENT DEDUCTIBLE AMOUNTS**

a. The Deductible, if any, listed in Item 6(b). of the Declarations is the amount of each **Subcontractor Loss** that is to be borne by the **Insured** with respect to each and every **Subcontractor Loss** to which this Policy applies.

b. The **Insured's** Co-payment Deductible Amount, if any, is listed in Item 7. of the Declarations and applies to each **Subcontractor Loss** after the application of the Deductible.

c. The **Insured's** total liability for all Deductible and Co-payment Deductible Amount for all **Subcontractor Losses** to which this insurance applies will not exceed the Policy Retention Aggregate listed in Item 8. of the Declarations.

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

d. The **Insured's** rights and duties in the event of a **Default of Performance** apply regardless of the application of the Deductible and Co-payment Deductible Amount.

e. If any payments are made by the Company under this Policy for any **Subcontractor Loss** covered by this Policy, the Deductible(s) shown in the Declarations apply regardless of whether any other policies issued by the Company or any other carrier also apply, and must be paid by the **Insured**.

## 4. EXCLUSIONS

This insurance does not apply to any **Subcontractor Loss**, or portions thereof:

a. Caused by any **Subcontractor/Supplier** who is in or to whom the **Insured** has issued a written notice of **Default of Performance**, and said default has not been cured as of the first day of the **Policy Period**.

However, if such **Default of Performance** was disclosed to the Company in advance of binding this Policy, the Company may, at the Company's sole discretion, agree to add coverage for any such **Subcontractor/Supplier** via endorsement to this Policy, in which case this exclusion will not apply for that **Subcontractor/Supplier**.

b. Arising from any **Covered Subcontract or Purchase Order Agreement** for which a payment and/or performance bond has been provided and the **Insured** is an obligee of such bond(s).

c. To the extent that the **Subcontractor Loss** is caused by any dishonest or fraudulent act or omission, or any intentional misrepresentation committed by the **Insured**.

d. Arising from any **Covered Subcontract or Purchase Order Agreement** that is purchased, assumed, or otherwise acquired by the **Insured** from any other person or entity, or sold or otherwise transferred or assigned by the **Insured** to any other person or entity unless specifically agreed to in writing by the Company.

e. Of any type, however caused, arising directly or indirectly, out of:

(1) war, including undeclared or civil war;

(2) warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) insurrection, rebellion, revolution, usurped power, or action taken by governmental authority.

f. Arising from nuclear reaction or nuclear radiation or radioactive contamination.

g. Arising out of the failure of a **Subcontractor /Supplier** to render professional services, but only with respect to their providing engineering, architectural or surveying services in their capacity as an engineer, architect or surveyor.

Professional Services include:

(1) preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

(2) supervisory or inspection activities performed as part of any related architectural or engineering activities.

However, this exclusion does not apply to:

(1) normal supervisory duties of a general contractor or **Subcontractor/Supplier** on a construction project; or

(2) a **Default of Performance** by a **Subcontractor/Supplier** engaged by the **Insured** whose work is primarily construction, but who may also provide incidental professional services necessary for the completion of the construction services required by the contract.

h. Arising, either directly or indirectly, from **Bodily Injury**.

i. To the extent that the **Subcontractor Loss** includes damages awarded by a court that are punitive or consequential in nature, such as:

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

(1) punitive or exemplary damages;

(2) double or treble damages (or any other multiple of actual damages); or

(3) consequential or incidental damages.

However, consequential and incidental damages as used in this Policy do not include liquidated damages.

5. **CLAIMS**

   a. The **Insured** bears the burden of proving that it has complied with all terms and conditions of this Policy and that the **Subcontractor Loss** is recoverable under this Policy.

   b. Notice of **Subcontractor Loss** must be submitted in writing to the Company within thirty (30) days from the time the **Insured** becomes aware that a **Subcontractor /Supplier** is in **Default of Performance** or is insolvent.

   c. In the event of a **Subcontractor Loss**, the **Insured** must submit to the Company a satisfactory **Proof of Subcontractor Loss**. Submission of a **Proof of Subcontractor Loss** must be made at the earlier of:

      (1) ten (10) years after the substantial completion of the **Covered Subcontract or Purchase Order Agreement**;

      (2) the expiration of any right to seek recovery under any **Covered Subcontract or Purchase Order Agreement** in connection with a **Default of Performance** covered by this Policy; or

      (3) the expiration of any statute of limitation or statute of repose applicable to recovery against the **Covered Subcontract or Purchase Order Agreement** or to the **Subcontractor Loss**.

   d. The Company's indemnification of the **Insured's Subcontractor Loss** will be calculated as follows, subject to the Limits of Insurance and the provisions of this Policy:

      (1) calculate the amount of **Subcontractor Loss** and then subtract any **Indirect Costs** in excess of the **Indirect Costs** Sublimit on Item 4(b)4. of the Declarations page;

      (2) subtract the Deductible from the amount determined in Item (1) above;

      (3) take the lesser of the amount determined in Item (2) above or the Co-Payment Layer Amount as stated in Item 7(b). of the Declarations and multiply by the Co-Payment Percentage stated in Item 7(a). of the Declarations (if any);

      (4) subtract the amount in Subparagraph 6.d.(3) above from the amount determined in Subparagraph 6.d.(2) above;

      (5) take the amount determined in Item (4) above and apply the lesser of the following Limits:

         (i) the Variable Subcontractor Loss Limit Factor times the Subcontract Amount; or
         (ii) the Each Subcontractor Loss Limit of Insurance, as applicable.

      In the event the Variable Subcontractor Loss Limit Factor, shown in Item 4(b). of the Declarations is listed as "Not Applicable" or "N/A", then the Each Subcontractor Loss Limit of Insurance will apply.

   e. The Company will indemnify the **Insured** within thirty (30) days of receipt of a satisfactory **Proof of Subcontractor Loss**. In the event the **Insured** provides the Company with documentation presented as a **Proof of Subcontractor Loss** that the Company finds deficient, the Company will notify the **Insured** of the deficiencies within thirty (30) days after the Company's receipt of such documentation. The Company will make payment for a Subcontractor Loss within thirty (30) days of receipt of information necessary to cure such deficiencies. If the Company notifies the **Insured** of a deficiency in a **Proof of Subcontractor Loss**, the Company will pay any covered amount, up to the Each **Subcontractor Loss** Limit of Insurance as stated in Item 4.b. of the Declarations, for which the **Proof of Subcontractor Loss** is not deficient.

   f. If the **Insured** pays **Subcontractor Loss(es)** over a period of time greater than thirty (30) days, the **Insured** may submit interim **Proofs of Subcontractor Loss**. If an amount would constitute a **Subcontractor Loss** except that the amount of the **Subcontractor Loss** has not been finally determined, the Company will indemnify the **Insured** for the Interim Percentage as stated in Item 10. of the Declarations, of the **Subcontractor Loss** payment which would have been payable as calculated above, after the Company accepts a satisfactory **Proof of Subcontractor Loss**.

   g. The **Insured** must immediately return any

© 2012 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

payments made by the Company upon a determination by a court, arbitrator, or other legally binding determination that the **Subcontractor Loss** does not arise out of a **Default of Performance**.

h. The **Proof of Subcontractor Loss** and any amounts claimed as covered **Subcontractor Loss(es)** under this Policy are subject to audit by the Company in accordance with GENERAL CONDITIONS, Item 7, Inspection and Audit, of this Policy.

i. In the event that the **Insured** and the Company cannot agree that a claim is a **Subcontractor Loss**, or cannot agree on the amount of **Subcontractor Loss** the **Insured** has incurred or paid, either party may commence arbitration proceedings in accordance with General CONDITIONS, Item 2., Arbitration, of this Policy.

6. **SUBROGATION AND RECOVERIES**
   a. In the event of any payment by the Company under this Policy, the Company shall receive, to the extent of such payment, all of the **Insured's** rights of recovery and other remedies against all persons, entities or organizations with respect to such payment.

   b. Unless otherwise agreed to by the Company and the **Insured**, the Company shall, at the Company's option, pursue all recovery and subrogation actions for **Subcontractor Losses** paid.

   c. The **Insured** must take all reasonable steps to preserve the Company's rights of recovery against the persons, entities or organizations identified in Item 6.a. hereto, and the **Insured** shall do nothing to prejudice such rights.

   d. The **Insured** must cooperate with the Company in the investigation, settlement or defense of any claim or suit and assist the Company, upon reasonable request, in the enforcement of any right against the person, entity or organization which may be liable to the **Insured** because of **Subcontractor Loss** to which this insurance applies, including but not limited to, filing any claims and enforcing any liens or security interest against a **Subcontractor/Supplier** or its property.

   e. After payment of the **Subcontractor Loss**, any funds or salvage recovered will be paid to the Company and shared between the **Insured** and the Company in the following order:

   (1) the Company will be fully reimbursed for the Company's costs of recovery, including but not limited to, attorney fees, expert witness fees, arbitrator fees and court and arbitration costs and expenses;

   (2) next, if any funds remain, the Company will be fully reimbursed for the **Subcontractor Loss** amount the Company paid in excess of the sum of the Deductible and Co-Payment Deductible Amount as listed in Item 6(b). and Item 7. of the Declarations, respectively; and

   (3) next, if any funds remain and the **Insured** paid a Co-Payment Deductible Amount, then the **Insured** and the Company will share, based on the Co-Payment Deductible Amount listed in Item 7. of the Declarations, any remaining sums until the amount of the Company's payment of the **Subcontractor Loss** and the Company's cost of recovery have been fully reimbursed.

   Sums remaining after all payments in Subparagraphs 6.e.(1) through 6.e.(3) hereto, if any, shall be retained solely by the **Insured**. The application of amounts recovered as described above applies regardless of any designation of amounts by the **Subcontractor/Supplier** or any other party.

7. **CONDITIONS**
   a. **Conditions of Coverage**
   As a condition precedent of coverage provided under this Policy, the **Insured** warrants and agrees:

   (1) to cease awarding contracts to any **Subcontractor/Supplier** that is in **Default of Performance** and for so long as the **Subcontractor/Supplier** is in **Default of Performance,** or until agreed to in writing by the Company;

   (2) upon becoming aware of the **Subcontractor Insolvency** or **Default of Performance** of any **Subcontractor/Supplier**, immediately take all reasonable and timely actions necessary to preserve any rights of recovery against such **Subcontractor/Supplier**, including but not limited to establishing the debt owed by the **Subcontractor/Supplier** to the **Insured** as a valid obligation of the **Covered Subcontract or Purchase Order Agreement** in accordance with any applicable statutes and procedures;

KAX 050 0412

© 2012 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

(3) to use all reasonable measures to prevent and to mitigate **Subcontractor Loss** at all times; and

(4) following the delivery of Notice of Subcontractor Loss to the Company, to execute, upon the Company's request, an assignment of all right, title, and interest arising under any **Covered Subcontract or Purchase Order Agreement**, including without limitation any legal or equitable claim or chose in action against any subcontractor/contractor to whom the **Insured** has issued a notice of **Default of Performance** and to cooperate, in accordance with the terms and conditions of this Policy, in the Company's prosecution of any legal actions the Company deems appropriate against such subcontractor.

b. **Action Against the Company**

No one may bring legal action against the Company under this Policy unless all terms of the Policy have been complied with and such action is commenced by the later of:

(1) seven (7) years following the date of termination of the **Covered Subcontract or Purchase Order Agreement** or the date of substantial completion of the **Covered Subcontract or Purchase Order Agreement** entered into during the **Policy Period**; or

(2) one (1) year after the Company's first disposition of a specific claim which is the basis for the action or proceeding.

c. **Premium Audit**

The premium shown in Item 9(b)1. of the Declarations is a deposit premium only. At the close of each reporting period the Company will compute the total premium due and send notice to the Sole Agent. Premium amounts invoiced will be total premium due less the premium paid to date. The Company will additionally complete periodic audits of completed scheduled projects. At the completion of these audits total premium will again be calculated and invoices will be issued for any amounts over or under the total paid premium to date. A final premium audit will be completed once all scheduled projects have been completed.

.

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# Cap*Assure*

## PART C
## DEFINITIONS

### DEFINITIONS

a. **Balance of the Contract** means the **General Construction Covered Contract,** less the amount paid to the **Insured.**

b. **Balance of the Subcontract or Purchase Order Agreement Price** means the **Subcontract Amount,** less the amount paid to the **Subcontractor /Supplier.**

c. **Bodily Injury** means any:

(1) bodily injury, sickness, disease; and/or

(2) pain, suffering, mental anguish, or emotional injury or distress of any kind sustained by any person, including death resulting from any of the foregoing at any time.

d. **Covered Project** means the construction project(s) shown on the Project Endorsement and which is the subject of the **General Construction Covered Contract.**

e. **Covered Subcontract or Purchase Order Agreement** means those written, binding agreements executed on a **Scheduled Project** by the **Insured** and the **Insured's Subcontractor /Supplier,** setting forth an agreed scope of work, schedule and price, as such may be amended from time to time or as otherwise defined by endorsement to this Policy. **Covered Subcontracts or Purchase Order Agreements** include written, binding purchase order agreements signed by the **Insured** and a vendor/supplier for the sale of materials or equipment to be incorporated into a **Scheduled Project.**

However, an agreement or other document that does not require as its primary purpose at least one of the following:

(1) the supply or the installation of any systems or equipment to be incorporated into a **Scheduled Project** or materials to be incorporated into a **Scheduled Project;** or

(2) the performance of other construction work on a **Scheduled Project,**

or is more than thirty-six (36) months in length

is not a **Covered Subcontract or Purchase Order Agreement.**

In addition, any agreement or other document whose **Subcontract Amount** exceeds the Enrolled **Subcontract Amount** Limitation set forth in Item 13. of the Declarations shall not be deemed a **Covered Subcontract or Purchase Order Agreement** unless specifically agreed to in writing in advance by the Company and endorsed to this Policy.

f. **Default and Termination of Performance** means failure of the **Insured** to fulfill the terms of the **General Construction Covered Contract** if, and only if, such failure results from the **General Contractor Insolvency** of the **Insured,** and the **Loss Payee** has terminated the **Insured's** right to proceed under the **General Construction Covered Contract.**

g. **Default of Performance** means failure of the **Subcontractor /Supplier** to fulfill the terms of the **Covered Subcontract or Purchase Order Agreement** as determined by the **Insured** or a legally binding authority. A determination by a legally binding authority shall supersede any previous determination.

h. **General Construction Contract Amount** means the total amount of the **General Construction Covered Contract,** plus any amounts to which the **Insured** is entitled, including but not limited to, any change orders, extra work, claims, or any adjustments in accordance with the **General Construction Covered Contract.**

i. **General Construction Covered Contract** means the written, binding agreement executed on the **Covered Project** by the **Loss Payee** and the **Insured,** setting forth an agreed scope of work, schedule and price, as such may be amended from time to time, including but not limited to all general conditions, supplemental general conditions, general requirements, addendum and alternates.

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

j.  **General Contractor Insolvency/Insolvent** means any of the following steps, or equivalent steps, that have been taken by or against the **Insured** by or in a court having jurisdiction over the **Insured's** affairs or pursuant to a statute applicable to the **Insured** and its creditors:

(1) bankruptcy or **General Contractor Insolvency** is adjudicated against the **Insured**;

(2) voluntary or involuntary proceedings are initiated under Chapter 7 or Chapter 11 of the Federal Bankruptcy Code of the United States or any similar statute in another country; or

(3) a court order is issued or the **Insured** accepts a voluntary resolution for the winding-up or liquidation of the **Insured's** affairs.

k.  **General Contractor Loss** means the costs and expenses paid by the **Loss Payee** to the extent caused by a **Default and Termination of Performance** of the **Insured** under the terms of the **General Construction Covered Contract**, less the unpaid Balance of the General Construction Covered Contract, including any amounts retained or recovered by the **Loss Payee** with respect to the **General Construction Covered Contract**. Such costs and expenses are:

(1) costs of completing **Insured's** obligations under the **General Construction Covered Contract**, including amounts the **Insured** is required to pay under the **General Construction Covered Contract** to third parties;

(2) costs of correcting defective or nonconforming work or materials;

(3) legal and other professional expenses paid by the **Loss Payee** and directly related to the **Insured's Default and Termination of Performance**; or

(5) liquidated Damages which may be assessed under the terms and conditions of the **General Construction Covered Contract**.

l.  **Loss Payee** means the entity set forth in the Project Endorsement.

m.  **General Construction Proof of Loss** means a written description and any other supporting evidence, including the applicable **General Construction Covered Contract**, notice of **Default and Termination of Performance**, and any other documents which demonstrate the claim is a covered **General Contractor Loss** and quantify the amount of the **General Contractor Loss**.

n.  **Indirect Costs** mean costs and expenses paid by the **Insured** to the extent caused by a **Default of Performance** of a **Subcontractor/Supplier** and that are not specifically included in Definition **v. Subcontractor Loss**, Items (1) through (4). **Indirect Costs** include, but are not limited to, those costs and expenses paid by the **Insured** for liquidated damages, job acceleration, and extended overhead.

o.  **Insured** means the person(s) or entity(ies) listed in Item 1 of the Declarations or stated as an insured by endorsement to this Policy.

p.  **Policy Period** means the period of time listed in Item 3 of the Declarations or any shorter period of time arising as a result of the cancellation of this Policy in accordance with GENERAL CONDITIONS, Item 4,. Cancellation, of this Policy.

q.  **Proof of Subcontractor Loss** means a written description and any other supporting evidence reasonably required by the Company, including the applicable **Covered Subcontract or Purchase Order Agreement**, notice of **Default of Performance**, and any other documents which demonstrate the claim is a covered **Subcontractor Loss** and quantify the amount of the **Subcontractor Loss**.

r.  **Qualification Procedures** mean the criteria that the **Insured** has represented that the **Insured** will adhere to in order to assure that the **Subcontractor/Supplier** will be able to carry out the terms of the **Covered Subcontract or Purchase Order Agreement**.

s.  **Scheduled Project** means the construction project(s) shown on reports provided to the Company monthly by the **Insured**.

t.  **Subcontract Amount** means the total amount of the **Covered Subcontract or Purchase Order Agreement**, plus any amounts to which the **Subcontractor/Supplier** is entitled, including any adjustments in accordance with the **Covered Subcontract or Purchase Order Agreement**.

u.  **Subcontractor Insolvency/Insolvent** means any of the following steps, or equivalent steps, that have been taken by or against a **Subcontractor/Supplier** by or in a court having jurisdiction over the **Subcontractor/Supplier's** affairs or pursuant to a statute applicable to the **Subcontractor /Supplier** and its creditors:

© 2012 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

(1) bankruptcy or **Subcontractor Insolvency** is adjudicated against the **Subcontractor /Supplier**.

(2) voluntary or involuntary proceedings are initiated under Chapter 7 or Chapter 11 of the Federal Bankruptcy Code of the United States or any similar statute in another country.

(3) a court order is issued or the **Subcontractor /Supplier** accepts a voluntary resolution for the winding-up or liquidation of the **Subcontractor/Supplier's** affairs.

v. **Subcontractor Loss** means the costs and expenses paid by the **Insured** to the extent caused by a **Default of Performance** of a **Subcontractor/Supplier** under the terms of a **Covered Subcontract or Purchase Order Agreement,** less the unpaid **Balance of the Subcontract or Purchase Order Agreement Price,** including any amounts retained or recovered by the **Insured** with respect to the **Covered Subcontract or Purchase Order Agreement** of the defaulted **Subcontractor /Supplier**. Such costs and expenses are:

(1) costs of completing **Subcontractor/ Supplier's** obligations under the **Covered Subcontract or Purchase Order Agreement,** including amounts the defaulted **Subcontractor/Supplier** is required to pay under the **Covered Subcontract or Purchase Order Agreement** to third parties.

(2) costs of correcting defective or nonconforming work or materials.

(3) legal and other professional expenses paid by the **Insured** and reasonably incurred in relation to the **Subcontractor/Supplier Default of Performance.**

(4) costs, charges, and expenses paid by the **Insured** in the investigation, adjustment, and defense of disputes and directly related to a **Subcontractor/Supplier Default of Performance.**

(5) **Indirect Costs**.

Multiple **Defaults of Performance** by the same **Subcontractor/Supplier** on one or more **Covered Subcontract or Purchase Order Agreements** executed during a **Policy Period** shall be considered to be a single **Subcontractor Loss.**

**Subcontractor Loss(es)** will be attributed to the **Policy Period** in which the **Scheduled Project** was executed, not the year(s) in which **Subcontractor Loss(es)** are actually paid by the **Insured**.

w. **Subcontractor/Supplier** means:

(1) any legal entity which has entered into a **Covered Subcontract or Purchase Order Agreement** with the **Insured**. **Subcontractor /Supplier** shall not include any subsidiary of the **Insured** now existing or hereafter formed or acquired, whether partially or wholly owned or controlled, or any subsidiary of a subsidiary (whether direct or indirect), or partnership, joint venture or corporation of the **Insured**.

(2) the receiver, trustee, liquidator, administrator, or similar representative of any **Subcontractor/Supplier** as described in Item w.(1) above, or its creditors, or the **Subcontractor/Supplier** as described in Item w.(1) above, as debtor in possession under Chapter 11 of the Federal Bankruptcy Code or any similar statute in another country.

(3) any successor to such legally existing entity, corporation, proprietorship, receiver, trustee, liquidator, administrator, or similar representative referred to in Item w. (1) and (2) above.

(4) any corporation and other entity controlling, controlled by, or under common control of such legally existing entity, corporation, proprietorship, receiver, trustee, liquidator, administrator, or similar representative referred to in Item w. (1), (2) and (3).

© 2012 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

**ENDORSEMENT #**

This endorsement, effective 12:01 a.m., forms a part of

Policy No. issued to

by Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**EARLY REPORTING ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**Construct*Assure* – PROJECT ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

If the **Insured** gives the Company written notice within five (5) business days from the time:

1.     they send written notification to a **Subcontractor/Supplier** that it is in **Default of Performance** under the **Covered Subcontract or Purchase Order Agreement**; or

2.     they become aware that the **Subcontractor/Supplier is Insolvent**;

The Company will waive the Co-payment Deductible Amount as listed in Item 6. of the Declarations.

In order for such waiver to apply, the insured must:

1.     Provide XL risk engineering and claims staff reasonable and timely access to the project site, project management staff, and all documents and records associated therewith.

2.     Provide notice to XL in advance of any and all actions they take in conjunction with curing the default.


Date Endorsement Issued: _____


All other terms and conditions of this Policy shall remain the same.

KSX 402 0412                                                                                                              Page 1 of 1
© 2012 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**ENDORSEMENT #**

This endorsement, effective 12:01 a.m.,          , forms a part of

Policy No.          issued to

by          .

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**INDIRECT COSTS AGREED AMOUNT ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**Construct*Assure* – PROJECT ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

In consideration of additional premium of $_____, it is hereby understood and agreed that in the event of a covered **Loss** under this Policy, for which the **Insured** has provided adequate **Proof of Loss** for **Loss** as defined in Section 9. **DEFINITIONS**, Item i. (1) - (4) of the Policy, the **Insured** shall be entitled to an additional amount of recovery equal to ten percent (10%) of the **Loss** as defined in Section 9. **DEFINITIONS**, Item i. (1) – (4) of the Policy, but not more than $500,000, that shall be deemed to compensate the **Insured** for **Indirect Costs** for which no **Proof of Loss** shall be required.

If the **Insured** is claiming **Indirect Costs** that are more than the above amount, the **Insured** shall be required to document all **Indirect Costs,** and will be compensated for those that are in excess of the above amount in accordance with Section 6. **CLAIMS** of this Policy.

Date Endorsement Issued:  _____

All other terms and conditions of this Policy shall remain the same.

© 2012 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

## ENDORSEMENT #

This endorsement, effective 12:01 a.m.,          , forms a part of

Policy No.       issued to

by        .

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### FOR CAUSE ENDORSEMENT

This endorsement modifies insurance provided under the following:

***CapAssure***

**THIS ENDORSEMENT APPLIES TO PART A CONTRACTOR DEFAULT ONLY.**

I.      **1.**      **INSURING AGREEMENT** is deleted and replaced as follows:

**INSURING AGREEMENT**

The Company will indemnify the **Loss Payee** for **General Contractor Loss** after application of the Deductible and Co-payment Deductible amounts as stated in Items 6. and 7. of the Declarations, resulting from a material breach of the covered contract which is not cured by the **Insured** resulting in **Default and Termination of Performance** of the **General Construction Covered Contract.** The amount paid by the Company will be subject to the Limits of Insurance stated in Item 4. of the Declarations.

II.      The following is added after Item **2. LIMITS OF INSURANCE:**

**SELF INSURED RETENTION**

a.      Self Insured Retention, if any, listed in Item 5. of the Declarations is the amount of the **General Contractor Loss** that is to be borne by the **Loss Payee.**

b.      The **Loss Payee's** rights and duties in the event of a **Default and Termination of Performance** apply regardless of the application of Self Insured Retention.

c.      If any payments are made by the Company under this Policy for any **General Contractor Loss** covered by this Policy, the Self Insured Retention shown in the Declarations apply regardless of whether any other policies issued by the Company or any other carrier also apply, and must be paid by the **Loss Payee.**

III.      The following are added to **EXCLUSIONS:**

●      Arising from an event of force majeure, or any other event which would excuse the **Insured** from performance under the terms and conditions of the **General Construction Covered Contract.**

●      To the extent that a court of competent jurisdiction has determined that the **Loss Payee** has materially breached the **General Construction Covered Contract,** irrespective of whether the court determines that the **Insured** also breached the **General Construction Covered Contract.**

KAX 401 0412

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

IV.  Paragraph b. of **CLAIMS** is deleted and replaced as follows:

    b.  Notice of **General Contractor Loss** must be submitted in writing to the Company within thirty (30) days from the time the **Loss Payee** sends written notice of **Default and Termination of Performance** by the **Insured.**

V.  The following is added to **CLAIMS**:

The Company's indemnification of the **Loss Payee's General Contractor Loss** will be calculated as follows, subject to the **Limits of Insurance** and the provisions of this Policy:

    (1)  Calculate the amount of **General Contractor Loss**;

    (2)  Subtract the Self Insured Retention from the **General Contractor Loss.**

VI.  Paragraph a. Conditions of Coverage of **CONDITIONS** is deleted and replaced as follows:

    a.  **Conditions of Coverage**

As a condition precedent of coverage provided under this Policy, the **Loss Payee** warrants and agrees:

    (1)  To use all reasonable measures to prevent and to mitigate General Construction Loss at all times;

    (2)  To comply with and abide by the obligations, terms and conditions of the **General Construction Covered Contract** in all respects; and

    (3)  To comply with all notice provisions and cure periods set forth in the **General Construction Covered Contract.**

VII.  **DEFINITIONS** is amended to include the following additional definition:

**Default** means "Default" as defined in the terms and conditions of the **General Construction Covered Contract**.

VIII.  The **Default and Termination of Performance** definition is deleted and replaced as follows:

**Default and Termination of Performance** means all of the following conditions are met:

    (1)  Failure of the **Insured** to fulfill the terms and conditions of the **General Construction Covered Contract** resulting in a substantial and material breach of the **General Construction Covered Contract** by the **Insured**; and

    (2)  **Loss Payee** has faithfully performed all obligations, terms and conditions of the **General Construction Covered Contract**; and

    (3)  **Loss Payee** has followed all notice provisions of the **General Construction Covered Contract** including providing the **Insured** with an opportunity to cure any **Default** in accordance with the terms and conditions of the **General Construction Covered Contract**; and

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

(4)     **Loss Payee** has declared the **Insured** in **Default** and terminated its right to proceed under the **General Construction Covered Contract.**

Provided however, in the event that the **Insured** has provided written notice to the **Loss Payee** and the Company within twenty (20) days of any **Default and Termination of Performance** that such **Default and Termination of Performance** is disputed, then such **Default and Termination of Performance** shall not be effective until such time as a court of competent jurisdiction has made a final determination that the **Insured** has materially and substantially breached the **General Construction Covered Contract**, and further that the **Loss Payee** has not breached the terms and conditions of the **General Construction Covered Contract**. For purposes of this definition, **General Contractor Insolvency** shall be a substantial and material breach of the **General Construction Covered Contract**.

All other terms and conditions of this Policy shall remain the same.

KAX 401 0412

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

**ENDORSEMENT #**

This endorsement, effective 12:01 a.m.,          , forms a part of

Policy No.        issued to

by        .

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**PROJECT ENDORSEMENT**

This endorsement modifies insurance provided under the following:

## Cap*Assure*

Item 1.    **Insured:** _____
               **Address:** _____
                          _____
                          _____

               **Producer Name:** _____
               **Address:** _____
                          _____

Item 2.    **Loss Payee:** _____
               **Address:** _____
                          _____
                          _____

Item 3.    **Policy Period:**

               From: _____    To: _____
                  at 12:01 A.M. Standard Time at the **Insured's** address set forth in Item 1.

Item 4.    **Limits of Insurance:**
               Part A –Contractor Default  $_____  Project Limit of Insurance (set forth in the endorsement)

Item 5.    **Self Insured Retention:**    $_____  for the **Loss Payee** (if applicable)

Item 6.    **Premium:**
               (a)    Part A – Contractor Default    $_____  which is $_____ minimum and earned.
               Premiums do not include taxes and surcharges

Item 7.    **Covered Project:**

All other terms and conditions of this Policy shall remain the same.

KAX 400 0412

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# EXHIBIT 3

"The insurer which has issued this insurance is not licensed by the Pennsylvania Insurance Department and is subject to limited regulation.  This insurance is NOT covered by the Pennsylvania Insurance Guaranty Association."

Name of Surplus Lines Broker:  Willis of New York, Inc.
Address:_200 Liberty Street, 7th Floor
New York, NY 10281-1003
212-915-8888

NOTICE TO POLICYHOLDERS

**FRAUD NOTICE**

| | |
|---|---|
| **Arkansas** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Colorado** | **It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.** |
| **District of Columbia** | **WARNING:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant. |
| **Florida** | Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree. |
| **Kansas** | A "fraudulent insurance act" means an act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto. |
| **Kentucky** | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime. |
| **Louisiana** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Maine** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines, or denial of insurance benefits. |
| **Maryland** | Any person who knowingly and willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **New Jersey** | Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties. |
| **New Mexico** | ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES. |

© 2013 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

| | |
|---|---|
| **New York** | **General: All applications for commercial insurance, other than automobile insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation. |
| | **All applications for automobile insurance and all claim forms:** Any person who knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation. |
| | **Fire:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime. |
| | The proposed insured affirms that the foregoing information is true and agrees that these applications shall constitute a part of any policy issued whether attached or not and that any willful concealment or misrepresentation of a material fact or circumstances shall be grounds to rescind the insurance policy. |
| **Ohio** | Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud. |
| **Oklahoma** | **WARNING:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony. |
| **Pennsylvania** | **All Commercial Insurance, Except As Provided for Automobile Insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties. |
| | **Automobile Insurance:** Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and the payment of a fine of up to $15,000. |
| **Puerto Rico** | **Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances [be] present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.** |

PN CW 01 0613

© 2013 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

| | |
|---|---|
| **Rhode Island** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Tennessee** | **All Commercial Insurance, Except As Provided for Workers' Compensation** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.<br><br>**Workers' Compensation:**  It is a crime to knowingly provide false, incomplete or misleading information to any party to a workers' compensation transaction for the purpose of committing fraud. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Utah** | **Workers' Compensation:**  Any person who knowingly presents false or fraudulent underwriting information, files or causes to be filed a false or fraudulent claim for disability compensation or medical benefits, or submits a false or fraudulent report or billing for health care fees or other professional services is guilty of a crime and may be subject to fines and confinement in state prison. |
| **Virginia** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Washington** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **West Virginia** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **All Other States** | Any person who knowingly and willfully presents false information in an application for insurance may be guilty of insurance fraud and subject to fines and confinement in prison.  (In Oregon, the aforementioned actions may constitute a fraudulent insurance act which may be a crime and may subject the person to penalties). |

© 2013 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

PRIVACY POLICY

The XL America, Inc. insurance group (the "Companies"), believes personal information that we collect about our customers, potential customers, and proposed insureds (referred to collectively in this Privacy Policy as "customers") must be treated with the highest degree of confidentiality. For this reason and in compliance with the Title V of the Gramm-Leach-Bliley Act ("GLBA"), we have developed a Privacy Policy that applies to all of our companies. For purposes of our Privacy Policy, the term "personal information" includes all information we obtain about a customer and maintain in a personally identifiable way. In order to assure the confidentiality of the personal information we collect and in order to comply with applicable laws, all individuals with access to personal information about our customers are required to follow this policy.

## Our Privacy Promise

Your privacy and the confidentiality of your business records are important to us. Information and the analysis of information is essential to the business of insurance and critical to our ability to provide to you excellent, cost-effective service and products. We understand that gaining and keeping your trust depends upon the security and integrity of our records concerning you. Accordingly, we promise that:

1. We will follow strict standards of security and confidentiality to protect any information you share with us or information that we receive about you;
2. We will verify and exchange information regarding your credit and financial status only for the purposes of underwriting, policy administration, or risk management and only with reputable references and clearinghouse services;
3. We will not collect and use information about you and your business other than the minimum amount of information necessary to advise you about and deliver to you excellent service and products and to administer our business;
4. We will train our employees to handle information about you or your business in a secure and confidential manner and only permit employees authorized to use such information to have access to such information;
5. We will not disclose information about you or your business to any organization outside the XL insurance group of Companies or to third party service providers unless we disclose to you our intent to do so or we are required to do so by law;
6. We will not disclose medical information about you, your employees, or any claimants under any policy of insurance, unless you provide us with written authorization to do so, or unless the disclosure is for any specific business exception provided in the law;
7. We will attempt, with your help, to keep our records regarding you and your business complete and accurate, and will advise you how and where to access your account information (unless prohibited by law), and will advise you how to correct errors or make changes to that information; and
8. We will audit and assess our operations, personnel and third party service providers to assure that your privacy is respected.

## Collection and Sources of Information

We collect from a customer or potential customer only the personal information that is necessary for (a) determining eligibility for the product or service sought by the customer, (b) administering the product or service obtained, and (c) advising the customer about our products and services. The information we collect generally comes from the following sources:

- Submission – During the submission process, you provide us with information about you and your business, such as your name, address, phone number, e-mail address, and other types of personal identification information;
- Quotes – We collect information to enable us to determine your eligibility for the particular insurance product and to determine the cost of such insurance to you. The information we collect will vary with the type of insurance you seek;
- Transactions – We will maintain records of all transactions with us, our affiliates, and our third party service providers, including your insurance coverage selections, premiums, billing and payment information, claims history, and other information related to your account;

NOTICE TO POLICYHOLDERS

- Claims – If you obtain insurance from us, we will maintain records related to any claims that may be made under your policies.  The investigation of a claim necessarily involves collection of a broad range of information about many issues, some of which does not directly involve you.  We will share with you any facts that we collect about your claim unless we are prohibited by law from doing so.  The process of claim investigation, evaluation, and settlement also involves, however, the collection of advice, opinions, and comments from many people, including attorneys and experts, to aid the claim specialist in determining how best to handle your claim.  In order to protect the legal and transactional confidentiality and privileges associated with such opinions, comments and advice, we will not disclose this information to you; and
- Credit and Financial Reports – We may receive information about you and your business regarding your credit.  We use this information to verify information you provide during the submission and quote processes and to help underwrite and provide to you the most accurate and cost-effective insurance quote we can provide.

Retention and Correction of Personal Information

We retain personal information only as long as required by our business practices and applicable law.  If we become aware that an item of personal information may be materially inaccurate, we will make reasonable effort to re-verify its accuracy and correct any error as appropriate.

Storage of Personal Information

We have in place safeguards to protect data and paper files containing personal information.

Sharing/Disclosing of Personal Information

We maintain procedures to assure that we do not share personal information with an unaffiliated third party for marketing purposes unless such sharing is permitted by law.  Personal information may be disclosed to an unaffiliated third party for necessary servicing of the product or service or for other normal business transactions as permitted by law.

We do not disclose personal information to an unaffiliated third party for servicing purposes or joint marketing purposes unless a contract containing a confidentiality/non-disclosure provision has been signed by us and the third party.  Unless a consumer consents, we do not disclose "consumer credit report" type information obtained from an application or a credit report regarding a customer who applies for a financial product to any unaffiliated third party for the purpose of serving as a factor in establishing a consumer's eligibility for credit, insurance or employment.  "Consumer credit report type information" means such things as net worth, credit worthiness, lifestyle information (piloting, skydiving, etc.) solvency, etc.  We also do not disclose to any unaffiliated third party a policy or account number for use in marketing.  We may share with our affiliated companies information that relates to our experience and transactions with the customer.

Policy for Personal Information Relating to Nonpublic Personal Health Information

We do not disclose nonpublic personal health information about a customer unless an authorization is obtained from the customer whose nonpublic personal information is sought to be disclosed.  However, an authorization shall not be prohibited, restricted or required for the disclosure of certain insurance functions, including, but not limited to, claims administration, claims adjustment and management, detection, investigation or reporting of actual or potential fraud, misrepresentation or criminal activity, underwriting, policy placement or issuance, loss control and/or auditing.

Access to Your Information

Our employees, employees of our affiliated companies, and third party service providers will have access to information we collect about you and your business as is necessary to effect transactions with you.  We may also disclose information about you to the following categories of person or entities:

- Your independent insurance agent or broker;

NOTICE TO POLICYHOLDERS

- An independent claim adjuster or investigator, or an attorney or expert involved in the claim;
- Persons or organizations that conduct scientific studies, including actuaries and accountants;
- An insurance support organization;
- Another insurer if to prevent fraud or to properly underwrite a risk;
- A state insurance department or other governmental agency, if required by federal, state or local laws; or
- Any persons entitled to receive information as ordered by a summons, court order, search warrant, or subpoena.

Violation of the Privacy Policy

Any person violating the Privacy Policy will be subject to discipline, up to and including termination.

For more information or to address questions regarding this privacy statement, please contact your broker.

NOTICE TO POLICYHOLDERS

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy.  You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Policyholder Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC and possibly the U.S. Department of State.  **Please read this Policyholder Notice carefully.**

OFAC administers and enforces sanctions policy based on Presidential declarations of "national emergency".  OFAC has identified and listed numerous

- Foreign agents
- Front organizations
- Terrorists
- Terrorist organizations
- Narcotics traffickers

as *Specially Designated Nationals and Blocked Persons*.  This list can be found on the U.S. Department of the Treasury's web site - http//www.treas.gov/ofac.

The Secretary of the Treasury also has identified a number of entities in the insurance, petroleum, and petrochemicals industries determined to be owned or controlled by the Iranian government. Business transactions with any of these entities are expressly prohibited.  These entities have been added to OFAC's list of *Financial Institutions Determined To Be Owned or Controlled by the Government of Iran.*  This list can be found on the U.S. Department of the Treasury's web site - http://www.treas.gov/offices/enforcement/lists/

In accordance with OFAC regulations, or any applicable regulation promulgated by the U.S. Department of State, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance will be immediately subject to OFAC.  When an insurance policy is considered to be such a blocked or frozen contract, neither payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

PN CW 05 1010

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
©2010 X.L. America, Inc.  All rights reserved.  May not be copied without permission.

**XL Group**
Insurance

**Regulatory Office**
Indian Harbor Insurance Company
505 Eagleview Blvd., Ste. 100
Dept: Regulatory
Exton, PA 19341-0636
(800) 688-1840

# Cap*Assure*
## POLICY DECLARATIONS

The insurer which has issued this insurance is not licensed by the Pennsylvania Insurance Department and is subject to limited regulation. This insurance is NOT covered by the Pennsylvania Property and Casualty Insurance Guaranty Association.

| | | |
|---|---|---|
| **Policy Number:** | CCR7420657 | |
| **Renewal of:** | New | |

**Item 1.**  **Insured:** L.F. Driscoll Company, LLC
**Address:** 9 Presidential Boulevard
Bala Cynwyd, PA 19004

**Producer Name:** Willis of Texas
**Address:** 15305 North Dallas Parkway, Suite 1100
Addison, TX 75001

**Item 2.**  **Loss Payee:** Liberty Property Limited Partnership (set forth in the Project Endorsement)
**Address:** Eight Penn Center
1628 John F. Kennedy Boulevard, Suite 1100
Philadelphia, PA 19103

**Item 3.**  **Policy Period:**

From: June 1, 2014     To: October 1, 2017

at 12:01 A.M. Standard Time at the **Insured's** address set forth in Item 1.

KAX 000 0412

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

**Item 4.**   **Limits of Insurance:**

    (a)   Part A – Contractor Default in the aggregate;

        <u>$15,000,000 limit  Months 1-12</u>

        <u>$25,000,000 limit Months 13-36</u>

        <u>$15,000,000 limit Months 37-40</u>   Project Limit of Insurance (set forth in the Project Endorsement)

    (b)   Part B – Subcontractor Default

| | | | |
|---|---|---|---|
| 1. | Variable Subcontractor Loss Limit | <u>Not Applicable</u> | % of Contract Amount |
| 2. | Each Subcontractor Loss Limit | $ <u>75,000,000</u> | |
| 3. | Aggregate Limit | $ <u>150,000,000</u> | |
| 4. | Indirect Costs Sublimit | $ <u>5,000,000</u> | per Subcontractor Loss |

**Item 5.**   **Self Insured Retention:**   $ <u>Not Applicable</u>   for the **Loss Payee** (if applicable)

**Item 6.**   **Deductible:**

    (a)   Part A – Contractor Default   $ <u>90% of applicable Limit shown under Item 4.(a)</u>   each and every General Construction Loss

    (b)   Part B – Subcontractor Default   $ <u>Not Applicable</u>   each and every **Subcontractor Loss**

**Item 7.**   **Co-Payment Deductible Amount:**

    (a)   Co-Payment Percentage   <u>Not Applicable</u>

    (b)   Co-Payment Layer Amount   $ <u>Not Applicable</u>

    (c)   Maximum Co-Payment Amount   $ <u>Not Applicable</u>

**Item 8.**   **Retention Aggregate:**   $ <u>Not Applicable</u>   Adjustable at a rate of $<u>N/A</u> / $1,000 of enrolled volume

**Item 9.**   **Deposit Premium:**

    (a)   Part A – Contractor Default   $ <u>Not Applicable</u>

    (b)   Part B – Subcontractor Default   $ <u>Not Applicable</u>

Deposit premiums are 100% minimum and earned and will be applied to initial enrollments until exhausted.

Premiums do not include taxes and surcharges.

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

**Item 10.**   **Premium Rates:**

    (a)   Part A – Contractor Default
          Per Project Endorsement #2

    (b)   Part B – Subcontractor Default
          All jobs    $_____    per $1,000 of Covered Subcontract(s) or **Purchase Order Agreement**

**Item 11.**   **Interim Percentage:**          95      %

**Item 12.**   **Covered Project:**    Comcast Innovation and Technology Center
                           1800 Arch Street
                           Philadelphia, PA 19103 (set forth in the Project Endorsement)

**Item 13.**   **Scheduled Projects:**   Refer to the monthly reports as specified in Definitions, Item s.

**Item 14.**   **Enrolled Subcontract Amount Maximum:**   $ 40,000,000

**Item 15.**   **Enrolled Subcontract Amount Minimum:**   $ Not Applicable

**Item 16.**   **Reporting Period:**   Installments

**Item 17.**   **ENDORSEMENTS ATTACHED AT POLICY ISSUANCE:**

| Endorsement Number | Endorsement Form Number | Endorsement Title |
|---|---|---|
|  | IL MP 9104 0314 IHIC | IN WITNESS |
|  | KAX 050 0412 | CAPASSURE POLICY FORM |
| 1 | XL – PASOP 1110 | SERVICE OF PROCESS |
| 2 | KAX 400 0412 | PROJECT ENDORSEMENT |
| 3 | MANUS LPT | NEW YORK - CHOICE OF LAW ENDORSEMENT |
| 4 | MANUS LPT | CLAIMS LIQUIDITY ENDORSEMENT |
| 5 | MANUS LPT | INDIRECT COSTS AGREED AMOUNT ENDORSEMENT |
| 6 | MANUS LPT | MINIMUM PREMIUM ENDORSEMENT |
| 7 | MANUS LPT | PROJECT ADDITION ENDORSEMENT |
| 8 | MANUS LPT | INCREASED INDIRECT COSTS SUBLIMIT ENDORSEMENT |

_____
Authorized Representative

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# IN WITNESS

## INDIAN HARBOR INSURANCE COMPANY

REGULATORY OFFICE
505 EAGLEVIEW BOULEVARD, SUITE 100
DEPARTMENT:  REGULATORY
EXTON, PA  19341-1120
PHONE:  800-688-1840

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

| | |
|---|---|
| Joseph Tocco | Toni Ann Perkins |
| President | Secretary |

IL MP 9104 0314 IHIC
©2014 X.L. America, Inc.  All rights reserved.  May not be copied without permission.

# Cap*Assure*
## GENERAL CONDITIONS

Words in bold have special meaning; refer to Part C - Definitions.

**1. COVERAGE TERRITORY**
This insurance only applies to claims made or brought in the United States (including its territories and possessions) and Canada.

**2. ARBITRATION**
Any dispute or other matter in question arising between the **Loss Payee** and the Company or the **Insured** and the Company arising under, out of, in connection with or in relation to this Policy shall be submitted to arbitration within thirty (30) days of a request by either party to the other for such arbitration. The parties hereby agree to pursue such arbitration though the American Arbitration Association (AAA) in accordance with its then existing Commercial Arbitration Rules.

The parties further agree that from the list of arbitrators provided by AAA a panel of three (3) neutral arbitrators shall be agreed upon. In the event of disagreement as to the panel or any member thereof, the selection of that arbitrator or those arbitrators shall rest with AAA. A decision in writing signed by a majority of the arbitrators, when served upon both parties, shall be binding upon both and judgment thereon may be entered in any court having jurisdiction thereof.

The arbitrators shall not be required or obliged to follow judicial formalities or the rules of evidence except to the extent required by governing law which is agreed between the parties to be the state law of the situs of the arbitration as herein agreed. Any decision of the arbitrator(s) shall be subject to the Limit of Insurance under this Policy. The parties shall submit their respective cases to the arbitrators within such period as may be mutually agreed between the parties or failing such agreement, within thirty (30) days of the appointment of the panel of arbitrators.

**3. ASSIGNMENT**
This Policy may not be assigned unless agreed to by the Company in writing, and via endorsement to this Policy.

**4. CANCELLATION**
(a) The Company is not permitted to cancel this Policy except for:
 (i) Nonpayment of premium;

 (ii) As provided in GENERAL CONDITIONS, Item 6. False or Fraudulent Statements, Reports or Claims Concealment;

 (iii) As provided in GENERAL CONDITIONS, Item 11. Change in Composition of the **Insured**; or

 (iv) Upon repeated violations in the application of the **Insured's Qualification Procedures**. In the event of repeated violations in the application of the **Qualification Procedures**, the Company will send the **Insured** a notification of the Company's intent to cancel this Policy by certified mail. This notification will delineate the violations of the **Qualification Procedures** for which the Company is cancelling the Policy, and will provide the **Insured** thirty (30) days to provide a cure. If the **Insured** has not provided a reasonably satisfactory cure during this period, the Policy will be cancelled thirty (30) days after the notification which initiated the cure period.

(b) In the event of such cancellation under Subparagraphs (i) through (iv.) above, the Company must deliver via certified mail to the Sole Agent (as defined in Item 10. below) a written notice stating that not less than ten (10) days after the date of the notice such cancellation shall be effective.

(c) If the Policy is canceled, there will be no return of Part A – Contractor Default premium set forth in Item 9(a) of the Declarations to the **Insured**.

(d) If the Policy is canceled, a return of Part B – Subcontractor Default premium set forth in Item 9(b). of the Declarations will be made to the **Insured**. The amount of return premium will be calculated as the Policy premium paid less the premium attributable to all **Covered Subcontracts** on **Scheduled Projects** subject to this Policy and executed during the **Policy Period** prior to the effective date of cancellation.

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

(e) The effective date of cancellation stated in the notice shall become the end of the **Policy Period**. The Company's cancellation of this Policy will not affect coverage under Part B – Subcontractor Default for **Subcontractor Loss** arising out of a **Default of Performance** under any **Covered Subcontract or Purchase Order Agreement** on a **Scheduled Project** executed during the **Policy Period** prior to the date of cancellation.

(f) The effective date of cancellation stated in the notice shall become the end of the **Policy Period**.

(g) If there has been no event of **General Contractor Insolvency** during the **Policy Period**, there will be no coverage under Part A – Contractor Default of this Policy.

5. **CHANGES**
Notice to any agent or by any other persons shall not affect a waiver or a change in any part of the Policy or stop the Company from asserting any right under the terms of this Policy; nor shall the terms of this Policy be waived or changed, except by endorsement issued to form a part of the Policy.

6. **FALSE OR FRAUDULENT STATEMENTS, REPORTS OR CLAIMS CONCEALMENT**
If the **Loss Payee** makes any statement, report, or claim known to be false or fraudulent, or if the **Loss Payee** or **Insured** knowingly conceals any material fact, the Company may, at the Company's option, void this Policy. All claim amounts paid shall be returned to the Company with interest by the **Loss Payee** or **Insured** upon demand. All premium paid by the **Loss Payee** or **Insured** hereunder shall be returned by the Company. The conditions contained in Item 6. represent the sole reasons by which the Company may void this Policy.

7. **INSPECTION AND AUDIT**
The Company is permitted, but not obligated, to inspect, sample and monitor the **Loss Payee's** or the **Insured's** property or operations, examine or require to be produced copies of any corporate records or books, internal documents and correspondence, letters or other documentation or records (including all electronic files, documents and records) in whatever form and wherever situated in the **Loss Payee's** or the **Insured's** possession or control relating to or connected with this Policy, a claim hereunder, a **General Contractor Loss** or **Subcontractor Loss** or any transaction between the **Loss Payee** or subcontractor **Loss Payee** a person, organization or entity completing a **General Construction Covered Contract** or **Covered Subcontract or Purchase Order Agreement**. At the Company's request, the **Loss Payee** or the **Insured** must take any and all

reasonable steps to obtain such information in the possession of others relating to or connected with this Policy or any **General Contractor Loss** or **Subcontractor Loss**. This section does not apply to information which the **Loss Payee** or subcontractor **Loss Payee** has been required by a court order or federal agency to provide restricted access.

The Company will treat the **Loss Payee's** and subcontractor **Loss Payee's** proprietary information as confidential.

8. **OTHER INSURANCE**
This insurance is excess only and non-contributing over any other valid and collectible insurance or performance bond available to the **Loss Payee** or the **Insured**, whether such other insurance is stated to be primary, pro-rata, contributory, excess, contingent, or otherwise.

9. **EXAMINATION UNDER OATH**
At the Company's request, the **Loss Payee** or the **Insured** shall permit the Company to question under oath the **Loss Payee** or the **Insured** and its agents, and to obtain verified answers under oath at such times as may be reasonably required, concerning any matter relating to this insurance or the **Loss Payee's** or **Insured's** claim, including, without limitation, the **Loss Payee's** or the **Insured's** books and records.

10. **SOLE AGENT**
The **Insured** named in Item 1. of the Declarations shall act on behalf of all **Insured(s)** for all purposes, including but not limited to the payment or return of premium, receipt, and acceptance of any endorsement issued to form a part of this Policy, complying with all applicable notice provisions, and giving and receiving notice of cancellation or non-renewal.

11. **CHANGE IN COMPOSITION OF THE INSURED**
The **Insured** must notify the Company within thirty (30) days in writing if, during the **Policy Period**, the **Insured** consolidate, merge with, or sell all or substantially all of the **Insured's** assets to any other person or entity, or if another person or entity should acquire beneficial ownership of shares having a majority of the ordinary voting power in the election of directors. Upon receipt of such notice, the Company may at the Company's option cancel this Policy effective thirty (30) days after the date of such change in the composition of the **Insured.**

KAX 050 0412

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

## 12. INSPECTION AND AUDIT

The Company is permitted, but not obligated, to inspect, sample and monitor the **Insured's** property or operations, examine or require to be produced copies of any corporate records or books, internal documents and correspondence, letters or other documentation or records (including all electronic files, documents and records) in whatever form and wherever situated in the **Insured's** possession or control relating to or connected with this Policy, a claim hereunder, a **General Contractor Loss** or **Subcontractor Loss** or any transaction between the **Insured** and a **Subcontractor/Supplier** or a person, organization or entity completing a **Covered Subcontract or Purchase Order Agreement**. At the Company's request, the **Insured** must take any and all reasonable steps to obtain such information in the possession of others relating to or connected with this Policy or any **Subcontractor Loss**. This section does not apply to information which the **Insured** has been required by a court order or federal agency to provide restricted access.

The Company will treat the **Insured's** proprietary information as confidential.

## 13. EXAMINATION UNDER OATH

At the Company's request, the **Insured** shall permit the Company to question under oath the **Insured** and its agents, and to obtain verified answers under oath at such times as may be reasonably required, concerning any matter relating to this insurance or the **Insured's** claim, including, without limitation, the **Insured's** books and records.

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# Cap*Assure*
## PART A
## CONTRACTOR DEFAULT

Words in bold have special meaning; refer to Part C - Definitions.

**1. INSURING AGREEMENT**

The Company will indemnify the **Loss Payee** for **General Contractor Loss,** but only to the extent of a **General Contractor Insolvency** of the **Insured** which results in a **Default and Termination of Performance.** The amount paid by the Company will be subject to the Limits of Insurance set forth in the Project Endorsement.

**2. LIMITS OF INSURANCE**

For this Part A, the Company will never pay more than the Limit of Insurance listed in Item 4(a). of the Declarations in the aggregate.  For this Part A, the Company will never pay more than the Project Limit of Insurance set forth in the Project Endorsement. This Limit of Insurance is the most the Company will pay in aggregate for the policy term.

**3. EXCLUSIONS**

This insurance does not apply to any **General Contractor Loss,** or portions thereof:

a. To the extent that the **General Contractor Loss** is caused by any dishonest or fraudulent act or omission, or any intentional misrepresentation committed by the **Loss Payee.**

b. Of any type, however caused, arising directly or indirectly, out of:

(1) war, including undeclared or civil war;

(2) warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) insurrection, rebellion, revolution, usurped power, or action taken by governmental authority.

c. Arising from nuclear reaction or nuclear radiation or radioactive contamination.

d. To the extent that the **General Contractor Loss** includes damages awarded by a court that are punitive or consequential in nature, such as:

(1) punitive or exemplary damages;

(2) double or triple damages (or any other multiple of actual damages); or

(3) consequential or incidental damages.

**4. CLAIMS**

a. The **Loss Payee** bears the burden of proving that it has complied with all terms and conditions of this Policy and that the **General Contractor Loss** is recoverable under this Policy.

b. Notice of **General Contractor Loss** must be submitted in writing to the Company within thirty (30) days from the time the **Loss Payee** sends written notice of **Default and Termination of Performance** by the **Insured** as a result of **General Contractor Insolvency.**

c. In the event of a **General Contractor Loss,** the **Loss Payee** must submit to the Company a satisfactory **General Construction Proof of Loss.** Submission of a **General Construction Proof of Loss** must be made within ninety (90) days after the final completion of the contract.

d. The Company will indemnify the **Loss Payee** within thirty (30) days of receipt of a satisfactory **General Construction Proof of Loss.** In the event the **Loss Payee** provides the Company with documentation that the **Loss Payee** presents as a **General Construction Proof of Loss** that the Company finds deficient, the Company will notify the **Loss Payee** of the deficiencies within thirty (30) days after the Company's receipt of such documentation. The Company will make payment for a **General Contractor Loss** within thirty (30) days of receipt of information necessary to cure such deficiencies. If the Company notifies the **Loss Payee** of a deficiency in a **General Construction Proof of Loss,** the Company will pay any covered amount, up to the Limit of Insurance, as to which the **General Construction Proof of Loss** is not deficient.

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

e. If the **Loss Payee** pays **General Contractor Loss(es)** over a period of time greater than thirty (30) days, the **Loss Payee** may submit interim proofs of **General Contractor Loss**. If an amount would constitute a **General Contractor Loss** except that the amount of the **General Contractor Loss** has not been finally determined, the Company will indemnify the **Loss Payee** for the Interim Percentage as stated in Item 11. of the Declarations, of the **General Contractor Loss** payment which would have been payable as calculated above, after the Company accepts a satisfactory **General Construction Proof of Loss**.

f. The **General Construction Proof of Loss** and any amounts claimed as covered **General Contractor Loss(es)** under this Policy are subject to audit by the Company in accordance with GENERAL CONDITIONS, Item 7, Inspection and Audit, of this Policy.

g. In the event that the **Loss Payee** and the Company cannot agree that a claim is a **General Contractor Loss**, or cannot agree on the amount of **General Contractor Loss** the **Loss Payee** has incurred or paid, either party may commence arbitration proceedings in accordance with GENERAL CONDITIONS, Item 2, Arbitration, of this Policy.

5. **CONDITIONS**
   a. **Conditions of Coverage**
      As a condition precedent of coverage provided under this Policy, the **Loss Payee** warrants and agrees to use all reasonable measures to prevent and to mitigate **General Contractor Loss** at all times.

   b. **Action Against the Company**
      No one may bring legal action against the Company under this Policy unless all terms of the Policy have been complied with and such action is commenced by the later of:

      (1) one (1) year following the date of substantial completion of the **General Construction Covered Contract;**

      (2) one (1) year after the Company's first disposition of a specific claim which is the basis for the action or proceeding.

6. **APPRAISAL**
   In case the **Loss Payee** and the Company fail to agree as to correct adjusted amount of any covered claim under this Policy then, on the written demand of either, the **Loss Payee** and the Company each shall select a competent and disinterested appraiser and notify the other of the person selected within thirty (30) days of such demand. The appraiser shall first select a competent and disinterested umpire, and failing for fifteen (15) days after consulting to agree upon such umpire, then, on request of the **Loss Payee** or the Company, such umpire shall be selected by a judge of a court of record in the state in which the insured property sustaining damage is located. If the location is outside the United States, the umpire shall be selected by a judge of a court of record in New York. The originally appointed appraisers shall then appraise the **General Contractor Loss**, stating separately the amount of actual cash value and all other amounts potentially due hereunder for each item of insured property; and, failing to agree, shall submit their differences, only, to the umpire. An award in writing, so itemized, of any two (2) appraisers when filed with the Company shall conclusively, without right of appeal, determine all amounts submitted to appraisal. Each appraiser shall be paid by the party selecting him and the expenses of appraisal and umpire shall be paid by the **Loss Payee** and the Company equally.

© 2012 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

# CapAssure
## PART B
## SUBCONTRACTOR DEFAULT

Words in bold have special meaning; refer to Part C - Definitions.

**1. INSURING AGREEMENT**

The Company will indemnify the **Insured** for **Subcontractor Loss** after application of the Deductible and Co-payment Deductible amounts as stated in Item 6(b). and Item 7. of the Declarations and subject to the Retention Aggregate stated in Item 8. of the Declarations, but only to the extent of a **Default of Performance** by the **Insured's Subcontractor/Supplier** as respects any **Covered Subcontract or Purchase Order Agreement.** The amount paid by the Company will be subject to the Limits of Insurance stated in Item 4(b)3. of the Declarations and will not be eroded by the Deductible and Co-payment Amounts stated in Item 6(b). and 7. of the Declarations page.

**2. LIMITS OF INSURANCE**

a. The Company will never pay more than the Aggregate Limit of Insurance listed in Item 4(b)3. of the Declarations. This Aggregate Limit of Insurance is the most the Company will pay regardless of the number of:

(1) **Insured(s)**;

(2) **Subcontractor(s)/Supplier(s)**;

(3) **Covered Subcontracts or Purchase Order Agreement(s)**;

(4) **Scheduled Project(s)**; or

(5) claims made or suits brought.

b. The Aggregate Limit of Insurance listed in Item 4(b)3. of the Declarations is the most the Company will pay for the sum of all **Subcontractor Loss(es)** in excess of the Deductible and Co-payment Deductible Amount from all **Defaults of Performance** as respects all **Covered Subcontracts or Purchase Order Agreements** executed during the **Policy Period**.

Once the Aggregate Limit of Insurance in any **Policy Period** is completely exhausted, the Company shall have no further obligation to indemnify the **Insured** for **Subcontractor Loss(es)**.

c. Subject to Item 2.b. above, the most the Company will pay for any one **Subcontractor Loss** will be the lesser of:

(1) the Variable Subcontractor Loss Limit Factor times the **Subcontract Amount**; or

(2) the Each Subcontractor Loss Limit of Insurance listed in Item 4(b)2. of the Declarations.

In the event the Variable Subcontractor Loss Limit Factor is listed as "Not Applicable" or "N/A", the most the Company will pay for any one **Subcontractor Loss** will be the Each Subcontractor Loss Limit of Insurance listed in Item 4(b)2. of the Declarations.

d. Subject to Item 2.c. above, the Company will not pay more than the Indirect Costs Sublimit of Insurance shown in Item 4(b)4. of the Declarations for all **Indirect Costs** from any one **Subcontractor Loss.** Any amounts that the Company pays to indemnify **Indirect Costs** under this Item 2.d. will erode the Each Subcontractor Loss Limit of Insurance applicable to the coverage provided for any one **Subcontractor Loss.**

**3. DEDUCTIBLE AND CO-PAYMENT DEDUCTIBLE AMOUNTS**

a. The Deductible, if any, listed in Item 6(b). of the Declarations is the amount of each **Subcontractor Loss** that is to be borne by the **Insured** with respect to each and every **Subcontractor Loss** to which this Policy applies.

b. The **Insured's** Co-payment Deductible Amount, if any, is listed in Item 7. of the Declarations and applies to each **Subcontractor Loss** after the application of the Deductible.

c. The **Insured's** total liability for all Deductible and Co-payment Deductible Amount for all **Subcontractor Losses** to which this insurance applies will not exceed the Policy Retention Aggregate listed in Item 8. of the Declarations.

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

d. The **Insured's** rights and duties in the event of a **Default of Performance** apply regardless of the application of the Deductible and Co-payment Deductible Amount.

e. If any payments are made by the Company under this Policy for any **Subcontractor Loss** covered by this Policy, the Deductible(s) shown in the Declarations apply regardless of whether any other policies issued by the Company or any other carrier also apply, and must be paid by the **Insured**.

## 4. EXCLUSIONS

This insurance does not apply to any **Subcontractor Loss**, or portions thereof:

a. Caused by any **Subcontractor/Supplier** who is in or to whom the **Insured** has issued a written notice of **Default of Performance**, and said default has not been cured as of the first day of the **Policy Period**.

However, if such **Default of Performance** was disclosed to the Company in advance of binding this Policy, the Company may, at the Company's sole discretion, agree to add coverage for any such **Subcontractor/Supplier** via endorsement to this Policy, in which case this exclusion will not apply for that **Subcontractor/Supplier**.

b. Arising from any **Covered Subcontract or Purchase Order Agreement** for which a payment and/or performance bond has been provided and the **Insured** is an obligee of such bond(s).

c. To the extent that the **Subcontractor Loss** is caused by any dishonest or fraudulent act or omission, or any intentional misrepresentation committed by the **Insured**.

d. Arising from any **Covered Subcontract or Purchase Order Agreement** that is purchased, assumed, or otherwise acquired by the **Insured** from any other person or entity, or sold or otherwise transferred or assigned by the **Insured** to any other person or entity unless specifically agreed to in writing by the Company.

e. Of any type, however caused, arising directly or indirectly, out of:

(1) war, including undeclared or civil war;

(2) warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government,

sovereign or other authority using military personnel or other agents; or

(3) insurrection, rebellion, revolution, usurped power, or action taken by governmental authority.

f. Arising from nuclear reaction or nuclear radiation or radioactive contamination.

g. Arising out of the failure of a **Subcontractor /Supplier** to render professional services, but only with respect to their providing engineering, architectural or surveying services in their capacity as an engineer, architect or surveyor.

Professional Services include:

(1) preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

(2) supervisory or inspection activities performed as part of any related architectural or engineering activities.

However, this exclusion does not apply to:

(1) normal supervisory duties of a general contractor or **Subcontractor/Supplier** on a construction project; or

(2) a **Default of Performance** by a **Subcontractor/Supplier** engaged by the **Insured** whose work is primarily construction, but who may also provide incidental professional services necessary for the completion of the construction services required by the contract.

h. Arising, either directly or indirectly, from **Bodily Injury**.

i. To the extent that the **Subcontractor Loss** includes damages awarded by a court that are punitive or consequential in nature, such as:

(1) punitive or exemplary damages;

(2) double or treble damages (or any other multiple of actual damages); or

(3) consequential or incidental damages.

However, consequential and incidental damages as used in this Policy do not include liquidated damages.

KAX 050 0412

© 2012 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

5. **CLAIMS**

a. The **Insured** bears the burden of proving that it has complied with all terms and conditions of this Policy and that the **Subcontractor Loss** is recoverable under this Policy.

b. Notice of **Subcontractor Loss** must be submitted in writing to the Company within thirty (30) days from the time the **Insured** becomes aware that a **Subcontractor /Supplier** is in **Default of Performance** or is insolvent.

c. In the event of a **Subcontractor Loss**, the **Insured** must submit to the Company a satisfactory **Proof of Subcontractor Loss**. Submission of a **Proof of Subcontractor Loss** must be made at the earlier of:

(1) ten (10) years after the substantial completion of the **Covered Subcontract or Purchase Order Agreement**;

(2) the expiration of any right to seek recovery under any **Covered Subcontract or Purchase Order Agreement** in connection with a **Default of Performance** covered by this Policy; or

(3) the expiration of any statute of limitation or statute of repose applicable to recovery against the **Covered Subcontract or Purchase Order Agreement** or to the **Subcontractor Loss**.

d. The Company's indemnification of the **Insured's Subcontractor Loss** will be calculated as follows, subject to the Limits of Insurance and the provisions of this Policy:

(1) calculate the amount of **Subcontractor Loss** and then subtract any **Indirect Costs** in excess of the **Indirect Costs** Sublimit on Item 4(b)4. of the Declarations page;

(2) subtract the Deductible from the amount determined in Item (1) above;

(3) take the lesser of the amount determined in Item (2) above or the Co-Payment Layer Amount as stated in Item 7(b). of the Declarations and multiply by the Co-Payment Percentage stated in Item 7(a). of the Declarations (if any);

(4) subtract the amount in Subparagraph 5.d.(3) above from the amount determined in Subparagraph 5.d.(2) above;

(5) take the amount determined in Item (4) above and apply the lesser of the following Limits:

(i) the Variable Subcontractor Loss Limit Factor times the Subcontract Amount; or
(ii) the Each Subcontractor Loss Limit of Insurance, as applicable.

In the event the Variable Subcontractor Loss Limit Factor, shown in Item 4(b)1. of the Declarations is listed as "Not Applicable" or "N/A", then the Each Subcontractor Loss Limit of Insurance will apply.

e. The Company will indemnify the **Insured** within thirty (30) days of receipt of a satisfactory **Proof of Subcontractor Loss**. In the event the **Insured** provides the Company with documentation presented as a **Proof of Subcontractor Loss** that the Company finds deficient, the Company will notify the **Insured** of the deficiencies within thirty (30) days after the Company's receipt of such documentation. The Company will make payment for a Subcontractor Loss within thirty (30) days of receipt of information necessary to cure such deficiencies. If the Company notifies the **Insured** of a deficiency in a **Proof of Subcontractor Loss**, the Company will pay any covered amount, up to the Each **Subcontractor Loss** Limit of Insurance as stated in Item 4.(b)2. of the Declarations, for which the **Proof of Subcontractor Loss** is not deficient.

f. If the **Insured** pays **Subcontractor Loss(es)** over a period of time greater than thirty (30) days, the **Insured** may submit interim **Proofs of Subcontractor Loss**. If an amount would constitute a **Subcontractor Loss** except that the amount of the **Subcontractor Loss** has not been finally determined, the Company will indemnify the **Insured** for the Interim Percentage as stated in Item 11. of the Declarations, of the **Subcontractor Loss** payment which would have been payable as calculated above, after the Company accepts a satisfactory **Proof of Subcontractor Loss**.

g. The **Insured** must immediately return any payments made by the Company upon a determination by a court, arbitrator, or other legally binding determination that the **Subcontractor Loss** does not arise out of a **Default of Performance**.

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

h.  The **Proof of Subcontractor Loss** and any amounts claimed as covered **Subcontractor Loss(es)** under this Policy are subject to audit by the Company in accordance with GENERAL CONDITIONS, Item 7, Inspection and Audit, of this Policy.

i.  In the event that the **Insured** and the Company cannot agree that a claim is a **Subcontractor Loss**, or cannot agree on the amount of **Subcontractor Loss** the **Insured** has incurred or paid, either party may commence arbitration proceedings in accordance with General CONDITIONS, Item 2., Arbitration, of this Policy.

## 6.  SUBROGATION AND RECOVERIES

a.  In the event of any payment by the Company under this Policy, the Company shall receive, to the extent of such payment, all of the **Insured's** rights of recovery and other remedies against all persons, entities or organizations with respect to such payment.

b.  Unless otherwise agreed to by the Company and the **Insured**, the Company shall, at the Company's option, pursue all recovery and subrogation actions for **Subcontractor Losses** paid.

c.  The **Insured** must take all reasonable steps to preserve the Company's rights of recovery against the persons, entities or organizations identified in Item 6.a. hereto, and the **Insured** shall do nothing to prejudice such rights.

d.  The **Insured** must cooperate with the Company in the investigation, settlement or defense of any claim or suit and assist the Company, upon reasonable request, in the enforcement of any right against the person, entity or organization which may be liable to the **Insured** because of **Subcontractor Loss** to which this insurance applies, including but not limited to, filing any claims and enforcing any liens or security interest against a **Subcontractor/Supplier** or its property.

e.  After payment of the **Subcontractor Loss**, any funds or salvage recovered will be paid to the Company and shared between the **Insured** and the Company in the following order:

   (1) the Company will be fully reimbursed for the Company's costs of recovery, including but not limited to, attorney fees, expert witness fees, arbitrator fees and court and arbitration costs and expenses;

   (2) next, if any funds remain, the Company will be fully reimbursed for the **Subcontractor Loss** amount the Company paid in excess of the sum of the Deductible and Co-Payment Deductible Amount as listed in Item 6(b). and Item 7. of the Declarations, respectively; and

   (3) next, if any funds remain and the **Insured** paid a Co-Payment Deductible Amount, then the **Insured** and the Company will share, based on the Co-Payment Deductible Amount listed in Item 7. of the Declarations, any remaining sums until the amount of the Company's payment of the **Subcontractor Loss** and the Company's cost of recovery have been fully reimbursed.

Sums remaining after all payments in Subparagraphs 6.e.(1) through 6.e.(3) hereto, if any, shall be retained solely by the **Insured**. The application of amounts recovered as described above applies regardless of any designation of amounts by the **Subcontractor/Supplier** or any other party.

## 7.  CONDITIONS

a.  **Conditions of Coverage**

As a condition precedent of coverage provided under this Policy, the **Insured** warrants and agrees:

   (1) to cease awarding contracts to any **Subcontractor/Supplier** that is in **Default of Performance** and for so long as the **Subcontractor/Supplier** is in **Default of Performance,** or until agreed to in writing by the Company;

   (2) upon becoming aware of the **Subcontractor Insolvency** or **Default of Performance** of any **Subcontractor/Supplier,** immediately take all reasonable and timely actions necessary to preserve any rights of recovery against such **Subcontractor/Supplier,** including but not limited to establishing the debt owed by the **Subcontractor/Supplier** to the **Insured** as a valid obligation of the **Covered Subcontract or Purchase Order Agreement** in accordance with any applicable statutes and procedures;

   (3) to use all reasonable measures to prevent and to mitigate **Subcontractor Loss** at all times; and

KAX 050 0412

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

(4) following the delivery of Notice of Subcontractor Loss to the Company, to execute, upon the Company's request, an assignment of all right, title, and interest arising under any **Covered Subcontract or Purchase Order Agreement**, including without limitation any legal or equitable claim or chose in action against any subcontractor/contractor to whom the **Insured** has issued a notice of **Default of Performance** and to cooperate, in accordance with the terms and conditions of this Policy, in the Company's prosecution of any legal actions the Company deems appropriate against such subcontractor.

b. **Action Against the Company**

No one may bring legal action against the Company under this Policy unless all terms of the Policy have been complied with and such action is commenced by the later of:

(1) seven (7) years following the date of termination of the **Covered Subcontract or Purchase Order Agreement** or the date of substantial completion of the **Covered**

**Subcontract or Purchase Order Agreement** entered into during the **Policy Period**; or

(2) one (1) year after the Company's first disposition of a specific claim which is the basis for the action or proceeding.

c. **Premium Audit**

The premium shown in Item 9(b). of the Declarations is a deposit premium only. At the close of each reporting period the Company will compute the total premium due and send notice to the Sole Agent. Premium amounts invoiced will be total premium due less the premium paid to date. The Company will additionally complete periodic audits of completed scheduled projects. At the completion of these audits total premium will again be calculated and invoices will be issued for any amounts over or under the total paid premium to date. A final premium audit will be completed once all scheduled projects have been completed.

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# Cap*Assure*
## PART C
## DEFINITIONS

**DEFINITIONS**

a. **Balance of the Contract** means the **General Construction Covered Contract,** less the amount paid to the **Insured.**

b. **Balance of the Subcontract or Purchase Order Agreement Price** means the **Subcontract Amount,** less the amount paid to the **Subcontractor /Supplier.**

c. **Bodily Injury** means any:

(1) bodily injury, sickness, disease; and/or

(2) pain, suffering, mental anguish, or emotional injury or distress of any kind sustained by any person, including death resulting from any of the foregoing at any time.

d. **Covered Project** means the construction project(s) shown on the Project Endorsement and which is the subject of the **General Construction Covered Contract.**

e. **Covered Subcontract or Purchase Order Agreement** means those written, binding agreements executed on a **Scheduled Project** by the **Insured** and the **Insured's Subcontractor/Supplier,** setting forth an agreed scope of work, schedule and price, as such may be amended from time to time or as otherwise defined by endorsement to this Policy. **Covered Subcontracts or Purchase Order Agreements** include written, binding purchase order agreements signed by the **Insured** and a vendor/supplier for the sale of materials or equipment to be incorporated into a **Scheduled Project.**

However, an agreement or other document that does not require as its primary purpose at least one of the following:

(1) the supply or the installation of any systems or equipment to be incorporated into a **Scheduled Project** or materials to be incorporated into a **Scheduled Project**; or

(2) the performance of other construction work on a **Scheduled Project**,

or is more than thirty-six (36) months in length

is not a **Covered Subcontract or Purchase Order Agreement**.

In addition, any agreement or other document whose **Subcontract Amount** exceeds the Enrolled **Subcontract Amount** Limitation set forth in Item 14. of the Declarations shall not be deemed a **Covered Subcontract or Purchase Order Agreement** unless specifically agreed to in writing in advance by the Company and endorsed to this Policy.

f. **Default and Termination of Performance** means failure of the **Insured** to fulfill the terms of the **General Construction Covered Contract** if, and only if, such failure results from the **General Contractor Insolvency** of the **Insured,** and the **Loss Payee** has terminated the **Insured's** right to proceed under the **General Construction Covered Contract.**

g. **Default of Performance** means failure of the **Subcontractor /Supplier** to fulfill the terms of the **Covered Subcontract or Purchase Order Agreement** as determined by the **Insured** or a legally binding authority. A determination by a legally binding authority shall supersede any previous determination.

h. **General Construction Contract Amount** means the total amount of the **General Construction Covered Contract,** plus any amounts to which the **Insured** is entitled, including but not limited to, any change orders, extra work, claims, or any adjustments in accordance with the **General Construction Covered Contract.**

i. **General Construction Covered Contract** means the written, binding agreement executed on the **Covered Project** by the **Loss Payee** and the **Insured,** setting forth an agreed scope of work, schedule and price, as such may be amended from time to time, including but not limited to all general conditions, supplemental general conditions, general requirements, addendum and alternates.

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

j. **General Contractor Insolvency/Insolvent** means any of the following steps, or equivalent steps, that have been taken by or against the **Insured** by or in a court having jurisdiction over the **Insured's** affairs or pursuant to a statute applicable to the **Insured** and its creditors:

    (1) bankruptcy or **General Contractor Insolvency** is adjudicated against the **Insured**;

    (2) voluntary or involuntary proceedings are initiated under Chapter 7 or Chapter 11 of the Federal Bankruptcy Code of the United States or any similar statute in another country; or

    (3) a court order is issued or the **Insured** accepts a voluntary resolution for the winding-up or liquidation of the **Insured's** affairs.

k. **General Contractor Loss** means the costs and expenses paid by the **Loss Payee** to the extent caused by a **Default and Termination of Performance** of the **Insured** under the terms of the **General Construction Covered Contract**, less the unpaid Balance of the General Construction Covered Contract, including any amounts retained or recovered by the **Loss Payee** with respect to the **General Construction Covered Contract.** Such costs and expenses are:

    (1) costs of completing **Insured's** obligations under the **General Construction Covered Contract,** including amounts the **Insured** is required to pay under the **General Construction Covered Contract** to third parties;

    (2) costs of correcting defective or nonconforming work or materials;

    (3) legal and other professional expenses paid by the **Loss Payee** and directly related to the **Insured's Default and Termination of Performance;** or

    (4) liquidated Damages which may be assessed under the terms and conditions of the **General Construction Covered Contract.**

l. **Loss Payee** means the entity set forth in the Project Endorsement.

m. **General Construction Proof of Loss** means a written description and any other supporting evidence, including the applicable **General Construction Covered Contract,** notice of **Default and Termination of Performance,** and any other documents which demonstrate the claim is a covered **General Contractor Loss** and quantify the amount of the **General Contractor Loss.**

n. **Indirect Costs** mean costs and expenses paid by the **Insured** to the extent caused by a **Default of Performance** of a **Subcontractor/Supplier** and that are not specifically included in Definition **v. Subcontractor Loss,** Items (1) through (4). **Indirect Costs** include, but are not limited to, those costs and expenses paid by the **Insured** for liquidated damages, job acceleration, and extended overhead.

o. **Insured** means the person(s) or entity(ies) listed in Item 1. of the Declarations or stated as an insured by endorsement to this Policy.

p. **Policy Period** means the period of time listed in Item 3. of the Declarations or any shorter period of time arising as a result of the cancellation of this Policy in accordance with GENERAL CONDITIONS, Item 4. Cancellation, of this Policy.

q. **Proof of Subcontractor Loss** means a written description and any other supporting evidence reasonably required by the Company, including the applicable **Covered Subcontract or Purchase Order Agreement,** notice of **Default of Performance,** and any other documents which demonstrate the claim is a covered **Subcontractor Loss** and quantify the amount of the **Subcontractor Loss.**

r. **Qualification Procedures** mean the criteria that the **Insured** has represented that the **Insured** will adhere to in order to assure that the **Subcontractor/Supplier** will be able to carry out the terms of the **Covered Subcontract or Purchase Order Agreement.**

s. **Scheduled Project** means the construction project(s) shown on reports provided to the Company monthly by the **Insured.**

t. **Subcontract Amount** means the total amount of the **Covered Subcontract or Purchase Order Agreement,** plus any amounts to which the **Subcontractor/Supplier** is entitled, including any adjustments in accordance with the **Covered Subcontract or Purchase Order Agreement.**

KAX 050 0412

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

u. **Subcontractor Insolvency/Insolvent** means any of the following steps, or equivalent steps, that have been taken by or against a **Subcontractor/Supplier** by or in a court having jurisdiction over the **Subcontractor/Supplier's** affairs or pursuant to a statute applicable to the **Subcontractor /Supplier** and its creditors:

    (1) bankruptcy or **Subcontractor Insolvency** is adjudicated against the **Subcontractor /Supplier**.

    (2) voluntary or involuntary proceedings are initiated under Chapter 7 or Chapter 11 of the Federal Bankruptcy Code of the United States or any similar statute in another country.

    (3) a court order is issued or the **Subcontractor /Supplier** accepts a voluntary resolution for the winding-up or liquidation of the **Subcontractor/Supplier's** affairs.

v. **Subcontractor Loss** means the costs and expenses paid by the **Insured** to the extent caused by a **Default of Performance** of a **Subcontractor/Supplier** under the terms of a **Covered Subcontract or Purchase Order Agreement,** less the unpaid **Balance of the Subcontract or Purchase Order Agreement Price,** including any amounts retained or recovered by the **Insured** with respect to the **Covered Subcontract or Purchase Order Agreement** of the defaulted **Subcontractor /Supplier.** Such costs and expenses are:

    (1) costs of completing **Subcontractor/ Supplier's** obligations under the **Covered Subcontract or Purchase Order Agreement,** including amounts the defaulted **Subcontractor/Supplier** is required to pay under the **Covered Subcontract or Purchase Order Agreement** to third parties.

    (2) costs of correcting defective or nonconforming work or materials.

    (3) legal and other professional expenses paid by the **Insured** and reasonably incurred in relation to the **Subcontractor/Supplier Default of Performance.**

    (4) costs, charges, and expenses paid by the **Insured** in the investigation, adjustment, and defense of disputes and directly related to a **Subcontractor/Supplier Default of Performance.**

    (5) **Indirect Costs.**

Multiple **Defaults of Performance** by the same **Subcontractor/Supplier** on one or more **Covered Subcontract or Purchase Order Agreements** executed during a **Policy Period** shall be considered to be a single **Subcontractor Loss.**

**Subcontractor Loss(es)** will be attributed to the **Policy Period** in which the **Scheduled Project** was executed, not the year(s) in which **Subcontractor Loss(es)** are actually paid by the **Insured.**

w. **Subcontractor/Supplier** means:

    (1) any legal entity which has entered into a **Covered Subcontract or Purchase Order Agreement** with the **Insured**. **Subcontractor /Supplier** shall not include any subsidiary of the **Insured** now existing or hereafter formed or acquired, whether partially or wholly owned or controlled, or any subsidiary of a subsidiary (whether direct or indirect), or partnership, joint venture or corporation of the **Insured.**

    (2) the receiver, trustee, liquidator, administrator, or similar representative of any **Subcontractor/Supplier** as described in Item w.(1) above, or its creditors, or the **Subcontractor/Supplier** as described in Item w.(1) above, as debtor in possession under Chapter 11 of the Federal Bankruptcy Code or any similar statute in another country.

    (3) any successor to such legally existing entity, corporation, proprietorship, receiver, trustee, liquidator, administrator, or similar representative referred to in Item w. (1) and (2) above.

    (4) any corporation and other entity controlling, controlled by, or under common control of such legally existing entity, corporation, proprietorship, receiver, trustee, liquidator, administrator, or similar representative referred to in Item w. (1), (2) and (3) above.

KAX 050 0412

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

**ENDORSEMENT #1**

This endorsement, effective 12:01 a.m., June 1, 2014 forms a part of Policy No. CCR7420657

issued to L.F. Driscoll Company, LLC

by Indian Harbor Insurance Company

**SERVICE OF PROCESS**

The Commissioner of Insurance of the State of Pennsylvania is hereby designated the true and lawful attorney of the Company upon whom may be served all lawful process in any action, suit or proceeding arising out of this policy.  The Company further designates:

> Sarah Mims
> Assistant Secretary
> 505 Eagleview Boulevard, Suite 100
> Exton, Pennsylvania 19341-0636

as its agent in Pennsylvania to whom such process shall be forwarded by the Commissioner of Insurance.

For Illinois exposures, the Insurer further designates the Director of the Illinois Division of Insurance and his successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the insured or any beneficiary hereunder arising out of an Illinois exposure and this contract of insurance.

All other terms and conditions of this policy remain unchanged.

---------------------------------------------
(Authorized Representative)

XL-PASOP 11 10

© 2010 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

**ENDORSEMENT #2**

This endorsement, effective 12:01 a.m., June 1, 2014 forms a part of Policy No. CCR7420657

issued to L.F. Driscoll Company, LLC

by Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**PROJECT ENDORSEMENT**

This endorsement modifies insurance provided under the following:

## Cap*Assure*

| | | |
|---|---|---|
| **Item 1.** | **Insured:** | L.F. Driscoll Company, LLC |
| | **Address:** | 9 Presidential Boulevard |
| | | Bala Cynwyd, PA 19004 |
| | **Producer Name:** | Willis of Texas |
| | **Address:** | 15305 North Dallas Parkway, Suite 1100 |
| | | Addison, TX 75001 |
| **Item 2.** | **Loss Payee:** | Liberty Property Limited Partnership |
| | **Address:** | Eight Penn Center, 1628 John F. Kennedy Boulevard, Suite 1100 |
| | | Philadelphia, PA 19103 |

**Item 3.** **Policy Period:**

From:   June 1, 2014                          To:   October 1, 2017

at 12:01 A.M. Standard Time at the **Insured's** address set forth in Item 1.

**Item 4.** **Limits of Insurance:**

Part A –Contractor Default
$15,000,000 limit  Months 1-12
$25,000,000 limit Months 13-36
$15,000,000 limit Months 37-40  Project Limit of Insurance (set forth in the endorsement)

**Item 5.** **Self Insured Retention:**   $  Not Applicable      for the **Loss Payee** (if applicable)

**Item 6.** **Premium:**

(a)   Part A – Contractor Default     $                        which is $ minimum and earned.
Premiums do not include taxes and surcharges

**Item 7.** **Covered Project:**

Comcast Innovation and Technology Center
1800 Arch Street
Philadelphia, PA 19103

All other terms and conditions of this Policy shall remain the same.

KAX 400 0412

Page 1 of 1

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

ENDORSEMENT #3

This endorsement, effective 12:01 a.m., June 1, 2014 forms a part of Policy No. CCR7420657

issued to L.F. Driscoll Company, LLC

by Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**NEW YORK - CHOICE OF LAW ENDORSEMENT**

This endorsement modifies insurance provided under the following:

# Cap*Assure KAX 050 0412*

Item 2. Arbitration is deleted in its entirety and replaced by the following:

**2.  Arbitration**

Any dispute or other matter in question arising between **Loss Payee** and the Company the **Insured** and the Company ("the parties") arising under, out of, in connection with or in relation to this Policy shall be submitted to mediation by a third party mediator acceptable to both the **Insured** and the Company. In the event that such mediation does not successfully resolve such dispute, the dispute will be submitted to arbitration within thirty (30) days of a request by either party to the other for such arbitration. The parties hereby agree to pursue such arbitration though the American Arbitration Association (AAA) in accordance with its then existing Commercial Arbitration Rules.

The parties further agree that from the list of arbitrators provided by the AAA, a panel of three (3) neutral arbitrators shall be agreed upon. In the event of disagreement as to the panel or any member thereof, the selection of that arbitrator or those arbitrators shall rest with the AAA. A decision in writing signed by a majority of the arbitrators, when served upon both parties, shall be binding upon both and judgment thereon may be entered in any court having jurisdiction thereof.

The arbitrators shall not be required or obliged to follow judicial formalities or the rules of evidence except to the extent required by governing law which is agreed between the parties to be the state law of New York as herein agreed. Any decision of the arbitrator(s) shall be subject to the Aggregate Limit of Insurance and the Each Subcontractor Loss Limit of Insurance as stated in Item 4. of the Declarations. The parties shall submit their respective cases to the arbitrators within such period as may be mutually agreed between the parties or failing such agreement, within thirty (30) days of the appointment of the panel of arbitrators.

The arbitrators shall make an award in writing within forty-five (45) days of the date on which the respective cases should have been submitted. The parties shall share equally in the payment of the fees of the arbitrators and the remaining costs of the arbitration shall be paid, as the award shall direct. Any arbitration shall take place in New York unless otherwise agreed. Failure by the party receiving the request for arbitration to agree to such arbitration or state their reasons for not being prepared to submit to such process within the thirty (30) days following the receipt of the request for arbitration, shall be adjudged an acceptance of the other party's position and the terms associated therewith and an agreement to take such action as would be consistent with such acceptance.

© 2014 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

The parties hereto agree that they have entered into this agreement by virtue of this clause to provide for a means of quickly settling disputes without resorting to litigation, but this agreement in no way infringes on any rights to take such legal action accorded in the Service of Process Endorsement of this Policy, the sole effect and intent of which is to provide, without waiver of any defense, an ultimate assurance of the amenability of the Company to due process in certain courts with respect to a claim hereunder following an arbitration decision determining that such amount is due. The parties agree however, that unless and until an award has been rendered by such panel of arbitrators, no other action or legal proceeding shall be commenced in respect of any claim hereunder except with regard to resort to judicial intervention to enforce the terms of this Dispute Resolution clause.

Nothing contained herein shall be construed to allow the arbitrators or any court or any other forum to award punitive, exemplary or any similar damages. By entering into this agreement to arbitrate, the parties expressly waive any claim for punitive, exemplary or similar damages. The only damages recoverable under this agreement are compensatory damages.

The award rendered by the arbitrator(s) shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.


Date Endorsement Issued:    June 16, 2015


All other terms and conditions of this Policy shall remain the same.

© 2014 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

## ENDORSEMENT #4

This endorsement, effective 12:01 a.m., June 1, 2014 forms a part of Policy No. CCR7420657

issued to L.F. Driscoll Company, LLC

by Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### CLAIMS LIQUIDITY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**Cap*Assure* KAX 050 0412**

It is hereby understood and agreed that in the event of a **Subcontractor Loss** under **Part B Subcontractor Default** of this Policy, for which the **Insured** has provided an Incomplete or Complete **Proof of Subcontractor Loss** and immediately provided the Company with all proceeds claimed or collected from any applicable Letter of Credit (LOC) which the **Insured** secured with the defaulted **Subcontractor/Supplier** prior to the **Default of Performance,** the Company shall disburse fifty percent (50%) of said funds directly back to the **Insured** within three (3) business days as a liquidity payment.  If the **Insured** does not provide the Company with all proceeds claimed or collected from said LOC, the **Insured** is not eligible for this liquidity payment.

The Company will not offset this liquidity payment against amounts paid for any loss for which the Company has made a liquidity payment until at least fifty percent (50%) of the total expected amount of **such Subcontractor Loss** has been paid by the Company to the **Insured**.  The Company will then offset any liquidity payments made against the total estimated value of the claim at that point.  In the event that the liquidity payment is greater than fifty percent (50%) of the expected total amount of the claim, the Company shall make no further payments on the claim until the total amount the Company has paid exceeds the amount paid as a liquidity payment.  In the event that the actual final amount of the claim is less than the liquidity payment paid by the Company to the **Insured,** the **Insured** will return to the Company the difference between the liquidity payment and the actual **Subcontractor Loss** amount.

The **Insured** then shall be responsible to provide a full and complete **Proof of Subcontractor Loss** within sixty (60) days of the Company making payment for all amounts paid under this endorsement.  Failure to provide a full and complete **Proof of Subcontractor Loss** within sixty (60) days will be considered a withdrawal of the claim and all amounts paid under this endorsement for such a claim shall be returned to the Company or offset by other balances where applicable at the Company's sole discretion.

Date Endorsement Issued:    June 16, 2015

All other terms and conditions of this Policy shall remain the same.

© 2014 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.

### ENDORSEMENT #5

This endorsement, effective 12:01 a.m., June 1, 2014 forms a part of Policy No. CCR7420657

issued to L.F. Driscoll Company, LLC

by Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### INDIRECT COSTS AGREED AMOUNT ENDORSEMENT

This endorsement modifies insurance provided under the following:

## Cap*Assure KAX 050 0412*

In consideration of additional premium of $Included, it is hereby understood and agreed that in the event of a covered **Subcontractor Loss** under **Part B Subcontractor Default**, for which the **Insured** has provided adequate **Proof of Subcontract Loss** for **Subcontractor Loss** as defined in **Part C Definitions**, Item v.(1)-(5), the **Insured** shall be entitled to an additional amount of recovery equal to ten percent (10%) of the **Subcontractor Loss,** as defined in **Part C Definitions**, Item v. (1)-(5) of the Policy, but not more than $500,000.  This shall be deemed to compensate the **Insured** for **Indirect Costs** for which no **Proof of Subcontractor Loss** shall be required.

If the **Insured** is claiming **Indirect Costs** that are more than the above amount, the **Insured** shall be required to document all **Indirect Costs,** and will be compensated for those that are in excess of the above amount in accordance with **Part B Subcontractor Default**, Section 5. **CLAIMS** of this Policy.

Date Endorsement Issued:   June 16, 2015 _____

All other terms and conditions of this Policy shall remain the same.

© 2014 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**ENDORSEMENT #6**

This endorsement, effective 12:01 a.m., June 1, 2014 forms a part of Policy No. CCR7420657

issued to L.F. Driscoll Company, LLC

by Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**MINIMUM PREMIUM ENDORSEMENT**

This endorsement modifies insurance provided under the following:

## Cap*Assure KAX 050 0412*

Coverage Part B of this Policy, Subcontractor Default, is subject to a minimum and earned premium amount of

Premiums do not include taxes and surcharges.


Date Endorsement Issued:     June 16, 2015


All other terms and conditions of this Policy shall remain the same.

© 2014 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**ENDORSEMENT #7**

This endorsement, effective 12:01 a.m., June 1, 2014 forms a part of Policy No. CCR7420657

issued to L.F. Driscoll Company, LLC

by Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**PROJECT ADDITION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

## Cap*Assure KAX 050 0412*

In consideration of the premium charged, it is agreed that the following project is added to the above policy as a **Scheduled Project** under Part B, Subcontractor Default:

| | |
|---|---|
| **Project Name:** | Comcast Innovation and Technology Center |
| **Project Owner:** | Liberty Property Limited Partnership |
| **Project Address:** | 1800 Arch Street, Philadelphia, PA 19103 |
| **Project Start Date or Project Notice to Proceed Date:** | June 1, 2014 |
| **Project Duration:** | 39 months |
| **Project Description:** | New Comcast tower in Philadelphia. The top section of the tower will be hotel, with the lower floors serving as Comcast offices for their various corporate holdings, and possibly rented tenant space. The project will have significant structural steel and a glass curtain wall exterior. |
| **Estimated Covered Subcontract or Purchase Order Values:** | $782,000,000 |
| **Contract Amount Minimum with respect to this Scheduled Project only:** | Not Applicable |
| **Estimated Premium:** | $ |

Additionally, the following entity is added to this Policy as an **Insured**, with respect to this project only:

Not Applicable

Date Endorsement Issued:   June 16, 2015

All other terms and conditions of this Policy shall remain the same.

MANUS LPT

© 2014 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

## ENDORSEMENT #8

This endorsement, effective 12:01 a.m., June 1, 2014 forms a part of Policy No. CCR7420657

issued to L.F. Driscoll Company, LLC

by Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### INDIRECT COSTS SUBLIMIT ENDORSEMENT

This endorsement modifies insurance provided under the following:

**Cap*Assure KAX 050 0412***

In consideration of premium paid, the Indirect Costs Sublimit shown in **Item 4.** (b) 4. of the Declarations Page is amended to show $10,000,000 for any **Subcontractor Loss** caused by a **Default in Performance** under the terms of a **Covered Subcontract or Purchase Order Agreement** that was approved by the Company and endorsed for coverage with endorsed values in excess of $40,000,000.

Date Endorsement Issued:      June 16, 2015

All other terms and conditions of this Policy shall remain the same.

© 2014 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

### ENDORSEMENT #9

This endorsement, effective 12:01 a.m., June 1, 2014 forms a part of Policy No. CCR7420657

issued to L.F. Driscoll Company, LLC

by Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### EARLY REPORTING ENDORSEMENT

This endorsement modifies insurance provided under the following:

**Cap*Assure* KAX 050 0412**

If the **Insured** gives the Company written notice within five (5) business days from the time:

1.     they send written notification to a **Subcontractor/Supplier** that it is in **Default of Performance** under the **Covered Subcontract or Purchase Order Agreement**; or

2.     they become aware that the **Subcontractor/Supplier** is **Insolvent**;

The Company will waive the Co-payment Deductible Amount as listed in Item 6. of the Declarations.

In order for such waiver to apply, the insured must:

1.     Provide XL risk engineering and claims staff reasonable and timely access to the project site, project management staff, and all documents and records associated therewith.

2.     Provide notice to XL in advance of any and all actions they take in conjunction with curing the default.

Date Endorsement Issued:    July 2, 2015

All other terms and conditions of this Policy shall remain the same.

MANUS LPT

Page 1 of 1

© 2014 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.

**ENDORSEMENT #10**

This endorsement, effective 12:01 a.m., July 21, 2014 forms a part of Policy No. CCR7420657

issued to L.F. Driscoll Company, LLC

by Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**MAILING ADDRESS CHANGE**

This endorsement modifies insurance provided under the following:

**Cap*Assure KAX 050 0412***

In consideration of no change in premium, Item 1, Address of the Policy Declarations page is amended to read as follows:

| Item 1. | Insured: | L.F. Driscoll Company, LLC |
| | Address: | 401 East City Avenue, Suite 500 |
| | | Bala Cynwyd, PA 19004 |

Date Endorsement Issued:    July 2, 2015

All other terms and conditions of this Policy shall remain the same.

© 2014 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.

ENDORSEMENT #11

This endorsement, effective 12:01 a.m., June 1, 2014 forms a part of Policy No. CCR7420657

issued to L.F. Driscoll Company, LLC

by Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

LARGE/LONG SUBCONTRACTOR ENDORSEMENT

This endorsement modifies insurance provided under the following:

**Cap*Assure KAX 050 0412***

In consideration of the premium charged, the following will be **Covered Subcontracts or Purchase Order Agreements**, up to one hundred ten percent (110%) of the estimated amounts listed below.

*Project #52-487, 1800 Arch Street-Base Building C&S and Hotel:*
AT Chadwick Company, Inc. - Subcontract# 040 - $$40,704,275
B. Pietrini & Sons- Subcontract #017- $64,798,882
Enclos Corp. - Subcontract #014- $500,000
Enclos Corp. - Subcontract #028- $101,290,280
Enclos Corp. - Subcontract #022 - $350,000
Schindler Elevator Corp. - Subcontract #021 - $36,415,458
Steelfab, Inc. – Subcontract #019 - $76,390,878

*Project #52-488, 1800 Arch Street-Public Areas Construction:*
AT Chadwick Company, Inc. – Subcontract #012 – $75,000.00
B. Pietrini & Sons- Subcontract #002- $437,718
Enclos Corp. - Subcontract #004 - $6,938,955
Steelfab, Inc. – Subcontract #003 - $6,742,150

Date Endorsement Issued:    August 6, 2015

All other terms and conditions of this Policy shall remain the same.

© 2014 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

ENDORSEMENT #11

This endorsement, effective 12:01 a.m., June 1, 2014 forms a part of Policy No. CCR7420657

issued to L.F. Driscoll Company, LLC

by Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

LARGE/LONG SUBCONTRACTOR ENDORSEMENT

This endorsement modifies insurance provided under the following:

**Cap*Assure* KAX 050 0412**

In consideration of the premium charged, the following will be **Covered Subcontracts or Purchase Order Agreements**, up to one hundred ten percent (110%) of the estimated amounts listed below.

*Project #52-487, 1800 Arch Street-Base Building C&S and Hotel*:
AT Chadwick Company, Inc. - Subcontract# 040 - $45,454,358
B. Pietrini & Sons- Subcontract #017- $64,798,882
Enclos Corp. - Subcontract #014- $500,000
Enclos Corp. - Subcontract #028- $101,290,280
Enclos Corp. - Subcontract #022 - $350,000
Schindler Elevator Corp. - Subcontract #021 – $36,415,458
Steelfab, Inc. – Subcontract #019 - $104,233,549

*Project #52-488, 1800 Arch Street-Public Areas Construction:*
AT Chadwick Company, Inc. – Subcontract #012 - $75,000.00
B. Pietrini & Sons- Subcontract #002- $437,718
Enclos Corp. - Subcontract #004 - $6,938,955
Steelfab, Inc. – Subcontract #003 - $6,742,150

Date Endorsement Issued:   <u>July 27, 2016</u>

All other terms and conditions of this Policy shall remain the same.

MANUS LPT

Page 1 of 1

© 2014 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

ENDORSEMENT #12

This endorsement, effective 12:01 a.m., October 1, 2016, forms a part of

Policy No. CCR7420657 issued to L.F. Driscoll Company, LLC

by Indian Harbor Insurance Company.


THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## PREMIUM REPORTING ENDORSEMENT

This endorsement modifies insurance provided under the following:

**PROJECT ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**
**SUBCONTRACTOR ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

For the period ending <u>December 31, 2016</u> the enrolled subcontractor volume of $<u>36,123,732</u> resulted in AP of


All other terms and conditions of this Policy shall remain the same.


Date Endorsement Issued:      <u>January 31, 2017</u>

© 2015 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

ENDORSEMENT #13

This endorsement, effective 12:01 a.m., January 1, 2017, forms a part of

Policy No. CCR7420657 issued to L.F. Driscoll Company, LLC

by Indian Harbor Insurance Company.


THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

PREMIUM REPORTING ENDORSEMENT

This endorsement modifies insurance provided under the following:

**PROJECT ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**
**SUBCONTRACTOR ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

For the period ending <u>March 31, 2017</u> the enrolled subcontractor volume of $<u>43,936,049</u> resulted in AP of


All other terms and conditions of this Policy shall remain the same.


Date Endorsement Issued:     <u>April 26, 2017</u>

KSX 410 0515

© 2015 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

ENDORSEMENT #14

This endorsement, effective 12:01 a.m., April 1, 2017, forms a part of

Policy No. CCR7420657 issued to L.F. Driscoll Company, LLC

by Indian Harbor Insurance Company.


THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### PREMIUM REPORTING ENDORSEMENT

This endorsement modifies insurance provided under the following:

**PROJECT ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**
**SUBCONTRACTOR ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

For the period ending June 30, 2017 the enrolled subcontractor volume of $28,277,755 resulted in AP of


All other terms and conditions of this Policy shall remain the same.


Date Endorsement Issued:     July 24, 2017

© 2015 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**ENDORSEMENT #15**

This endorsement, effective 12:01 a.m., June 1, 2014, forms a part of

Policy No. CCR7420657 issued to L.F. Driscoll Company, LLC

by Indian Harbor Insurance Company.


THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**POLICY EXTENSION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**PROJECT ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**
**SUBCONTRACTOR ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

In consideration of the premium charged, it is agreed that the expiration date of Policy CCR7420657 has been extended to April 1, 2018.


Date Endorsement Issued:      October 11, 2017


All other terms and conditions of this Policy shall remain the same.

© 2015 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.

ENDORSEMENT #16

This endorsement, effective 12:01 a.m., June 1, 2014, forms a part of

Policy No. CCR7420657 issued to L.F. Driscoll Company, LLC

by Indian Harbor Insurance Company.


THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

INTERIM RETROSPECTIVE PREMIUM ENDORSEMENT

This endorsement modifies insurance provided under the following:

**PROJECT ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

Pursuant to the terms and conditions of the signed Retrospective Premium Agreement between Indian Harbor Insurance Company and L.F.Drisoll Company, LLC., effective June 1, 2014 an Interim Retrospective Premium adjustment will be made in consideration of the Returned Premium of

Date Endorsement Issued:     September 26, 2017


All other terms and conditions of this Policy shall remain the same.

© 2015 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.

ENDORSEMENT #17

This endorsement, effective 12:01 a.m., July 1, 2017, forms a part of

Policy No. CCR7420657 issued to L.F. Driscoll Company, LLC

by Indian Harbor Insurance Company.


THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**PREMIUM REPORTING ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**PROJECT ATTACHING SUBCONTRACTOR DEFAULT INSURANCE
SUBCONTRACTOR ATTACHING SUBCONTRACTOR DEFAULT INSURANCE**

For the period ending <u>September 30, 2017</u> the enrolled subcontractor volume of $<u>30,882,261</u> resulted in AP of



All other terms and conditions of this Policy shall remain the same.



Date Endorsement Issued:    <u>October 16 2017</u>

© 2015 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

## ENDORSEMENT #18

This endorsement, effective 12:01 a.m., October 1, 2017 forms a part of Policy No. CCR7420657

issued to L.F. Driscoll Company, LLC

by Indian Harbor Insurance Company

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### MANUSCRIPT- CAPASSURE AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under this policy, Cap*Assure KAX 050 0412*:

In consideration of additional premium of          the following amendments are made to this Policy:

On the Policy Declarations, **Item 4. Limits of Insurance (a)** is amended to read:

| | |
|---|---|
| **Item 4.** | **Limits of Insurance:** |
| | (a)   Part A –Contractor Default - Project Limit of Insurance |

$15,000,000 per occurrence and in aggregate  for **General Contractor Loss** occurring in Months 1-12, June 1, 2014 to June 1, 2015, of this policy.
$25,000,000 per occurrence and in aggregate  for **General Contractor Loss** occurring in Months 13-36, June 1, 2015 12:02 AM to June 1, 2017 12:01 AM
$15,000,000 per occurrence and in aggregate  for **General Contractor Loss** occurring in Months 37-40, June 1, 2017 12:02 AM to October 1, 2017 12:01 AM
$10,000,000 per occurrence and in aggregate  for **General Contractor Loss** occurring in Months 41-46, October 1, 2017 12:02 AM to April 1, 2018 12:01 AM

Additionally, the following changes are made to **Endorsement #2** to this Policy, **Project Endorsement**:

**Item 3. Policy Period** is amended to read:

From:   June 1, 2014 _____   To:   April 1, 2018 _____
at 12:01 A.M. Standard Time at the **Insured's** address set forth in Item 1.

| | |
|---|---|
| **Item 4.** | **Limits of Insurance is amended to read:** |
| | (b)   Part A –Contractor Default - Project Limit of Insurance |

$15,000,000 per occurrence and in aggregate  for **General Contractor Loss** occurring in Months 1-12, June 1, 2015, of this policy.
$25,000,000 per occurrence and in aggregate  for **General Contractor Loss** occurring in Months 13-36, June 1, 2015 12:02 AM to June 1, 2017 12:01 AM
$15,000,000 per occurrence and in aggregate  for **General Contractor Loss** occurring in Months 37-40, June 1, 2017 12:02 AM to October 1, 2017 12:01 AM
$10,000,000 per occurrence and in aggregate  for **General Contractor Loss** occurring in Months 41-46, October 1, 2017 12:02 AM to April 1, 2018 12:01 AM

| | |
|---|---|
| **Item 6.** | **Premium is amended to read:** |
| | (a)   Part A – Contractor Default            which is       minimum and earned. |
| | Premiums do not include taxes and surcharges |

Date Endorsement Issued:    October 17, 2017 _____

All other terms and conditions of this Policy shall remain the same.

MANUS LPT

Page 1 of 1

© 2014 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.